**Barry Lee FAIRCHILD, Petitioner,**

v.

**A.L. LOCKHART, Director, Arkansas Department of Correction, Respondent.**

**No. PB–C–85–282.**

United States District Court, E.D. Arkansas, Pine Bluff Division.

April 4, 1989.

John Wesley Hall, Jr., Little Rock, Ark., Richard H. Burr, New York City, for petitioner.

Jack Gillean, Office of the Atty. Gen., Little Rock, Ark., for respondent.

## MEMORANDUM OPINION

## FINDINGS OF FACT

## CONCLUSIONS OF LAW

EISELE, Chief Judge.

### PRIOR PROCEEDINGS AND SUCCESSOR PETITION.

Petitioner Barry Lee Fairchild was convicted of capital murder and sentenced to death. The Arkansas Supreme Court affirmed the conviction and sentence on direct appeal, *Fairchild v. State*, 284 Ark. 289, 681 S.W.2d 380 (1984) *cert. denied*, 471 U.S. 1111, 105 S.Ct. 2346, 85 L.Ed.2d 862

(1985), and denied Mr. Fairchild substantive relief on his petition for post-conviction relief. *Fairchild v. State*, 286 Ark. 191, 690 S.W.2d 355 (1985). Petitioner then sought relief via petition for habeas corpus in this Court, electing to pursue only grounds which could potentially secure him a new trial, as opposed to those which might result in a different sentence. This Court rejected the two claims advanced in petitioner's original petition, *Fairchild v. Lockhart*, 675 F.Supp. 469 (E.D.Ark.1987), aff'd 857 F.2d 1204 (8th Cir.1988), *cert. denied*, 488 U.S. 1051, 109 S.Ct. 884, 102 L.Ed.2d 1007 (1989).

Petitioner has now filed what he denominates a Successor Petition for Writ of Habeas Corpus, seeking to raise two new grounds for reversal of his conviction. The factual basis for both of these new grounds is an IQ test recently administered to petitioner, on which petitioner registered a Full Scale IQ of 63, a Verbal IQ of 69, and a Performance IQ of 61. The petition alleges that those scores are consistent with a finding that petitioner is "mentally retarded." Appended to the successor petition as supporting material are copies of the petitioner's medical records from his evaluations by both the Arkansas State Hospital and the Medical Center for Federal Prisoners, affidavits from some of petitioner's family and friends, petitioner's school records, the state court order for psychiatric evaluation, the report concerning the latest testing of petitioner's intelligence, and affidavits of his trial and habeas attorneys.

For his first ground for habeas corpus relief, petitioner alleges that he did not intelligently and knowingly waive his *Miranda* rights before making the two confessions which were key evidence at his trial. Essentially, petitioner claims that he did not knowingly and intelligently waive his rights because he did not understand those rights or the consequences of his waiver thereof immediately before he made those confessions. Petitioner further claims that his inability to understand the rights as read and explained to him was compounded by the stressful situation in which he found himself at the time he was interrogated, stress to which he was especially susceptible because of his retardation. The claim as pled is not that petitioner was incapable of understanding his rights under any circumstances, but rather that he did not understand them under the circumstances obtaining at the time of his confessions. *See* Successor Petition for Writ of Habeas Corpus, at 13–19.

As a second ground for granting the writ, petitioner alleges that the state's failure to provide a professionally adequate evaluation of petitioner's mental condition denied him due process of law. Petitioner asserts that the state failed to perform an adequate review of his mental condition, and that it also denied him the means of obtaining an adequate independent evaluation. The result of these failures, according to petitioner, is that neither he, his counsel, nor the jury was advised of petitioner's retardation. Petitioner further argues that, as a mentally retarded person, he was especially susceptible to being led to agree with statements and suggestions of the interrogating police officers. Also, it is contended that his statements are inherently more unreliable because his experiences and memory are "filtered" through his retardation. In other words, petitioner suggests that his retardation creates grounds for doubting the reliability of his confession, grounds which the jury was not allowed to consider because the state's acts and omissions prevented petitioner from developing the relevant evidence.

The respondent has moved to dismiss the successor petition on procedural grounds. Respondent asserts that this second petition constitutes abuse of the writ under Rule 9(b) of the Rules Governing Section 2254 Cases and 28 U.S.C. § 2244(b). Respondent also asserts that petitioner has procedurally defaulted under the rule of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

THE STATE'S MOTION TO DISMISS.

As stated above, the State raises two procedural grounds for dismissal.

A. Abuse of the Writ

The State's first contention is that Mr. Fairchild's Successor Petition for Habeas

Corpus Relief constitutes an abuse of the writ. In essence, the State argues that the latest claims brought by petitioner's counsel could have been asserted in the earlier petition—and that failure to do so then should preclude review of those claims now. The Court disagrees.

First, it is important to recall the words of the United States Supreme Court in *Sanders v. United States*, 373 U.S. 1, 8, 83 S.Ct. 1068, 1073, 10 L.Ed.2d 148 (1963):

> Conventional notions of finality of litigation have no place where life or liberty is at stake and infringement of constitutional rights is alleged.

Rule 9(b) of the Rules Governing Section 2254 Cases in the United States District Courts requires that a successive petition be dismissed if "it fails to allege new or different grounds for relief and a prior determination was made on the merits...." If new and different grounds are alleged, the petition nonetheless may be dismissed "if the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ."

The Rule is essentially a codification of the principles articulated in *Sanders* regarding denial of successive petitions. In trying to gives examples of what it thought constituted an abuse, the Court in that case said:

> [I]f a prisoner deliberately withholds one of two grounds for federal collateral relief at the time of filing his first application, in the hope of being granted two hearings rather than one ..., he may be deemed to have waived his right to a hearing on a second application.... The same may be true if ... the prisoner deliberately abandons one of his grounds at the first hearing.

*Sanders* at 18, 83 S.Ct. at 1078.

There has been no showing by the State that Mr. Fairchild has deliberately withheld the current claims raised in the successor petition, or that he deliberately abandoned these claims in the earlier hearing before this court.

*Sanders* relied on *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), where the Court laid out the limits of the writ abuse doctrine. In that case the Court held that because habeas corpus is governed by equitable principles, "a suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks." *Id.* at 438, 83 S.Ct. at 848. Thus, according to *Fay*, a petitioner loses his right to have a new claim considered in a successor petition only if he "understandingly and knowingly" waived the privilege of seeking to vindicate his claims in the earlier proceeding for "strategic, [or] tactical" reasons. *Id.* Again, this is not the situation here.

■ The burden is on the government to allege with particularity and clarity the abuse of the writ. *Sanders*, 373 U.S. at 17, 83 S.Ct. at 1078. Once the State has met this burden, the petitioner has the burden of answering the allegation and of proving by a preponderance of the evidence that he has not abused the writ. *Price v. Johnston*, 334 U.S. 266, 292, 68 S.Ct. 1049, 1063, 92 L.Ed. 1356 (1948). The petitioner may meet this burden by showing that the claim asserted for the first time in a successive petition is based on facts or legal theories of which the petitioner had no legal knowledge when making his first habeas petition. *Williams v. Lockhart*, 862 F.2d 155, 159 (8th Cir.1988).

■ The State rests heavily upon the *Williams* case, in which the Eighth Circuit adopted a rule first articulated by the Fifth Circuit Court of Appeals in *Jones v. Estelle*, 722 F.2d 159 (1983). In that case, the Court held that when a petitioner was represented by competent counsel in a prior habeas proceeding, as was Mr. Fairchild, the petitioner cannot justify the omission of claims by asserting personal ignorance because awareness of a potential claim is chargeable to his counsel, and therefore, to the petitioner. The Court recognizes this to be a strong argument. Nevertheless, it is persuaded that that argument should not control here.

In 1986, this Court appointed Mr. John Hall, petitioner's present counsel, to advise Mr. Fairchild as to what issues might be raised if he chose to pursue his habeas

remedies. Mr. Hall's report was filed in September 24, 1986, and neither of the issues raised presently were included in that report. The present petition contends that these claims were not raised earlier because all the parties concerned were lead to believe, on the basis of psychiatric evaluations conducted by the state and the federal government, that Mr. Fairchild was mentally competent to waive his rights. It is further argued that the soundness of those findings have only recently been drawn into question by newly discovered facts following Mr. Fairchild's performance on an IQ test conducted late last month.

Nonetheless, the State argues that because many of the records which Mr. Hall relied upon in filing the successor petition were available to him when he made his previous report, or could have been discovered with reasonable diligence, his failure to raise these issues should preclude review now. Such a ruling would leave habeas petitioners in an extremely precarious position—especially in cases such as this one where we are dealing with the death penalty, and the petitioner's mental status is at issue. It should be noted that no such issue was raised in the *Williams* case. Additionally, adopting the State's argument here would in no way serve the underlying purpose of the abuse of writ doctrine and of Rule 9(b) which is to avoid hearing successive claims "whose only purpose is to vex, harass, or delay." *Sanders*, 373 U.S. at 18, 83 S.Ct. at 1078. As the Court in *Sanders* stated:

> The principles governing ... denial of a hearing on successive application are addressed to the sound discretion of the federal trial judges. Theirs is the major responsibility for the just and sound administration of the federal collateral remedies, and theirs must be the judgment as to whether a second or successive application shall be denied without consideration of the merits. Even as to such an application, the federal judge clearly has the power—and, if the ends of justice demand, the duty—to reach the merits.

*Sanders*, at 18, 83 S.Ct. at 1078.

The Court finds that the successor petition does not constitute an abuse of the writ of habeas corpus. Moreover, it is the judgment of this Court that the ends of justice require that we reach the merits of Mr. Fairchild's present petition.

## B. Procedural Default

The State's second procedural argument is that the successor petition rests on grounds that were not presented at any time to the state courts, and are, therefore, procedurally defaulted. As such, the State contends, this Court is barred from reaching the merits of petitioner's claim unless Mr. Fairchild establishes cause for default and prejudice arising therefrom as required by *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

As the Eighth Circuit summarized in *Smittie v. Lockhart*, 843 F.2d 295 at 296 (1988), "Federal courts must conduct a four-step analysis to determine whether a petition may be considered when its claims have not been presented to a state court." *citing Laws v. Armontrout*, 834 F.2d 1401, 1412–15 (8th Cir.1987).

The first step is to determine if the petitioner "fairly presented the federal constitutional dimensions of his federal habeas corpus claim to state courts." *Smittie* at 296. Since Mr. Fairchild did not bring the present claim before any Arkansas state court, the next step in the analysis requires that the federal court determine whether the petitioner has exhausted his state remedies, or if any existing state remedies are futile. *Id.*

Following his conviction, Mr. Fairchild filed a post-conviction appeal pursuant to Rule 37 of the Arkansas Rules of Criminal Procedure. This appeal was denied in *Fairchild v. State*, 286 Ark. 191, 690 S.W.2d 355 (1985). In *Grooms v. State*, 293 Ark. 358, 358, 737 S.W.2d 648 (1987), the Arkansas Supreme Court held "A successive Rule 37 petition will not be entertained unless the original petition was specifically dismissed without prejudice to filing a subsequent petition." Since the Arkansas Supreme Court's earlier denial of Mr. Fairchild's appeal did not specify that it was without prejudice, this Court must

conclude that all further State remedies would be futile.

Having so found, the next step in the procedural default analysis is to determine whether the petitioner has demonstrated "adequate cause to excuse his failure to raise the claim in state court." At least with respect to the procedural aspect of petitioner's claim, the Court finds that adequate cause exists since at no time prior to this petition was it ever known that Mr. Fairchild possessed an IQ score which would arguably reveal him to be mentally retarded and, therefore, draw into question for the first time his ability to understand and thus intelligently waive those constitutional rights identified in the standard *Miranda* warnings. It does appear that there existed another low IQ report on the petitioner made in 1965–66, but this too was only recently discovered.

The final step is to determine whether failure to address the merits of Mr. Fairchild's claim in state court would result in "actual prejudice". *Laws*, at 1415. Given the critical importance Mr. Fairchild's confessions played in the prosecution of this case, it is obvious to this Court that failure to consider the merits of the claims in the successor petition would constitute actual prejudice.

On December 30, 1988, the Eighth Circuit rendered its opinion in the case of *Mercer v. Armontrout*, 864 F.2d 1429. Judge Lay, writing for the Court in a section of the opinion dealing with granting a stay of execution, said:

> The initial point of inquiry in granting or denying a stay of execution in a death case must be whether the petition is frivolous. If the petition is not frivolous on its face, the *very essence of this court's duty is to study and research the points raised.* The severity and finality of the death penalty requires the utmost diligence and scrutiny of the court. In capital cases the law is uniquely complex and difficult to understand. No judge can digest, retain, or apply these principles to a voluminous state court record without reflective study and analysis. To suggest that a life or death decision

can be made by simply reading a petition is to advocate dereliction of judicial duty. The penalty has already been rendered and approved by the highest court of the state in which the crime has been committed. However, as worthy as state courts may be, the state process does not always ensure constitutional process. Experience has long demonstrated that human judgment rendered through judicial process is not infallible. As long as federal habeas review exists, it is the duty of federal judges to make certain that an individual does not forfeit his life at the hands of the state unless the state process lawfully rendered the punishment, it complied with federal constitutional standards, and the defendant was furnished with competent and effective representation within the norms required by the sixth amendment. Regardless of how heinous the crime, no one may reasonably question that a predicate to carrying out a death sentence is careful review of the constitutionality of the defendant's conviction and sentence.

*Mercer v. Armontrout, supra*, 864 F.2d at 1431–32. (Emphasis in the original)

The Court will deny the State's motion to dismiss on procedural default grounds, and move to the merits of the claim.

ANALYSIS OF NEW PETITION.

It is important to break down, and separately analyze, the two differing thrusts of Mr. Fairchild's new "Successor Petition for Writ of Habeas Corpus." It is alleged that a new and recent IQ test fixes his IQ at 63. It is contended that both the jury and the courts have heretofore operated upon the assumption that "Mr. Fairchild was a person of average intelligence." The petition goes on to state that, "The validity of his waiver of constitutional rights and the reliability of his confession were assessed on the basis of this assumption." p. 2 Writ. It argues that the state failed to provide a professionally competent evaluation of Mr. Fairchild's mental condition before his trial, and that this, "precluded the defense from discovering and presenting to the jury the substantial doubt about the accuracy and reliability of Mr. Fairchild's confessions

which was interjected by his retardation and the stressful circumstances in which the confessions were given." Petitioner contends that "his mental retardation profoundly affected his ability to make an intelligent waiver of his *Miranda* rights, and if known to the jury, likely would have raised substantial doubts about the reliability and accuracy of his confessions."

It is clear that petitioner is not dealing here with one, but two separate questions: (1) whether petitioner's IQ on March 5, 1983, was such that he could not, or did not, knowingly and intelligently waive his *Miranda* rights, and (2) whether the level of his IQ on March 5, 1983, could reasonably "raise substantial doubts about the reliability and accuracy of his confessions."

██ Before dealing with the question of the effect, if any, of petitioner's IQ upon his ability to make an intelligent waiver of his *Miranda* rights, the Court first wants to make it clear that, on the basis of the facts previously found and reaffirmed below, no reasonable argument can be made that petitioner's IQ—whether 63 or 87 or some other number—could in this case raise "substantial doubts about the reliability or accuracy of his confessions." While it is quite probable—indeed, obvious [1]—that Mr. Fairchild in his videotaped confessions did not tell "the whole truth and nothing but the truth," the Court is convinced that, in material respects, they reflect Mr. Fairchild's recollection of the events of February 26, 1983, and his involvement in those ugly and tragic events.

This Court has previously dealt with the issue of the voluntariness of Mr. Fairchild's confessions. The Court's finding of fact and conclusions of law are set forth in a 51-page memorandum dated September 11, 1987. The Court also had some comments to make on the videotaped confessions early on during the course of the hearing:

THE COURT: Let's see. This is being tried to the Court and I think some feedback from the Court as we go along would not be inappropriate and would not, in effect, be considered as pre-judg-

ing any of the issues. One of the points that you've made is that if we just look at the video tape, that we'll be able to draw certain inferences and one of the inferences was the suggestion that there had been a lot of coaching and that the man had memorized his statement and so forth. Another inference is that the officers must have talked to him beforehand because they had substantial information or that their questions revealved [sic] that they had some prior information.

\*   \*   \*   \*   \*   \*

I do not think it's obvious at all that the confession was coached or memorized or whatnot. I watched Mr. Fairchild making his statements and when he—His statements give the feeling of truth to me because particularly when he is using his hands to describe on the right-hand side or the left or whatever. 'And we went up this and down this hill,' he's making an uphill or downhill with his hands just automatically as he talks. All of the incidental body language is corroborative, it seems to me, of what is being said. And what is being said is also not—did not given me the impression that it had been rehearsed. Now, there may have been some little feeling about, you know, 'Be sure that you tell them about the Toyota car having a red stripe.' You know, you can kind of get that impression that maybe someone knew about that and wanted to be sure that he remembered that. Not only that, there are a few things they kind of wanted him to remember.

But the broad thrust of his confession gives me the impression that it is an honest statement of what happened as he recalled it, and that's why I'm telling you, you know, that something could come along and maybe change that but I do not agree that looking at those video tapes by themselves would give me cause to believe that this was a hoked up, rehearsed, memorized sort of a packaged type of confession. Rather, it seems to have the indicia of spontaneity and truth.

---

1. For instance, according to a stipulation entered into during the 1983 state trial, Mr. Fairchild did not reveal the true identity of his accomplice.

There are a few little incidents in which I gather he's trying to put into it what the police want him to in terms of a detail here and a detail there. But on the whole it seems to me to have that ring.

That comment was made early on during the two-day hearing. After hearing all of the witnesses and reviewing all of the evidence, the Court made the following findings:

It appears that Mr. Fairchild and the officers left Russellville around 11:30 p.m. and arrived in Little Rock close to 1:30 a.m.

When Fairchild arrived at the Pulaski County Correctional Facility, he was turned over to Major Dill, and then possibly to Sheriff Robinson. Mr. Fairchild was read his rights and Officer Waggoner, Major Dill, and others talked with him. Mr. Fairchild talked freely about his involvement in the murder of Ms. Mason. Some notes were taken on Mr. Fairchild's admissions and then arrangements were made to videotape his statement or confession. There was a casual atmosphere. Coffee and doughnuts were brought in and consumed by the officers and Mr. Fairchild. The Court estimates that Mr. Fairchild was at the Pulaski County Correctional Facility for approximately an hour prior to the time of the commencement of the videotaped interview. A good part of that hour was taken up with Mr. Fairchild's explaining his role in the crime, but there were also periods when everyone just sat around waiting for the videotape arrangements to be made.

The force to which Fairchild was subjected at Russellville was necessary and incidental to the arrest. No force or threats or physical coercion were used against Mr. Fairchild on the trip back from Russellville to Little Rock, or at the Little Rock facility. Fairchild's attitude was: "You got me!" He was willing to talk.

Officer Tom Waggoner was with Mr. Fairchild in the interview room. He had worked on the case and was also familiar with Fairchild. He secured the "rights" forms and advised Fairchild of his rights.

Fairchild signed the forms and then freely discussed his involvement in the murder of Ms. Mason. When Mr. Fairchild agreed to give a videotaped interview, it was decided to move from the interview room into a larger office for that purpose.

None of the officers who were with Mr. Fairchild suggested to him what his testimony should be.

After the first videotaped statement was completed, Mr. Fairchild agreed to go with Major Dill, Sheriff Robinson and other officers on a "tour," starting at a point where Mr. Fairchild and his companion kidnapped Ms. Mason on Washington Street in North Little Rock and proceeding to the abandoned farm area near Scott. They then followed the route Mr. Fairchild and his companion traversed in leaving the area to the point where Fairchild's car ran off the road while being chased by an Arkansas State Police unit. Mr. Fairchild gave the directions which brought them all to the scene where Ms. Mason's body had earlier been found. He pointed out where they left the body. The Court did not, in the slightest, credit Mr. Fairchild's statements that the police officers were showing him the route taken and identifying for him the crime scene. At one point on the way back from the murder scene, Mr. Fairchild pointed out where he had thrown his gloves away. The officers stopped the cars and searched for the gloves but were unable to find them. During this "tour," the officers asked Fairchild about jewelry that they understood was taken from Ms. Mason's body. Mr. Fairchild told the officers that he had taken a watch from Ms. Mason but had sold it or given it away. When the officers asked who had it, he inquired if that person would get in trouble and was advised that such person would not get in trouble if he or she were not involved with the kidnapping or murder. Fairchild then told the officers that his sister had the watch. The officers then drove to Mr. Fairchild's house where they obtained the watch. They then returned to

the Pulaski County Correctional Facility. Shortly thereafter, a deputy prosecuting attorney, Mr. Dale Adams, came to the facility and took another videotaped statement from Mr. Fairchild. A little later, officers from the Little Rock Police Department arrived and questioned Fairchild about his involvement in the assault on Officer Oberle.

So the Court has already found that, "no force or threats or physical coercion were used against Mr. Fairchild on the trip back from Russellville to Little Rock, or at the Little Rock facility." Mr. Fairchild's attitude was: "You got me!" He was willing to talk. And the Court has further found that: "None of the officers who were with Mr. Fairchild suggested to him what his testimony should be."

After having been advised of his rights, Mr. Fairchild talked freely with the officers about his involvement in the rape and murder of Ms. Mason. As found, "there was a casual atmosphere, coffee and doughnuts were brought in and consumed by the officers and Mr. Fairchild." Mr. Fairchild had fully confessed his involvement prior to the making of the two videotaped confessions. The officers were aware of the facts and circumstances because Mr. Fairchild had informed them thereof.

So, petitioner's argument, that his mental retardation makes him more susceptible to suggestion, goes nowhere. The officers made no suggestions. Mr. Fairchild's statements were simply a recitation of facts within his memory or, at least, so much of those facts as he chose to reveal.

This is a death penalty case. It deserves the most careful and serious consideration possible. Back at the time of the hearing in 1987, the Court carefully observed and listened to the videotaped confessions—not once but several times. In the light of the new issues now being raised by the "successor petition," the Court has viewed those videotapes yet again and has also reviewed the transcript of the two-day hearing. It finds no reason to depart from the factual findings that it made then. On the contrary, that review has reenforced the Court's confidence in those findings.

The Court is convinced that no reasonable person could listen to the evidence presented at the two-day hearing and view the videotaped confessions and still have any doubt about the involvement of Mr. Fairchild in the rape and murder of Ms. Mason. Whether a judge or a jury knew that Mr. Fairchild's IQ was 50, or 60, or 80, or 100 would in no way shake the confidence of the court or jury in that factual conclusion. (NOTE: Whether the jury might have been influenced by specific evidence of low IQ in assessing the punishment is a different question which will be discussed later.)

This is not to say that the petitioner has not raised a serious issue. But that issue is whether the level of his mental condition was such on March 5, 1983, that he could not, or did not, "knowingly and intelligently waive his *Miranda* rights," and *not* whether the level of his mental condition could affect the confidence of any trier of fact in the finding that Mr. Fairchild was involved in the rape and murder of Ms. Mason. The Court's prior findings and conclusions filed September 11, 1987, remove the possible predicate for this latter contention.

Since the petitioner has, by his new allegations and by the testimony of certain witnesses during the March 1989 hearing, particularly that of Ms. Luckasson, again attacked the voluntariness and reliability of Mr. Fairchild's video confessions, the Court has reviewed its prior fact-findings and attached the results thereof to this Opinion as Appendix A.

PAST INQUIRIES INTO MR. FAIRCHILD'S COMPETENCY.

As everyone knows, who is familiar with this case, the Court has already gone to considerable lengths in an effort to determine Mr. Fairchild's competency. The issue was first thrust into the limelight when the Court received a letter in June 1986 written by Mr. Darrell Richley on behalf of Mr. Fairchild. It advised that Mr. Fairchild had decided not to continue with his federal habeas corpus case. The letter expressed that Mr. Fairchild's "feeling is one way or the other he will die at prison, either now or fifty years from now, and he would

rather it be now." The letter inquired as to "what documents the court may require to enable Mr. Fairchild's execution to be carried out."

The Court concluded that, under the law, if Mr. Fairchild was competent, he had the right to waive his federal habeas corpus rights. The Court held a hearing on August 15, 1986, for the purpose of advising Mr. Fairchild of his rights and assessing his competency. A transcript of that hearing is in the file. After interrogating Mr. Fairchild at some length and going over with him the possible results of his habeas petition, the Court asked Mr. Fairchild if he had thought about these things:

MR. FAIRCHILD: Yes, sir, I've thought about it.

THE COURT: But you still want to abandon the writ and go ahead with the execution?

MR. FAIRCHILD: Yes, sir.

THE COURT: Mr. O'Bryan, in your dealings with your client over the years here, do you have any opinion as to his competence, his mental state? Is there anything to suggest to you that he is incompetent or that he has any mental problems or any difficulties that should be explored perhaps before making a determination as to his competency to make this important decision?

MR. O'BRYAN: I can't say anything that's occurred in my dealings with Mr. Fairchild to lead me to believe that he's not competent.

THE COURT: Does the State, Mr. Miller, have any information that would lead it or suggest to it that there is any problem about Mr. Fairchild's present competence to make this decision?

MR. MILLER: No, Your Honor, we have no such information.

\* \* \* \* \* \*

THE COURT: Well, let me hear from your attorney and then from the State what you think the Court should do in the light of this record. Mr. O'Bryan, first you.

MR. O'BRYAN: Your Honor, my feeling is that the Court ought to do what Mr. Fairchild is asking. I think he is competent to request his petition be dismissed. And, certainly, if I was in his shoes, I wouldn't be asking for that—I don't think I would—but he does explain rational, logical reasons for his decision. It makes sense to me that he could come to that conclusion. As I say, I'm satisfied that he's competent. Of course, I'm not a psychologist, but he has been examined by the State Hospital and the psychiatrist at the Department of Correction, and I don't think he's ever been found to be incompetent.

\* \* \* \* \* \*

THE COURT: (addressing petitioner) What weighs on your mind? What is it saying to you, "I want to stop all this. I want to get it over with." Just the best you can, again, tell me what it is that's making you come to that conclusion.

MR. FAIRCHILD: Just like I said, I have this death sentence and I'm ready to get it over with.

THE COURT: Well, I think what I'm going to do—I'm watching. Let me ask you this: Have you in the past ever had any problems with any drugs? Has drugs been a problem for you?

MR. FAIRCHILD: Not serious. Not really no problem.

THE COURT: You have used drugs in the past?

MR. FAIRCHILD: I have used drugs, yes.

THE COURT: But you haven't had any recently, of course.

MR. FAIRCHILD: No. No, sir.

THE COURT: Well, I hesitate to delay in letting you carry out your intentions, but I have sufficient concern and hesitation to feel that it might be to everybody's advantage if you had the opportunity to be evaluated briefly by professionals and have an opportunity to talk to them about your decision so we can all be satisfied that you're making—that it's a firm decision. It's not one that's transient; that when you feel and understand everything that there is to be said about it that you still are convinced.

So, out of an abundance of caution, the Court decided to send Mr. Fairchild to the Medical Center at Springfield, Missouri for a professional evaluation before making its final decision with respect to Mr. Fairchild's competency to waive his federal habeas corpus rights.

On October 2, 1986, the Springfield authorities advised that the psychiatric evaluation had been completed. The Court was further advised "in the opinion of our clinical staff, the above named individual [Mr. Fairchild] is mentally competent to waive his right to habeas corpus relief." A report was enclosed.

Mr. Fairchild was admitted to the medical center at Springfield on August 21, 1986. He was under observation for over a month. The "Report of Final Forensic Psychiatry Staff Evaluation," dated September 22, 1986, states, *inter alia:*

EVALUATION: Upon admission to the Forensic Psychiatry Unit, the defendant was oriented to the unit rules, regulations, and the policies of the U.S. Medical Center by a correctional counselor. He was seen by the examining psychiatrist and psychologist, as well as the unit manager and case manager. A preliminary physical examination was completed. During the course of the evaluation, a complete psychiatric examination was conducted. A complete physical examination with x-rays as indicated, and complete laboratory examination, was performed. Appropriate consultations by specialists were obtained when indicated. In addition to being seen on a daily basis by the correctional officers and correctional counselors, he was reviewed periodically by the Forensic staff. Correctional officers and correctional counselors observed interpersonal relationships with other patients and staff, and recorded the observations on the clinical chart.

STAFF CONFERENCE: At the staff conference, directed by the examining psychiatrist, the clinical chart was reviewed. All reports were carefully evaluated, including background information furnished by the Court. The defendant was personally interviewed by various members of the staff. Special consideration was given to reports of behavior and clinical observation while in the institution. After the review of all data, comments and opinions were given by members of the staff, and a final opinion was decided by the examining psychiatrist.

OPINION: It is the opinion of the examining psychiatrist that the defendant is MENTALLY COMPETENT TO WAIVE HIS RIGHT TO HABEAS CORPUS, in that he has a factual understanding of legal proceedings, including the ramifications of dismissing said habeas corpus.

That report was signed for the staff by Dr. Donald R. Butts, Forensic Psychiatrist.

Also attached is the "Final Psychiatric Evaluation" in five pages dated September 29, 1986, also signed by Dr. Butts. Some of the pertinent excerpts are:

OCCUPATIONAL HISTORY: The patient said that he had worked in construction at times in the Little Rock area.

EDUCATIONAL BACKGROUND: The patient dropped out of school in the ninth grade in North Little Rock and went to work. He stated that he had a lot of problems reading in school. This affected all of his other subjects.

MEDICAL HISTORY: The patient denies any significant medical history and says that he is in excellent health.

MARITAL HISTORY: The patient states that he has never been married and has no children.

FAMILY BACKGROUND: The patient's father died in 1969 at the age of 95 years of cancer. The patient's mother is 51 years of age and apparently is in good health. He has one brother and two sisters. He is the second oldest of the siblings. Regarding his educational background, the patient says that he, after nine years in public schools, can neither read nor write.

PSYCHIATRIC HISTORY: The patient states that his only psychiatric history is a 30 day observation that was performed on him in 1983 at Rogers Hall on the grounds of the State Hospital in Little Rock, Arkansas. He was evaluated by Dr. Rosendale and the other staff at that

facility secondary to his instant offense which is that of robbery, rape, kidnapping and murder. The patient and his records have revealed that he was found to be competent, and he received a diagnostic category of antisocial personality. The patient was subsequently evaluated by Dr. Dolph Ogelsby who performed a psychiatric evaluation in the Maximum Security Unit at the Tucker Unit of the Arkansas Department of Correction after the patient had been on death row for a number of months. Mr. Fairchild at that time had been having some sleep difficulties and these were taken care of with the elimination of caffeine from his diet.

ARREST HISTORY: Mr. Fairchild states that he has had trouble with the law since he was 11 years old at which point he was apprehended for "chunking rocks at police cars in North Little Rock." In 1971 he was incarcerated at the Cummings [sic] Unit of the State Prison System for robbery of a filling station. This sentence was for one year. In 1974 he again was sent to the Cummings Unit for robbery and he was sentenced for seven years. He did four of these years and had three suspended. In 1979 he was again returned to prison for theft of property for two years and in 1983 he again was returned to prison on his instant offense. The patient, throughout his history of incarceration has never made any suicidal attempts or gestures and apparently has not been thought to be psychotic.

\*    \*    \*    \*    \*    \*

MENTAL STATUS AT THE TIME OF ADMISSION:

Appearance, Behavior, and Attitude: The patient is a young black male who is pleasant appearing and was very cooperative and docile in his demeanor. He appears his stated age and was relatively well groomed and clean in prison attire. He appeared to be healthy and in good contact with reality. His speech was coherent and he related in a very appropriate manner.

Affect and Mood: The patient was neither elated or depressed. He seemed somewhat sad, however. He spoke in a coherent manner and he understood why he was at our facility.

Stream of Mental Activity: The patient's associations were good. His speech was appropriate and he reached goal ideas readily.

Sensorium: The patient was oriented to time, place, person, and situation. His memory for remote and recent material was good. His general fund of knowledge was quite limited, however.

Thought Processes: At the present time there did not appear to be any hallucinations or thoughts of mind control. He had no particular ideas of reference and did not feel victimized by the Arkansas Penal System. He seemed rather matter of fact when discussing his situation.

Thought Content: There was no evidence of delusions or illusions, no evidence of overt neurotic symptoms.

Cognition: The patient's IQ was estimated to be in the low-average to average range on mental status evaluation. His judgment and insight seem intact. His interpretation of proverbs was rather concrete. He did not use any particular rationalizations of his behavior and was very straightforward in describing his background. There were no loose associations and no circumstantial or tangential thinking. There was no bizarre mental content nor suicidal ideation noted. The patient does not give a significant history of head injuries and he has never been significantly ill in his life. He expressed no particular anxiety except that he made it rather clear that he did not prefer to be in our facility and would rather be back in Arkansas where he could at least communicate and perhaps receive visitation from his family members.

COURSE IN HOSPITAL: The patient was very cooperative in all respects. He was kept on maximum security, however, on Ward 10–D, due to his status in the Arkansas State System. While he was at our facility he had an initial psychiatric evaluation and was observed daily in

all aspects on the closed unit of 10–Building. He had medical, psychological, and psychiatric workups with appropriate consultations prior to the final staffing by the Unit Team. The Unit Team consists of one Psychiatrist, one Psychologist, one Unit Manager, one Case Manager, two Counselors, plus several Nurses and the usual number of Correctional Officers. All of these staff members had observational and other appropriate input into the initial, periodic, and final team staffings. The patient had an initial history and physical, chemistry panel, blood count, orinalisis, serology, and chest Xray, all of which were reported as being within normal limits. No consultations were found necessary, as the patient did not have specific medical symptoms. He was not given psychotropic or antidepressant medications during his hospitalization. Psychological evaluation was done and interpreted by Dr. Richard D'Andrea, and his report accompanies mine.

FORMULATION AND CLINICAL IMPRESSION: This is a young, black male who is from North Little Rock, Arkansas. He has had a poor experience in the Educational Systems and this resulted in him not being able to read or write. He apparently started with antisocial behavior quite young in life and had had altercations with the North Little Rock Police as early as 11 years of age. He has spent the majority of his adult life incarcerated in the Arkansas Penal System for primarily robbery charges. His last charge in 1983, however, was of a much more serious nature, that of a capital murder. He has never had a significant psychiatric history and his only other evaluation at Rogers Hall in Little Rock revealed him to be competent. The patient is very plain about his desires now that he does not wish to appeal his death sentence on the capital murder offense. On the other hand, he believes that his chances for obtaining a new trial or of having his sentence reduced to life in prison are remote. Even with the latter option he does not wish to spend his life in prison and as he has had more than an

adequate exposure to life in the State Prison System, it can be considered that his opinion was formed after significant experience. Mr. Fairchild was very cooperative and was not a discipline problem at our facility. He was quite plain spoken and matter of fact about his point of view and in no way revealed significant psychopathology or any evidence of incompetency.

DIAGNOSTIC IMPRESSION:

AXIS I: No mental disorder.

AXIS II:

1. Antisocial personality by history.

OPINION: In answering the questions asked by the Court, it is my opinion that Mr. Fairchild has no evidence of a significant mental disorder that would adversely affect his competency or capacity to appreciate the legal position that he is in. He is capable of making rational decisions and cooperating with his attorneys. He is capable of making decisions regarding whether to continue or not with further appeals or procedures relating to his rights to appeal his death sentence for a capital murder offense. He is very capable of making the decision to waive his rights if he so chooses. He seemed to understand quite fully the ramifications of continuing with an appeal and he is not interested in the possibilities that could result, particularly that of the death sentence being reduced to life in prison without parole. He has no optimism for obtaining a new trial either and even if he did he doesn't think the outcome would be any different for him. As stated previously, the patient is quite aware of the day by day existence of life in prison. He quite simply does not wish to receive a long term sentence. He appears in no way impulsive in making these decisions and is under no pressure from anyone else to take this legal stance. He is not an apparently hysterical individual and has no evidence of any irrational thought processes. Whereas Mr. Fairchild was not suffering from an Axis I type mental condition, it is fair to say that he does at times become anxious and the potential for him to be depressed

is there although he seems to be remarkably intact thus far. He seems to be a person who could become easily frustrated as he is not an extremely talkative or articulate person and is hampered by his inability to read or write. A recommendation of supportive counselling wherein he could cathect his feelings regarding the above would be a humane endeavor.

Also attached is a four-page Psychological Report, dated September 16, 1986, and signed by Richard J. D'Andrea, Ph.D., Staff Psychologist. That report states, *inter alia:*

TESTS ADMINISTERED: Revised Beta Examination, Visual Motor Bender Gestalt Test, and Minnesota Multiphasic Personality Inventory.

MENTAL STATUS: Mr. Fairchild was friendly and cooperative during his present study. He was oriented to time, place, person, and situation as evidenced by his understanding of his present legal predicament and the reason for his psychological evaluation. His flow of speech was coherent and his responses were relevant. There were no loosening of associations or circumstantial or tangential thinking. Affect was appropriate and mood was sad. Concentration and attention span were adequate, and there was no disturbance in recent or remote memory. Hallucinations, delusions, or bizarre mental content were denied. Significant head injuries were denied. He was neither clinically depressed nor elated. Suicide thoughts or attempts were denied. He did not indicate any disturbance in eating or sleeping behavior. Alcohol or drug abuse was denied. Mr. Fairchild made an adequate adjustment to the unit during his evaluation. Other than expressing a desire to return to Arkansas where he could be close to his family, he did not appear to be under any immediate distress.

PSYCHOLOGICAL TESTING: Psychological testing indicated that Mr. Fairchild received a Revised Beta Examination IQ score of 87, which places him at the upper limits of the Dull Normal range of intellectual ability. Since Mr. Fairchild was unable to read or write, this test was administered due to its nonreliance on verbal skills. There was no evidence of any motor-perceptual difficulties indicative of any organic brain impairments, as measured by the Visual Motor Bender Gestalt Test.

The MMPI indicated a significant need to appear in a favorable light and to give socially approved answers regarding self-control and moral values. Lack of flexibility in adapting and a poor tolerance for stress and pressure is suggested. Similar individuals are seen as evasive, defensive about admitting to problems, and handling anxiety and conflicts by refusing to recognize their presence. They are described as hostile, irritable, demanding, argumentative, resentful, suspicious, immature, narcissistic, egocentric, and self-indulgent. Rationalization and projection are noted defense mechanisms. These individuals are often seen as impulsive and manipulative and are often in conflicts with authority figures. Poor sexual and marital adjustments are often noted. There was no evidence of the distress signs of anxiety or depression, nor was there any evidence of bizarre mental content which would be suggestive of any psychosis.

DIAGNOSTIC IMPRESSION:

Axis I: No Mental Disorder

Axis II: Antisocial Personality

SUMMARY AND CONCLUSIONS: In regard to the question asked by the court, Mr. Fairchild is not suffering from a mental disorder that would adversely affect his capacity to appreciate his legal position and make a rational choice with respect to continuing or abandoning further litigation in regard to his decision to waive his rights to appeal his death sentence for a capital murder offense. He fully understands that if he were to continue with the appeal, there exists the possibility that he may receive a new trial, and secondly, the possibility that the death sentence could be reduced to life in prison without parole. In regard to the first possibility, he believes that the chances of obtaining a new trial and also being found not guilty are so remote

that his efforts would be futile. In regard to the second possibility, he adamantly stated that he does not want to spend the rest of his life incarcerated. In regard to this issue, he speaks from experience since he has spent most of his adult life in prison. In addition, the decision to waive his rights to appeal has not been impulsive in nature and has existed for over six months.

RECOMMENDATIONS: Mr. Fairchild is not suffering from a mental disorder requiring psychiatric hospitalization or treatment. However, due to the uniqueness of his present legal predicament, he could benefit from counseling which can offer support and help him vent his frustrations and anxieties concerning the future.

## ANALYSIS OF DATA SUPPLIED WITH NEW PETITION.

Petitioner attaches nine appendices to his new "Successor Petition":

A   Arkansas State Hospital Records on Petitioner

B   Medical Center for Federal Prisoners Records on Petitioner from 1986

C   Affidavot of Merdine Fairchild, Petitioner's Mother

D   Affidavits of Family and Friends

E   Petitioner's School Records

F   State Court Order for Psychiatric Evaluation at Arkansas State Hospital

G   Report of Ruth Luckasson and Denis Keyes

H   Affidavit of Joe O'Bryan

I   Affidavit of John Wesley Hall, Jr.

We have already discussed the report from the Medical Center for Federal Prisoners and we have referred to comments made on the record by Mr. Fairchild's lawyers concerning his competence. Mr. Joe O'Bryan in a new affidavit states: "I had my own doubts as to Mr. Fairchild's mental abilities ..." and felt he needed expert evaluation. However, the state court denied his request for adequate funds to employ an independent expert. He further states: "After the State Hospital did its evaluation and found

Mr. Fairchild competent, I had no reason to believe that it had done an inadequate evaluation of his mental capabilities." Mr. John Wesley Hall, Jr. has also prepared and filed a new affidavit which states that: "At the time I got into the case, the MCFP had determined Mr. Fairchild's IQ to be 87. I understood from other sources that his IQ had also been determined to be about 80. Based on the apparent thoroughness of the report from MCFP and the court's own assessment of that in its letter to the attorneys, I felt that I had no legitimate reason to question that finding." Mr. Hall goes on to state:

I have had frequent contact with Mr. Fairchild during the last two and a half years. My personal belief was that the MCFP finding of an 87 IQ was somewhat higher than Mr. Fairchild really was, but not so substantially off as it was found to be in February 1989 by Ms. Luckasson and Mr. Keyes.

Mr. Fairchild sometimes has a difficult time communicating, and he has to think hard to articulate what he feels and thinks. Nevertheless, when I was informed that his IQ in 1989 was only 63 and that he is qualified as mentally retarded, I was surprised. Based on that, I obtained his school records. We thus found that in 1966, his IQ was tested at 65 by Jacksonville school officials.

The affidavits of petitioner's mother and of "family and friends" attached to the petition do not, frankly, appear to add anything new or significant to the information already possessed by the professionals who examined Mr. Fairchild at the Arkansas State Hospital or those who examined him at the Medical Center for Federal Prisoners at Springfield, Missouri. For example, Mrs. Fairchild provided a great amount of information by her answers to a questionnaire used by the Arkansas State Hospital experts back in 1983.

Petitioner's school records, although not specifically brought to the attention of the Court before, are not surprising, being consistent with other history heretofore available including the circumstance that Mr.

Fairchild cannot, for practical purposes, read or write.

Mr. Fairchild was under observation at the Arkansas State Hospital for nearly three weeks in April 1983. Some additional excerpts from the various reports of the Arkansas State Hospital should be noted:

CIRCUMSTANCES SURROUNDING ADMISSION:

"I didn't did it. My lawyer told me not to talk about it." He states that he was arrested on March 5, 1983 in Russellville. "I was on a bus. I was going to California. They stopped the bus in Russellville and took me off." He states this was some two weeks after the alleged crime occured [sic]. He states that he is charged with Murder, Rape, and Robbery, and when asked what type of charge this would be, he answered "capital felony." He was asked if he knew the possible penalty, and he replied, "death or life without parole."

PREVIOUS LEGAL DIFFICULTY:

He has had one previous conviction for Theft of Property, and was sentenced to two (2) years and served 18 months, this was in 199 [sic]. He states that he was assigned in the Vo–Tech area and he learned welding, and was given a certificate. He states he never worked in this area because he did not particularly like welding. He states that he has probably been arrested 10 to 12 times, but other than the aforesaid, these arrests have been the result of misdemeanors.

FAMILY HISTORY:

His father is dead, he died at the age of 95 in 1959. His mother is 50. He has four brothers and five sisters. One brother and two sisters are at home. He is single. He has been living commonlaw and has four children, 3 boys and one girl, ages 12, 14, 17, and 9.

PAST HISTORY:

He was born in Little Rock, at the University Hospital, on March 5, 1954. He started school at about the age __, and went to the 11th grade in the Jacksonville Public School System. He stated that he repeated no grades. He considered himself an average student, he made B's and C's. He states that he quit to go to work. He states that he has followed the construction trade for the most part. He has never been in any military service.

It is noted that he apparently told the hospital authorities, just as he did the Pulaski County officers, that he had an eleventh grade education. But he went even further when he stated that he considered himself an average student who made B's and C's. (He also told the police officers on the night he confessed that he had eleven years of school and could read and write.) But the staff at the Arkansas State Hospital independently obtained information from Mr. Fairchild's mother and through their staff social workers that the last grade he attended was the ninth grade, that he never enjoyed school, but always skipped school. See Social Service Report of April 28, 1983, "Educational History." And in 1986, he told the authorities at Springfield the truth: that he had a ninth grade education but could not, for practical purposes, read or write.

Another Arkansas State Hospital report states, *inter alia:*

CONTENT & TREND OF THOUGHT: OBSESSIONS & COMPULSIONS: Nothing can be obtained concerning obsessional thinking or compulsive actions as such. During the last interview, which was conducted this date, he spent the majority of the time trying to convince the examiner that he is hallucinating. He says that he is hearing voices, but he cannot identify the voices, and the voices seem to be originating from his head. He cannot identify what the voices are saying. He claims that he has been hallucinating all of his life and he has wanted to get help in the past, but was too scared to ask for same. He says that he now realizes that he needs help, and wants same. When he was informed that under circumstances that during the period of observation and evaluation he was not to receive medicine, there was a sudden flash of anger across his face as evidenced by a very hostile look, but he immediately controlled same.

DELUSIONS & HALLUCINATIONS: There is nothing listed suggestive of delusional thinking, and in spite of his allegations, it is the examiner's opinion that he is not hallucinating.

PARANOID IDEATION: He makes the statement that he feels that the police unduly arrested him.

JUDGMENT & INSIGHT: The defendant's judgment is grossly intact. His attorney told him not to discuss his case, and he certainly has been able to follow this advice. He claims that he was not read the miranda rights when he was arrested, but when asked to recite these rights, he rapidly goes though the four steps. He claims that he has not made a statement to the police. He is competent to stand trial.

SUMMARY  Barry Lee Fairchild is a 29–year old, black male, who is charged with Capital Felony Murder. He claims that he is innocent, but his lawyer told him not to discuss the case. During the initial interview, he was in contact, he gave the date of his arrest, and the circumstances surrounding arrest. He is single, he lives in commonlaw status and claims that he has four children. He has served one sentence in prison, of 18 months. He claims that he has been arrested 10 to 12 times, but usually a result of misdemeanors. His father is dead and his mother is living. He has one brother and two sisters at home. He was born in Little Rock, Arkansas. He went to the 11th Grade in school at Jacksonville Public School system. He repeated no grades. He claims that he has had no fulltime jobs with any degree of regularity. He has worked as busboy at restaurants. He has done construction work. He claims that he was a patient at the Benton Unit of the state hospital in 1974 for 7 to 8 months. During the period of observation, he has not been overly cooperative with the examiner, claiming that he cannot remember. Although he can give a good account of several incidents that happened in the past. On initial interview, he was in contact. He said that his lawyer told him not to discuss the case, even though he alleges that he had nothing to do with the alleged crime, and that the police are unduly arresting him. He is now complaining of auditory hallucinations, which he says are imminating from inside his head, but he cannot describe the voices or identify what is being said to him. In spite of his allegations, his affect does not register the concern expected from auditory hallucinations. There is no evidence of delusional thinking. He has refused to cooperate with the psychologist, Dr. Dave Pritchard. He has refused to cooperate with the examiner in a brief intellectual assessment. It is thought that at the time of the commission of the alleged crime, he was responsible, and further, that he is competent to stand trial. He will have no difficulty in assisting his attorney in a court of law.

DIAGNOSIS:

Axis I Malingering

Axis II Personality Disorder, mixed, Passive–Aggressive and Antisocial features

Axis III None

Particularly important to the issue before the Court is Dr. Rosendale's statement that Mr. Fairchild "claims that he was not read the *Miranda* rights when he was arrested, but, when asked to recite these rights, he rapidly goes through the four steps."

Mr. Fairchild contends that the state should have properly examined him and provided a competent and professional evaluation of his mental condition. The "Psychological Evaluation" submitted April 29, 1983, includes the following:

BEHAVIORAL OBSERVATIONS: Mr. Fairchild sat with his head bowed and gaze averted during most of the evaluation. Mr. Fairchild appeared to be hostile and uncooperative in the examination.

PROCEDURES: Interview April 28, 1983
Wechsler Memory Scale April 28, 1983
Memory Malingering Test April 28, 1983

INTELLECTUAL NEUROPSYCHOLOGICAL FUNCTIONING: Mr. Fairchild's responses to the Wechsler Memory Scale indicated a severe memory prob-

lem, consistent with total dementia. Mr. Fairchild's responses to the Memory Malingering Test indicated that he was grossly exaggerating or inventing any memory problems. Because of Mr. Fairchild's uncooperativeness with the examination, no formal assessment of his current intellectual functioning was undertaken.

PERSONAL FUNCTIONING: Because of Mr. Fairchild's uncooperativeness in the examination, no examination of Mr. Fairchild's current level of personal functioning was undertaken.

So, it is the State's position that it did not deny Mr. Fairchild an adequate, competent and professional evaluation of his mental condition. Rather he chose not to cooperate and thereby frustrated at least part of the State's efforts. The State asks what more could reasonably be expected of it in the light of both Mr. Fairchild's uncooperativeness and the evidence of his malingering?

The reports of Ms. Ruth Luckasson and Mr. Dennis Keyes will be discussed when reviewing their testimonies, *infra*.

## HISTORY PERTAINING TO CURRENT ISSUES.

The petitioner filed a motion to suppress in the state court and a *Denno* hearing was held pursuant thereto. However, the motion to suppress did not raise any issue concerning the giving of the *Miranda* warnings or whether the petitioner voluntarily and intelligently waived his *"Miranda* rights." The motion to suppress was based solely upon the theory that the defendant's videotaped statements were made "under threat of physical force," reflected "only the suggestions of law enforcement officers" and "were not made voluntarily." However, the trial court listened to the evidence about the giving of the *Miranda* rights and the waiver during the suppression hearing and treated the issue of the voluntary and intelligent waiver of such rights as having been properly raised. At the conclusion of the hearing, the judge identified the issues as follows:

First of all, the voluntariness of the execution of the rights waiver, which is State's Exhibit Number One. And basically, whether or not the Defendant, or the evidence reflects that the Defendant intelligently, voluntarily and knowingly executed the waiver of rights, which is before the Court.

The second issue to be decided is the voluntariness of the first video statement made by the Defendant on March 5, 1983, at 2:31 a.m.

The third issue is the sufficiency of the Defendant being apprised of his rights before the commencement of the second video statement.

Then, the fourth issue is the validity or the voluntariness of the second video statement made March 5, 1983, at 6:40 a.m.

The fifth issue deals with the voluntariness of statements allegedly made by the Defendant in a vehicle between the first video statement and the second video statement, which vehicle was being driven by Major Larry Dill, and which were oral statements made by the Defendant.

The Court then ruled:

The Court having heard the evidence presented in this suppression hearing finds for the record first, that the document labeled "State's Exhibit No. One," which has been referred to as the rights waiver, or statement of rights and rights waiver, was, from the evidence, voluntarily, intelligently and knowingly executed by the Defendant. The Defendant having been made aware of his Constitutional rights, as set forth in the document.

And this Court found in 1987 after two days of hearings that Pulaski County Sheriff officers advised Mr. Fairchild of his *"Miranda* rights" immediately after he was taken into the Pulaski County Correctional Facility in Little Rock after his trip from Russellville. This was over an hour before the first videotaped confession was recorded. (See p. 9, Findings of Fact and Conclusions of Law.) The Court made this finding based on the testimony of the witnesses and the circumstantial evidence despite the denial of Mr. Fairchild.

From viewing the first videotape, it was obvious that Mr. Fairchild had, before the videotape recording began, signed and initialed the *Miranda* rights waiver form. The transcript of the pertinent portion of the videotape is as follows:

LT WAGGONER: Today's date is March 5, 1983, the time is 2:31 a.m. . . . This interview is going to be in reference to the Marjorie Mason homicide which occurred on or about 2-26-83. Barry, *prior to this*, were you advised of your rights on a standard rights form?

MR. FAIRCHILD: Yes, sir.

LT WAGGONER: Is that this form here?

MR. FAIRCHILD: Yes, sir.

LT WAGGONER: Okay. Is this your signature here?

MR. FAIRCHILD: That's right.

LT WAGGONER: Okay. *We're going to go over this rights form again*, Okay. And I need for you to answer yes after each sentence if you understand them, okay. It starts out, it says, "The date is 3/5/83, time is 2:31 a.m. Subject has an eleventh grade education." You can read and write, is that correct?

MR. FAIRCHILD: Right.

LT WAGGONER: Okay. It says, "I, Barry Lee Fairchild, date of birth of 3/5/54, now live at 1213 East 4th Street, North Little Rock." Says that you've been advised that you're a suspect in a Capital Murder, do you understand that?

MR. FAIRCHILD: Right.

LT WAGGONER: Okay. It says that you have the right to use the telephone, do you understand that?

MR. FAIRCHILD: Right.

LT WAGGONER: Okay, it says that you have the right to remain silent—

MR. FAIRCHILD: Right.

LT WAGGONER: You understand that?

MR. FAIRCHILD: Right, I understand that.

LT WAGGONER: Okay. That you have the right to talk to an attorney, either retained by you or appointed by the court before giving a statement—

MR. FAIRCHILD: Right.

LT WAGGONER: You do understand that?

MR. FAIRCHILD: I understand.

LT WAGGONER: Okay. Also, to have your attorney present when answering any questions, do you understand that?

MR. FAIRCHILD: Right, I understand that.

LT WAGGONER: Okay. *You've been advised that* if you waive these rights, you have the right to stop the interrogation at any time—

MR. FAIRCHILD: Yes, sir.

LT WAGGONER: Also, any statement you make, can and will be used against you in a court of law.

MR. FAIRCHILD: Right.

LT WAGGONER: And that is your signature right here?

MR. FAIRCHILD: Yes, sir.

LT WAGGONER: The second part of this waiver says, "I've read the above statement of my rights and understand them." Any questions about your rights? The ones we've just read to you?

MR. FAIRCHILD: No, sir.

LT WAGGONER: You fully understand your rights?

MR. FAIRCHILD: Yes, I do.

LT WAGGONER: Okay. No promises or threats have been made to induce you into making any type of statement?

MR. FAIRCHILD: No, sir.

LT WAGGONER: No threats?

MR. FAIRCHILD: No, sir.

LT WAGGONER: Okay. And that is your signature here?

MR. FAIRCHILD: Yes, sir.

(Emphasis supplied)

The second videotaped interview was conducted by Deputy Prosecuting Attorney Dale Adams. It began some three hours after the end of the first videotape. As the first order of business, Mr. Adams administered the oath and then went over the "rights" form with Mr. Fairchild as follows:

MR. ADAMS: Okay, Mr. Fairchild, I have in front of me here a rights form that's used by the Sheriff's Office. It

says, "I have been advised that I am a suspect in Capital Murder, that I have the right to use the telephone." Is that initial "BF" out there yours?

MR. FAIRCHILD: Yes, sir.

MR. ADAMS: Okay. "That I have the right to remain silent," you've initialed that?

MR. FAIRCHILD: Yes, sir.

MR. ADAMS: All right. "I have the right to talk with an attorney, either retained by me or appointed by the court before giving a statement," you've initialed that?

MR. FAIRCHILD: Yes, sir.

MR. ADAMS: "To have my attorney present when answering any questions," your initial there, correct?

MR. FAIRCHILD: Yes, sir.

MR. ADAMS: "That I have also been advised that if I waive these rights, I have the right to stop the interrogation at any time," did you initial that?

MR. FAIRCHILD: Yes, sir.

MR. ADAMS: That any statement I give will be used against me in a court of law, your initial there, you signed it there?

MR. FAIRCHILD: Yes, sir.

MR. ADAMS: "And I have read the above statement of my rights and understand them. No promises or threats have been made to induce me into making this statement," and you signed "Barry Fairchild?"

MR. FAIRCHILD: Yes, sir.

MR. ADAMS: And it's witnessed by Lieutenant Tom Waggoner and Allen Swint?

MR. FAIRCHILD: That's right.

Since no challenge was ever made to the confessions on the ground that Mr. Fairchild was not advised of his rights or did not intelligently waive those rights, the state was never directly called upon to show the circumstances attendant to the original giving of, and waiver of, those rights. Nevertheless, the state trial court record is not completely silent on that issue. In fact, there is a great deal of testimony in that record concerning the manner in which Officer Waggoner went about advising Mr. Fairchild of his rights. See,

e.g., State Trial Transcript, pp. 920–22. According thereto, Lt. Waggoner gave Mr. Fairchild a copy of the rights and waiver form and then read each item thereon from an identical copy and obtained petitioner's statement that he understood same. At the time, the officers believed that Mr. Fairchild could read because he told them he could. The Court doubts that Mr. Fairchild read back any of those rights but he probably did repeat or paraphrase same, thereby leading the officers to accept his statement that he could read. The Court accepts that Officer Waggoner explained the rights orally to Mr. Fairchild. This is clear from Mr. Fairchild's own testimony. When Mr. Fairchild was on the stand during his capital murder trial, his own attorney inquired about the matter:

Q. Barry, I want to hand you an exhibit marked State's Exhibit 1. Just start right up there at the first word and tell me what it says, right at the top?

A. Up here?

Q. Yeah.

A. What the number?

Q. Okay.

A. 03—

Q. What does it say right before the number? What is that D–A–T–E, right before the number there, the first thing? Can you see any word on that form you can read, anywhere?

A. My name.

Q. Your name?

A. Yes.

Q. Your initials?

A. Right.

Q. You did write these initials on here, didn't you?

A. Yes, I wrote them.

Q. Do you remember Lieutenant Tom Waggoner showing you this? He asked you all of these questions, didn't he?

A. He asked me those questions.

Q. Did he ask you if you understood you had a right to use the telephone?

A. That was after they had done did what they did.

Q. Right. He went and asked you everyone [sic] of these questions?

A. He asked me those.

Q. He explained them to you?

A. Right.

Q. Did you understand them?

A. Yes, I understood them.

Q. And then he asked you to initial them?

A. Right.

Q. You did understand that?

A. Yes.

Q. He had to read them to you?

A. Yes.

## DISCUSSION OF THE PERTINENT LAW.

The relevant analytic framework is summarized in *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 1114–1, 89 L.Ed.2d 410 (1986). It is worth repeating this summary at length:

In *Miranda v. Arizona*, the Court recognized that custodial interrogations, by their very nature, generate "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused. In particular, prior to the initiation of questioning, they must fully apprise the suspect of the state's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to have counsel present if he so desires.

Echoing the standard first articulated in *Johnson v. Zerbst* [58 S.Ct. 1019, 82 L.Ed. 1461 (1938)], *Miranda* holds that "the defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." The inquiry has two distinct dimensions. First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must

have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

(Citations and original punctuation omitted in part.) *See also Miller v. Dugger*, 838 F.2d 1530, 1538–9 (11th Cir.1988), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988) (waiver of *Miranda* rights must be both *voluntary*, i.e., free from official coercion, and *knowing and intelligent*, i.e., with an understanding of the nature of the rights which are being waived.).

The Court has already held that the confessions were voluntary, and that there was no merit to Fairchild's allegations that he was coerced into making the statements. *Fairchild v. Lockhart*, 675 F.Supp. 469, 490–1 (E.D.Ark.1987), *aff'd* 857 F.2d 1204 (8th Cir.1988), *cert. denied*, 488 U.S. 1051, 109 S.Ct. 884, 102 L.Ed.2d 1007 (1989). Even if Fairchild's alleged mental deficiencies made him more susceptible to suggestion, that would not be sufficient to make the confessions involuntary under either the Due Process Clause or the Fifth Amendment because there is no evidence that the State knew of the retardation or intentionally took advantage of it. And this Court has already found that none of the police officers coached Mr. Fairchild or suggested to him what his testimony should be. *See Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (police coercion or overreaching is an essential element in any finding that a confession was not "voluntary"); *followed Winfrey v. Wyrick*, 836 F.2d 406, 411 (8th Cir.1988).

██ This leaves only the claim that Mr. Fairchild did not make a knowing and intelligent waiver because he did not understand the nature of the *Miranda* rights and the consequences of relinquishing them. "The particular determination of

whether there has been an intelligent waiver ... must depend in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). One court has defined the requirements thus: "The undisputed facts and psychological evidence indicate that [the defendant] chose to speak with the knowledge that he could keep silent or have counsel present while he talked. That is the meaning of intelligent waiver; that and no more." *Harris v. Riddle*, 551 F.2d 936, 939 (4th Cir.1977), *cert. denied* 434 U.S. 849, 98 S.Ct. 160, 54 L.Ed.2d 118 (1977).

■ "Although at trial the prosecution must establish that a challenged confession was voluntary, on collateral review, the burden of proving involuntariness rests with the habeas petitioner." *Sumpter v. Nix*, 863 F.2d 563, 565 (8th Cir.1988). The Court is persuaded that the result in this case is the same whichever party bears the burden of proof.

■ "The ultimate question of the validity of a suspect's waiver of his *Miranda* rights is a legal question requiring an independent federal determination, not an issue of fact on which a presumption of correctness would apply to a determination by a state court." *Smith v. Zant*, 855 F.2d 712, 716 (11th Cir.1988) (quotation marks and citation omitted), *citing Miller v. Fenton* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (voluntariness of confession is a legal question requiring an independent federal determination). "Accordingly, we have accepted those 'basic, primary or historical facts' determined by the state courts, while independently reviewing the legal conclusions drawn therefrom." *Fields v. Wyrick*, 682 F.2d 154, 157 (8th Cir.1982), *rev'd on other grounds*, 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982); *accord, Winfrey v. Wyrick*, 836 F.2d 406 (8th Cir.1987) (whether defendant understood his rights is a "subsidiary issue of fact" relevant to the legal issue of whether the confession was voluntary).

■ The effect of a defendant's mental deficiencies on the validity of his decision to waive his rights has been considered in a large number of cases. *See* Annot., *Mental Subnormality of Accused as Affecting Voluntariness or Admissibility of Confession*, 8 A.L.R.4th 16 (1981, Supp.1988) (collecting state and federal cases). Doubtless there is a level of mental deficiency so great that the defendant would be unable to waive at all because he could under no circumstances understand what he was doing. Though there is language in one decision indicating that retardation purely and simply forecloses a knowing waiver, even that case did not rely on only that single factor. Short of the level of absolute incapacity, the cases all consider lack of intelligence (and the related factor of low IQ) as one part of the totality of circumstances to be examined in deciding whether a waiver is knowingly made. "[T]he fact that a confession is made by one whose mentality is subnormal is to be taken into consideration and viewed as a fact indicating, although not establishing that the confession was lacking in voluntariness." *Lavallis v. Estelle*, 370 F.Supp. 238, 245 (S.D.Tex. 1974), *aff'd mem.* 500 F.2d 1182 (5th Cir. 1974). *See also, United States v. Marchildon*, 519 F.2d 337, 342 n. 9, 344 (8th Cir. 1975) (Court considers defendant's age, education, mannerisms, intelligence); *United States v. Stith*, 479 F.2d 315, 317 (8th Cir. 1973), *cert. denied*, 414 U.S. 845, 94 S.Ct. 107, 38 L.Ed.2d 83 (1973) (Court considers intelligence and education). As with all decisions made on the totality of the circumstances, the cases tend to be rather fact-specific.

The most pertinent Eighth Circuit cases on this point are *Winfrey v. Wyrick*, 836 F.2d 406 (8th Cir.1987) and *United States v. Voice*, 627 F.2d 138 (8th Cir.1980). In *Wyrick*, the court held that:

Based on the state and district court findings and the undisputed facts, we conclude that Winfrey's confession was voluntary. The primary facts suggesting coercion are Winfrey's age and low IQ. Yet, in past cases this court considered facts similar to these and held that confessions were voluntary. *Hall v.*

*Wolff,* 539 F.2d 1146 (8th Cir.1976) (defendant 19 years old, of low order of intelligence); *Coney v. Wyrick,* 532 F.2d 94 (8th Cir.1976) (defendant 16 years old, of "subnormal intelligence"). *Accord, Vance v. Bordenkircher,* 692 F.2d 978 (4th Cir.1982), *cert. denied,* 464 U.S. 833, 104 S.Ct. 114, 78 L.Ed.2d 114 (1983) (defendant 15 years old, IQ of 62, no lawyer or parent present).

836 F.2d at 411. Similarly, in *Voice,* the court held that the defendant had knowingly waived his right to remain silent based on the following facts:

Defendant, although having a "dull-normal" IQ, was not mentally retarded. He had a fifth grade education and could read, write, and do math problems and crossword puzzles. When examined by doctors before trial he was responsive and followed directions. [He was read his rights by the interrogating officers before each questioning session, he was not threatened, and he indicated he understood his rights. On earlier occasions, he had asserted his right to remain silent.]

627 F.2d at 145–6.

Four reported decisions have expressly or implicitly found that the defendant's lack of mental capacity, including low IQ, precluded a knowing waiver of rights under the totality of circumstances.

The most recent of these four, and the most recent located decision to consider the issue, is *Smith v. Zant,* 855 F.2d 712 (11th Cir.1988). There, the court held that "[t]he record in this case compels the conclusion that [the defendant] did not intelligently waive his *Miranda* rights." 855 F.2d at 716. A psychologist testified that the defendant's IQ was approximately 65, and that a person with defendant's low mental ability would be unlikely to "appreciate what he is doing when his *Miranda* rights are read to him." *Id.* 717. A second expert testified that the defendant was unable to complete the MMPI because he could not read the test, and also stated that the defendant would not understand the warning and the waiver decision unless everything was explained to him slowly,

simply and repeatedly. This expert also explained that the defendant's difficulties in comprehension would be compounded if he was under stress at the time the waiver was executed. *Id.* 718. The district court and the court of appeals both accepted this testimony as establishing a lack of knowing waiver.

The court of appeals also rejected the claim that the waiver was valid because the defendant had been given the *Miranda* warnings during an earlier arrest for an unrelated crime:

We agree with the state that prior experience with criminal justice may be relevant in determining whether a waiver of constitutional rights is valid, but we find no evidence on the record to convince us that the prior prosecution of [the defendant] was particularly important in this case. The state offered no testimony to rebut the deeply pessimistic opinions of [defendant's] experts about [defendant's] capacity to understand and waive his rights.... Accordingly, we conclude that petitioner did not intelligently waive his *Miranda* rights.

*Id.,* 855 F.2d, at 718–19.

The defendant in *Henry v. Dees,* 658 F.2d 406 (5th Cir.1981) was a twenty year old marginal mental retardate with an IQ between 65 and 69. He had completed the sixth grade, but had reading skills at the second grade level. "His mental capacity brings into serious question his understanding of the documents he signed. The record contains uncontradicted testimony of a psychologist that it was unlikely [defendant] could have understood the complex waivers and their consequences. Given this evidence, we are persuaded [defendant] did not ... waive his constitutional rights...." 658 F.2d at 411.

*Cooper v. Griffin,* 455 F.2d 1142 (5th Cir.1972), begins with the broad statement that "[i]n view of the undisputed evidence in the record that both boys are mentally retarded, we hold that they did not knowingly and intelligently waive their rights." 455 F.2d at 1143. But the facts upon which the case rested were broader, and indicate that the court was looking at the

totality of the circumstances to ascertain that the confessions were not knowingly and intelligently made. The court also appears to have used the word "retarded" to encompass general mental incapacity rather than merely low IQ. It based its conclusion on the following facts: the boys were 15 and 16 years old; they had no prior experience with the criminal justice system; one had an untreated gunshot wound at the time of the interrogation; the other was interrogated for 12 hours before confessing; there was substantial uncontroverted evidence both boys were extremely slow and that neither of them could comprehend the *Miranda* warnings; and their IQ's were judged to be between 61 and 67. 455 F.2d at 1144. "[T]he boys surely had no appreciation of the options before them or of the consequences of their choice. Indeed it is doubtful that they even comprehended all of the words read to them." 455 F.2d at 1146.

Finally, the court in *Toliver v. Gathright*, 501 F.Supp. 148, 150 (E.D.Va.1980), did not decide the issue because it suppressed the defendant's confession on another ground. However, the Court noted that "it would be hard pressed to find that the state met its 'heavy burden' of demonstrating a knowing waiver," because defendant was retarded, with an IQ of approximately 60; his rights were read to him in a summary fashion, without explanation; and a psychiatrist testified that persons of defendant's mental capacity are generally unable to comprehend complex ideas without detailed explanation. 501 F.Supp. at 150. "While it has been held that the fact that a suspect is of limited mental capacity is not dispositive on the issue of waiver where the circumstances support the conclusion that he did in fact comprehend his rights, this is not the case here." *Id.*

There have also been a number of cases in which defendants with below average intelligence, even some who were mildly retarded, were held to have understood their rights well enough to make a knowing waiver.

In *Reddix v. Thigpen*, 805 F.2d 506 (5th Cir.1986), a psychologist claimed that de-

fendant suffered from mental retardation and psychosis. However, the court found that defendant's waiver was knowingly and intelligently made, based upon the facts that defendant had been arrested a number of times on previous occasions, and had been read his rights each time; that he had been read his rights repeatedly before giving his statement; that he admitted he understood his right to have a lawyer present and knew the meaning of threat; and that he was capable of understanding the simple meanings of simple words and of applying them to real life situations. 805 F.2d at 516–17.

In *De La Rosa v. Texas*, 743 F.2d 299 (5th Cir.1984), *cert. denied*, 470 U.S. 1065, 105 S.Ct. 1781, 84 L.Ed.2d 840 (1985), a borderline retarded or dull normal defendant was held able to understand the meaning of *Miranda* warnings given orally four different ways: read in Spanish and English and stated in informal language in Spanish and English. 743 F.2d at 301–3. Similarly, in *Conner v. Auger*, 595 F.2d 407 (8th Cir.1979), *cert. denied*, 444 U.S. 851, 100 S.Ct. 104, 62 L.Ed.2d 67 (1979), the court of appeals affirmed the district court's acceptance of state court findings that defendant's "low intelligence did not, in these circumstances, preclude his understanding the nature and significance of his constitutional rights." 595 F.2d at 411.

The facts in *United States ex rel. Cooper v. Warden*, 566 F.2d 28 (7th Cir.1977), were that defendant had a low IQ and was not spontaneous. On the other hand, defendant's own experts testified that defendant was able to read his rights, that he responded quickly and directly, and that he could read and understand *Miranda* rights if assisted. Also, defendant's "behavior and actions when he testified at the suppression hearing were clearly discernible to the [state court] trial judge." That direct observation, combined with the equivocal nature of the expert's report, supported the state court decision that the confession was knowingly made. The district court deferred to that finding under section 2254, and was affirmed by the court of appeals. (As indicated above, deferral to state court

findings on this ultimate issue is no longer held appropriate.)

The defendant in *Harris v. Riddle*, 551 F.2d 936 (4th Cir.1977), *cert. denied*, 434 U.S. 849, 98 S.Ct. 160, 54 L.Ed.2d 118 (1977), was 17 years old and had an IQ of 67, in the dull-normal range. The expert testified that he had sixth-grade intelligence but only third-grade language skills. But he also testified that defendant understood the right to remain silent, though not all of the consequences of giving up that right. The court held that defendant's comprehension was sufficient. 551 F.2d at 939.

In *United States v. Young*, 529 F.2d 193 (4th Cir.1975), the defendant had a below average IQ, limited education and reading problems. But the court held that:

[T]hese factors are not in themselves determinative of the voluntariness of a waiver, for one must examine the totality of circumstances surrounding the waiver. Numerous other factors pertinent to defendant's comprehension of the *Miranda* warnings appear in the record. [Defendant] signed a waiver statement; he told the postal inspectors that he understood the *Miranda* warnings recited to him; he repeated at trial, although with some hesitation, that he had understood the inspector's warning; he was able to read aloud much of the waiver form without difficulty in court.

529 F.2d at 195.

*Miller v. United States*, 396 F.2d 492 (8th Cir.1968), *cert. denied*, 393 U.S. 1031, 89 S.Ct. 643, 21 L.Ed.2d 574 (1969), involved a thirty-five year old black man with a third or fourth grade education and a limited ability to read or write. The trial court was affirmed in its finding of intelligent waiver because:

[I]t had an opportunity to observe the defendant and was in a position to form a judgment as to his ability to comprehend. The hearing on the motion [to suppress] was thorough, and the defendant was given every opportunity to present evidence.

396 F.2d at 495.

This issue has been considered in several district court opinions. In *United States of America ex rel. Lopez v. Chrans*, 696 F.Supp. 1210 (N.D.Ill.1988), the state court's finding that an IQ of 86 did not render the waiver unknowing or involuntary was held to be supported by the record. 696 F.Supp. at 1212. In *United States v. Nash*, 414 F.Supp. 1213 (S.D.Tex. 1976), an 18-year-old defendant with a verbal IQ of 71, performance IQ of 89 and full scale IQ of 78, all above the defective level of 70, who had the vocabulary of a fourth-grader and sporadic knowledge of words up to eighth or ninth grade and who was able to read waiver form in court, though slowly, was found able to make a knowing waiver. 414 F.Supp. at 1218–19. Finally, in *Lavallis v. Estelle*, 370 F.Supp. 238 (S.D. Tex.1974), *aff'd mem.* 500 F.2d 1182 (5th Cir.1974), the defendant had an IQ between 65 and 71 and a psychologist testified that defendant would have difficulty understanding ideas that entail appreciation of future events or reasoning. But the same expert concluded that the defendant could have understood his rights and the waiver if the person explaining these concepts to him got down on defendant's level and used simple vocabulary, pausing between statements and placing no pressure on defendant. The evidence showed that under the totality of the circumstances, defendant's rights were adequately explained and understood. 370 F.Supp., at 245.

The Court accepts that no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving, and do so waive, the constitutional rights embraced in the *Miranda* rubric.

## IQ TESTING AND MENTAL RETARDATION IN THE COURTS.

### A. Efforts to Define Mental Retardation.

In arguing that Mr. Fairchild is mentally retarded, the petitioner's brief states that Mr. Fairchild was given the Wechsler Adult Intelligence Scale–Revised (WAIS–R) test in late February, and registered IQ scores ranging in the 60's. "These scores place him within the lowest 1% of the population. Fairchild has mental retardation." Successor Petition for Writ of Habeas Corpus, p.

10 ¶ 23. Although the brief notes that Fairchild's evaluation included a comparison with results of an IQ test administered to Fairchild in the 1960's and Fairchild's overall academic record, the brief seems to place paramount emphasis upon Fairchild's 1989 IQ score in concluding: (1) that he is mentally retarded, and (2) was, therefore, unable to intelligently waive his constitutional rights. There are a number of analytic flaws in this argument.

First, the authorities seem to be in agreement that IQ scores are not dispositive of mental retardation, and that such measurements of intelligence make up only one of three elements of the overall clinical definition of retardation.

Second, petitioner's giving paramountcy to IQ levels runs counter to most current teaching on the subject since advocates for the mentally retarded have usually argued that courts should place less emphasis on IQ scores when passing on such a defendant's competency and, instead, inquire more into the specific functional disabilities of putative mentally retarded criminal defendants.

Finally, there is substantial recognition in the courts, growing out of long experience, that IQ tests and other forms of standardized testing have in the past exhibited patterns of racial, socio-economic, and cultural bias which would further call into question the accuracy of IQ scores. This recognition suggests a cautious approach when dealing with such a volatile "science" even though it does now appear that recent revisions of the most frequently used tests have been purged of such biases.

B. Mental Retardation and IQ.

There seems to be general agreement as to the clinical definition of mental retardation.

The essential features [of mental retardation] are: (1) significantly subaverage general intellectual functioning, (2) resulting in, or associated with, deficits or impairments in adaptive behavior, (3) with onset before the age of 18.

Diagnostic and Statistical Manual of Mental Disorders, 36 (3d ed. 1980) [hereinafter cited as DSM–III].

Similarly, the American Association on Mental Deficiency, one of the principal professional organizations in the field, refers to mental retardation as "significantly subaverage intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period." American Association on Mental Deficiency, Classification in Mental Retardation 1, (H. Grossman ed. 1983) [hereinafter cited as AAMD, Classification in Mental Retardation].

These definitions have been accepted by various courts, including the United States Supreme Court in *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 442 n. 9, 105 S.Ct. 3249, 3255 n. 9, 87 L.Ed.2d 313 (1985) (quoting the AAMD, Classification in Mental Retardation). See also *United States v. Masthers,* 539 F.2d 721, 724 n. 16 (D.C.Cir.1976).

Only the first element of the retardation definition—intellectual functioning—is measured by reference to a person's IQ score. Both the DSM–III and AAMD define "significantly subaverage intellectual functioning" as an IQ level of 70 or below on an individually administered IQ test. DSM–III at 36. Because of the fallibility of such tests, however, "an IQ score is generally thought to have an error of measurement of approximately five points; hence an IQ of 70 is considered to represent a band zone of 65 to 75." *Id.*

Mentally retarded individuals are grouped into four categories or subtypes, which use IQ scores as guides or points of reference. These categories are known as "Mild" (IQ levels of between 50–70), "Moderate" (IQ between 35–49), "Severe" (IQ between 20–34) and "Profound" (IQ level below 20). DSM–III at 39. Thus, if Mr. Fairchild fits the other criteria for mental retardation, he would most likely be classified as "mildly retarded" based solely on his 1989 IQ scores.

However, such a classification depends upon establishing that Mr. Fairchild has deficits in adaptive behavior, which are not

measured by IQ scoring. "Adaptive behavior refers to the effectiveness with which an individual meets the standards of personal independence and social responsibility expected of his or her age and cultural group." DSM–III at 37. According to Prof. Ruth Luckasson, one of the evaluators upon whose testing the successor petition relies:

> For an individual to be classified as mentally retarded, the deficit in intellectual functioning must be accompanied by impairments in adaptive behavior defined as 'significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually standardized scales.' Thus, adaptive behavior is a term of art.... The inclusion of adaptive behavior in the definition of mental retardation requires that intellectual impairment, measured by an intelligence test, have some practical impact on the individual's life.

J. Ellis & R. Luckasson, "Mentally Retarded Criminal Defendants," 53 Geo.Wash.L. Rev. 414, 422 (1983) [hereinafter cited as Ellis & Luckasson] *quoting* AAMD, Classification in Mental Retardation, at 11.

### C. De-emphasizing IQ.

Aside from the fact that an individual's IQ is only a part of what constitutes a diagnosis of mental retardation, giving paramount importance to IQ runs counter to the analysis many advocates of the mentally retarded say courts should use when a criminal defendant's intelligence is called into question. These advocates note that, in the past, courts have confused mental illness, which is an organic condition with psychologic or behavioral manifestations, and mental retardation, which is not an illness but rather a limitation on a person's ability to learn. Consequently, it is argued, courts have ignored many of the disabilities that are characteristic of the mentally retarded such as inability to handle stress, suggestibility, and the so called "cheating to lose" phenomena whereby a defendant will accept blame in order to win the favor of an authority figure. Ellis & Luckasson, 445–52; J. Person, "The Accused Retardate", 4 Colum.Hum.Rts.L.Rev. 239, 242–55 (1972). They argue that, in the past, courts have placed too much emphasis upon an individual's IQ score without comprehending the specific disabilities a mentally retarded individual may have. Ellis & Luckasson, *supra*, 423–24. And note the comments of Professor Mickenberg:

> In large part, legal treatment of retarded defendants has been distorted by the law's ignorance of exactly what mental retardation means. Virtually all cases dealing with this subject have simply recited a defendant's IQ, noted that it was below normal, and then stated that simply because the defendant might be stupider than the average person does not mean that he is incompetent.

> These courts have adopted the common fallacy that mental retardation is defined by IQ scores. Actually, IQ is no more than a convenient numerical scale used to categorize degrees of mental aptitude. While certain categories at the lower end of the IQ scale have been assigned the classification of 'retarded', the scores themselves say little about a person's skills and aptitudes.

> \*       \*       \*       \*       \*       \*

> It is therefore essential that courts recognize that 'mental retardation is a relative concept, the limits of which have meaning only in terms of social conditions.' The degree of a person's retardation, and even the very fact of his retardation, is determined by the ability to perform various functions. \* \* \* 'Mental retardation is not a unitary disorder in the sense that all persons who are so designated share a common condition.' Certain retarded persons may have severe mental and physical disabilities which make life outside a hospital impossible. 'The term mental retardation is likewise applied to persons who have no noticeable physical defect and whose intellectual abilities, although inadequate

for some tasks, are perfectly adequate for many others.'

\*     \*     \*     \*     \*     \*

This distinction is crucial. . . . In making [competency] decisions, courts cannot merely rely upon IQ scores. Rather they must inquire into the manner in which the defendant's retardation impairs his abilities to perform the functions required of a competent defendant. This necessitates an analysis of the symptomology of a defendant's retardation and a correlation of those manifestations with the catalogue of necessary trial skills.

I. Mickenberg, "Competency to Stand Trial and the Mentally Retarded Defendant: The Need for a Multi–Disciplinary Solution to a Multi–Disciplinary Problem", 17 Cal. W.L.Rev. 365, 390–92 (1981). And consider the approach taken by Professor Person:

'[M]easured intelligence falling below IQ 70' seems adequate as a practical indicator to the court to require subsequent psychiatric testing. It will not prevent a defendant with an IQ greater than 70 from raising these issues; it will not be the *ratio decidendi* of these issues; it is only a signal that these issues must be raised and that psychiatric examination is necessary.

Person, *supra*, 4 Colum.Hum.Rts.L.Rev. at 242.

One exception to the above is being forwarded in a case currently before the U.S. Supreme Court, *Penry v. Lynaugh*, —— U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). In that case, the petitioner contends that it would be cruel and unusual punishment to execute a person with a reasoning capacity of a seven years old and an IQ level between 50 and 63. Brief of Petitioner at 35–50, *Penry v. Lynaugh, supra*. Several psychological associations acting as *amici*, argue that "mental retardation always involves a substantial impairment that reduces a defendant's level of blameworthiness and moral culpability for a capital offense." Brief of *Amici Curiae* in Support of Petitioner at 10–11. They contend that "all persons with mental retardation lack that level of ability that would allow them to be capable of the level of culpability required for the death penalty." *Id.*, at 15. Thus, they argue that the execution of such individuals would violate the Eighth Amendment since it would be disproportionate to the defendant's degree of culpability. But while calling for a *per se* rule banning the execution of all mentally retarded defendants, petitioner and *amici* in *Penry* caution:

American law has never held, nor do *amici* contend, that people with mental retardation cannot be held responsible or punished for criminal acts they commit. Some defendants who have mental retardation are entitled to acquittal because the effect of their disability matches the jurisdiction's test for insanity or because they lack the requisite *mens rea*. Other mentally retarded defendants properly can be convicted and subject to appropriate punishment.

*Id.*, at 10.

Thus, despite the Eighth Amendment claim that the death penalty is never appropriate punishment for a mentally retarded defendant, it is conceded that these defendants may be perfectly competent to function in other phases of a criminal prosecution. While courts should be sensitive to the kinds of disabilities found among the mentally retarded, it does not follow that there is a "bright line" rule based on IQ—or for that matter mental retardation itself—that automatically determines a defendant's competence or ability to waive constitutional rights. The preferred analysis, the literature suggests, is one that compares the defendant's specific intellectual deficits with the intellectual ability necessary to perform competently in various settings. *See generally* Ellis & Luckasson, *supra*. As the Supreme Court observed in *City of Cleburne v. Cleburne Living Center, supra*, "it is undeniable, . . . that those who are mentally retarded have a reduced ability to cope with and function in the everyday world. Nor are they all cut from the same pattern." *Id.*, 473 U.S. at 442, 105 S.Ct. at 3255.

## D. IQ Testing and the School Cases.

The other seeming irony in placing paramount importance upon Mr. Fairchild's IQ score is that such measures of intelligence have been repeatedly attacked for their racial and cultural bias against blacks, immigrants and other minorities.

> It is well documented that minorities do not perform as well as Anglo–Americans on standardized exams—principally because of cultural and socioeconomic differences.

*Columbus Board of Educ. v. Penick*, 443 U.S. 449, 511 n. 17, 99 S.Ct. 2941, 2964 n. 17, 61 L.Ed.2d 666 (Rehnquist, J., dissenting).

The inherent cultural, linguistic and racial bias of employment tests, and their perceived threat as tools for discrimination, in part helped lead to the passage of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., which prohibits discriminatory hiring practices including discriminatory testing. Note, "Employment Testing: The Aftermath of *Griggs v. Duke Power Company*", 72 Colum.L.Rev. 900, 900–01 (1972).

Similarly, in the area of education, these defects in standardized tests lead many to see competency testing programs as a subtle means to effect "re-segregation" of schools "since unequal educational opportunities may cause black children to score lower than their white counterparts." M.S. McClung, "Competency Testing Programs: Legal and Educational Issues", 47 Fordham L.R. 651, 688 (1979).

In numerous cases, the Fifth Circuit Court of Appeals proscribed the use of various tests used in recently desegregated school districts on the grounds that such tests would not accurately reflect intelligence or scholastic ability of black children, but rather would measure the effects of past discrimination. See e.g., *Lemon v. Bossier Parish School Board*, 444 F.2d 1400 (1971); *United States v. Sunflower County School District*, 430 F.2d 839 (1970); *United States v. Tunica County School District*, 421 F.2d 1236 (1970); *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 *rev'd. in part on other grounds* 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 530 (1969). More recently, school district policies denying high school diplomas to students who failed minimum competency tests were challenged (although upheld) because of the disproportionate impact these tests had on black students. *Debra P. v. Turlington*, 644 F.2d 397 (5th Cir.1981) (78 percent of all black students failed competency exit exam compared with 25 percent of all white students). See also, *Anderson v. Banks*, 520 F.Supp. 472 (S.D.Ga.1981); Note, "Testing The Tests: The Due Process Implications of Minimum Competency Testing", 59 N.Y.U.L.Rev. 577 (1984).

After tracing the history of the impact IQ tests have had on minorities, one writer on the subject summed up as follows:

> The interpretation of IQ data seems never to be free both of policy implications and of ideological overtones.
>
> \*        \*        \*        \*        \*        \*
>
> The consequence has been that the IQ test has served as an instrument of oppression against the poor—dressed in the trappings of science, rather than politics. The message of science is heard respectfully, particularly when the tidings it carries are soothing to the public conscience. \* \* \* The poor, the foreign-born, and racial minorities were shown to be stupid. They were shown to have been born that way. The underprivileged are today demonstrated to be ineducable, a message as soothing to the public purse as to the public conscience.

L. Kamin, "The Politics of IQ" in *The Myth of Measurability* 63–64 (1977).

One of the earliest cases to discuss the discriminatory impact of IQ testing in schools was *Hobson v. Hansen*, 269 F.Supp. 401 (D.D.C.1967) (Wright, J.) *appeal dism'd* 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1968), *aff'd. sub nom Smuck v. Hobson*, 408 F.2d 175 (D.C.Cir.1969). The issue in that case was whether the District of Columbia Board of Education had, through its policies, deprived black and poor students of an equal educational opportunity. Circuit Judge J. Skelly Wright,

sitting by designation, found that the school board had discriminated against black children through various policy decisions. Among these was the use of a "track" system, whereby all students were assigned according to academic ability to one of four separate, self-contained curricular tracks ranging from "Honors" for gifted children to "Basic" for those with severe academic deficits. To measure students academic potential, the school administered various standardized tests at several grade levels in both the elementary and the junior high level. Only one of these was an IQ test (Otis Quick Scoring Mental Ability test). *Hobson v. Hansen, supra,* 269 F.Supp. at 518–19. The criteria for assignment to the "Basic" track was *inter alia* IQ test scores of 75 or below. *Id.* at 448. The court found "at both the elementary and junior high school levels the per cent of Negroes enrolled in the lowest track exceeds their proportionate representation in the total student body." *Id.* at 456. The court went on to find that various social and environmental influences, as well as the fact that these tests were standardized against the performance of white, middle class school children, increased the likelihood that black and poor students would do poorly on such tests.

> When standard aptitude test are given to low income Negro children, or disadvantaged children, however, the tests are less precise and accurate—so much so that test scores become practically meaningless. Because of the impoverished circumstances that characterize the disadvantaged child, it is virtually impossible to tell whether the test score reflects lack of ability—or simply lack of opportunity.

*Id.,* at 485.

In *Larry P. v. Riles,* 495 F.Supp. 926 (N.D.Cal.1979), *aff'd in part, rev'd in part* 793 F.2d 969 (9th Cir.1984) the district court held that IQ test scores generated from the Stanford–Binet and Wechsler Intelligence Scale for Children–Revised (WISC–R) tests that were used to place children in special education groups for the "educable mentally retarded" (E.M.R.) had a disproportionate effect on black children

and violated the Rehabilitation Act of 1973, 29 U.S.C. § 794, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., Education of the Handicapped Act, 20 U.S.C. § 1415(e)(2) and the Fourteenth Amendment. As Judge Wright did some 12 years earlier in *Hobson,* the Court in *Larry P.* described in detail the inherent inaccuracies and biases of IQ tests and then concluded that the school district should not have used such tests as a basis for assigning students to E.M.R. programs where they would ultimately receive less education than their white counterparts. *Id.* 952–60.

For instance, the court noted that the original Stanford–Binet and Wechsler tests were standardized against the test results of several thousand white children. *Id.,* at 955 and 957 n. 64. Variations in tests scores among male and female children led to subsequent revisions in the test to remove the unwanted bias. However, at least as of the date of the opinion, no similar revisions had been made to account for variations among black and white children. *Id.*

> The tests were developed and standardized in the United States on white, essentially middle-class groups.... Although several leading figures in the early testing movement saw no problem with this situation, given their own racial prejudices or at least strong ethnocentrism, others, including Dr. Wechsler, the developer of the Wechsler battery of tests central to this litigation, frankly admitted the problem. Wechsler stated in 1944 that the tests were not valid for the 'colored population of the United States.' His tests, like the others involved here, had not been made suitable for minority racial and ethnic groups. The tests had been adjusted, for example, to eliminate difference in the average scores between the sexes, but a comparable effort was not made and has never been made for black and white children.

*Id.,* at 971 *citing* D. Wechsler, The Measurement of Intelligence 107 (1944).

The school cases do draw into serious question the accuracy and probative value

of the IQ score Fairchild received in elementary school in the 1960's. Consequently, the ability to use that score as verification of the accuracy of the latest IQ tests must be questioned and analyzed in the light of current information. And even though the latest WAIS–R and Stanford–Binet tests have apparently been purged of the biases found in their predecessors, the history of scientific development in this field suggests caution in uncritically accepting the IQ numbers produced by such tests. Not only does this history so suggest but also the evidence and testimony received in the most recent hearings (see discussion below) make clear the necessity of critical factual analysis in order to arrive at an intelligence appraisal of significance of such scores in answering the legal questions posed in individual cases.

So it appears that the experts in the field of psychological testing are also of the opinion that IQ tests alone do not necessarily give an accurate picture of a person's mental or intellectual ability. This scientific conclusion is consistent with the legal standard, discussed above, which requires the trier of fact to take into consideration the "totality of the circumstances" in determining whether a person voluntarily and intelligently waived his *"Miranda"* rights.

IMMEDIATE OCCASION FOR HEARING.

Mr. Fairchild's execution date was set for March 8, 1989. When he filed his "Successor Petition for Writ of Habeas Corpus" on March 1, 1989, alleging that an IQ test had been performed providing a score of 63 and indicating "mental retardation," the Court had to decide whether a full hearing should be held. It was suggested that the parties might agree on a neutral expert to examine Mr. Fairchild. Thereupon, the attorneys for the petitioner and the State chose Dr. Judy White Johnson who then tested Mr. Fairchild on March 2, 1989, and reported thereon on March 3, 1989. Her tests yielded a composite IQ score of 60. To aid in deciding whether a full scale hearing was required, the Court had Dr. Johnson orally review for it her written report.

Dr. Johnson, from the beginning, noted some inconsistencies. For instance, her report states:

During this examination, Mr. Fairchild did not display behaviors typical of mentally retarded examinees such as perseveration, impulsivity, distractibility, poor attention span, task avoidance, and lack of perseverance. His conversation was appropriate as were his questions such as how long I'd been in practice, if I liked being a psychologist, what kind of practice, etc. At times, he showed an understanding of concepts and vocabulary that are not expected from someone with his level of measured intelligence.

She was questioned about this at the session on March 3, 1989:

Q. Now, I would like to get some idea of the significance of those comments. I guess I'll put it to you this way: Are you suggesting that the level of the measured intelligence is not reflecting his actual intelligence?

A. Well, "intelligence" is an artificial construct, and tests are devised to measure this artificial construct but it doesn't tell you everything about a person. And with him, some of the words he used like when he was defining words, some of his vocabulary words were far above what you would expect with someone with an IQ of 60.

Q. In other words, if a person came in to you and you knew that person had an IQ of 60 and you had reliable information that that was so and you interrelated with that person in terms of conversation, and so forth, you would expect some typical behavior, such as perseveration. That's a tendency to repeat.

A. Right. Do the same thing over and over.

Q. And impulsivity.

A. Right.

Q. And distractibility and poor attention span, task avoidance and lack of perseverance.

So, you have a person there that tests would be such that you would

expect to find those behavior characteristics, and you did not.

A. That's right.

Q. What conclusion do you draw from that?

A. Well, I think that he has a potentially higher level of functioning and that shows up in the testing where there was a lot of variability. There are 15 tests and each test is made up of 20 or 30 items. Normally a person will show a pattern of passing items and then they will start failing items and then they will fail completely. And he had a pattern more of knowing things and failing things back and forth. He might fail some easy ones and pass harder ones.

Q. Are you suggesting most of them are progressively more difficult?

A. That's correct.

Q. And so you would expect the failure to start coming more and more.

A. Right.

Q. When you don't see that, when you do well here and you do poorly here and on more difficult things you do well again, once again, what conclusion do you draw from that?

A. Well, that that person can do better. One of the things that he showed was anything that was school-like, he was very positive he couldn't do it.

Q. Turned off by attitude?

A. Right. Like, "I can't do that. I just don't do that. I never understood numbers." But then on another part of the test when he wasn't being asked to deal with numbers, he might quickly answer. For example, there was a page that has like two quarters, two dimes and a penny. And I show this page to him with these pictures, and I say, "How much money would this be?" And within less than five seconds he say, "Seventy-one cents."

Q. Seventy-one cents.

A. Right. But I think if I had said, "Add 25 plus 25 plus 10 plus 10 plus 1," he wouldn't have been able to do it because he wouldn't expect that he would be able to do it because of his long history of school failure.

Q. What does that comment convey or should that convey to the Court in terms of the significance of IQ tests such as this?

A. Well, regarding the issue of mental retardation in general, I think it goes to the issue of adaptive abilities because for retardation you have to have a low IQ but you also have to have impaired adaptive abilities. I didn't attempt to evaluate that and I could not with a test or in a short period of time.

Q. I do want to make clear for everyone's benefit the last paragraph of your report you say: "In summary, his level of measured intelligence is in the mentally retarded ability classification. A diagnosis of mental retardation requires three features: (1) significantly subaverage general intellectual functioning, accompanied by, (2) significant deficits or impairments in adaptive functioning, with (3) onset before the age of 18. The latter two features of this diagnostic classification were not evaluated."

And, of course, two would require you to become familiar with how Mr. Fairchild adapts every day.

A. Right.

Dr. Johnson then went over and described the fifteen different tests that make up the Stanford–Binet, identifying various things that "surprised" her. The Court nevertheless concluded that a full hearing would be required to resolve the issues raised. That hearing started on Thursday afternoon, March 16, 1989, and ended on Tuesday evening, March 21, 1989.

CONCLUSION.

■ On the basis of all of the evidence and the totality of the circumstances including:

1. A review of the state court record and the transcript of the testimony of Mr. Fairchild and the other witnesses in the state court proceedings;

2. A review of the transcripts of all of the appearances and hearings in *this*

Court with particular focus on Mr. Fairchild's performance as a witness and his awareness of the issues and his communicative skills;

3. The views and opinions of his attorneys and others who have had close association with Mr. Fairchild, as disclosed in the record;

4. A careful review of the factual reports and also the opinions of those who examined or observed Mr. Fairchild when he was at the State Hospital in 1974 and in 1983, and at the Federal Hospital in Springfield in 1986;

5. A careful consideration and evaluation of the documentary evidence, testimony and the opinions of Dr. George Baroff, Dr. Judy White Johnson, Ms. Ruth Luckasson, Dr. Theodore Blau, Dr. Pritchard, Dr. Rosendale, Mr. Dennis Keyes and Dr. Donald Butts and the other witnesses who testified in person or by deposition at the hearing which commenced on Thursday afternoon, March 16, 1989, and ended Tuesday evening, March 21, 1989;

The Court finds and concludes that Mr. Fairchild was not only capable of but did, in fact, voluntarily, knowingly, and intelligently waive his *Miranda* rights before confessing his involvement in the robbery, rape, and murder of Ms. Mason on March 5, 1983.

And the Court further finds and concludes that petitioner has not sustained his contention that the State failed to provide him with a professionally adequate evaluation of his mental condition before his 1983 state court trial.

The Court can also state at this time that it is convinced, and so finds, that Mr. Fairchild is not now retarded and was not in 1983. It is also convinced, and so finds, that in March of 1983, he understood not only the language and terminology of the *Miranda* warnings but also the practical meaning and effect thereof.

The Court's own judgment as to the mental status of Mr. Fairchild based upon all of the evidence and based upon observing him

testify and communicating in court on different occasions, upon viewing and reviewing the videotaped confessions, and upon reading transcripts of his testimony in the state court proceedings and listening to witnesses—expert and lay—describe his actions and conduct was, and continues to be, that he would fall in the "dull, below normal" category but that he is not "retarded." Because of the circumstances under which the various "IQ" tests were given, probably the Revised Beta Examination conducted by Dr. Richard D'Andrea at Springfield is the least contaminated by by motivational or "secondary gain" phenomenon. Although by hindsight one might wish that a WAIS–R or Revised Stanford–Binet test had been administered under those optimal motivational circumstances, the Court is nevertheless convinced that the 87 IQ received by Mr. Fairchild on the Revised Beta is closer by far to an accurate IQ reading on Mr. Fairchild than either the 1989 WAIS–R or the Stanford–Binet test results. It is the Court's opinion that the best tests, administered under optimal circumstances, would yield an IQ for Mr. Fairchild somewhere between 75 and 87.

Although it is not true, as alleged by petitioner, that the jury and the courts have previously operated upon the assumption that "Mr. Fairchild was a person of average intelligence," it is true that they probably operated upon the assumption that he was not retarded even though he was below normal. And this latter assumption we now know to be correct.

Petitioner's successor petition for habeas relief will therefore be denied and dismissed and the Stay of Execution entered on March 3, 1989, will be cancelled and set aside.

## THE COURT'S INITIAL REACTION TO CLAIM OF RETARDATION.

When the Court, on March 1, 1989, first learned that Mr. Fairchild had received an IQ score of 63, it was, frankly, puzzled. Mr. Fairchild's mental status had been before this Court and the State courts before. He had been examined by many experts. Neither they, nor anyone else, including Mr. Fairchild's attorneys, suspected that he

was mentally retarded. The Court notes Mr. Hall's affidavit of March 1, 1989, which contains the following:

3. At the time I got into the case, the MCFP had determined Mr. Fairchild's IQ to be 87. I understood from other sources that his IQ had also been determined to be about 80. Based on the apparent thoroughness of the report from MCFP (and the court's own assessment of that in its letter to the attorneys), I felt that I had no legitimate reason to question that finding at the time.

4. I have had frequent contact with Mr. Fairchild during the last two and a half years. My personal belief was that the MCFP finding of an 87 IQ was somewhat higher than Mr. Fairchild really way, but not so substantially off as it was found to be in February 1989 by Ms. Luckasson and Mr. Keyes.

5. Mr. Fairchild sometimes has a difficult time communicating, and he has to think hard to articulate what he feels and thinks. Nevertheless, when I was informed that his IQ in 1989 was only 63 and that he is qualified as mentally retarded, I was surprised. Based on that, I obtained his school records. We thus found that in 1966, his IQ was tested at 65 by Jacksonville school officials.

And this Court's own evaluation of Mr. Fairchild gave it no reason to doubt the validity of the report that it had received from the MCFP. So the Court, in preparation for the new hearing, went back through, and reviewed, all of the evaluations on Mr. Fairchild. See "Past Inquiries Into Mr. Fairchild's Competency," *supra*.

### THE SCOPE OF THE CONTROVERSY.

All parties to this controversy acknowledge that Mr. Fairchild is of below normal intelligence, is a functional illiterate, and that he had a disastrous academic experience. And there is general agreement that Mr. Fairchild does *presently* understand the *Miranda* rights and waiver.

There is a controversy about Mr. Fairchild's correct IQ, the extremes ranging from the low 60's to the middle 80's. There is a controversy as to whether Mr.

Fairchild is "mentally retarded." And there is the controversy over Mr. Fairchild's understanding of the *Miranda* rights and waiver back on March 5, 1983, immediately before he gave the videotaped confessions.

Finally, there is the controversy over whether the State failed to provide Mr. Fairchild a professionally adequate evaluation of his mental condition prior to his state court trial in 1983.

As to the issue of mental retardation, petitioner's experts would place him in the "mildly" retarded group while respondent claims he is clearly not "mentally retarded" at all, as that term is scientifically and legally defined. Additionally, petitioner does not claim that mildly retarded persons cannot understand the *Miranda* rights. Rather, he claims that he did not understand them on March 5, 1983.

### REVIEW OF IMPORTANT PARTS OF PETITIONER'S CASE.

It is petitioner's position that his IQ is in the low 60's which would place him in the "mildly retarded" classification. Dr. Baroff's testimony in this regard is informative:

THE COURT: Now, retardation, they usually use the level of 70 to cut it off. If you're above 70, you're considered not retarded?

THE WITNESS: That's correct.

THE COURT: I mean, do you have some—

THE WITNESS: Yes, that's correct.

THE COURT: Now, within the retarded areas, I am hearing you talk using such terms as mild and moderate and so forth. What are the categories of mentally retarded starting from the least to essentially the most? Are there several?

THE WITNESS: Four.

THE COURT: Four. And what are they?

THE WITNESS: Mild. And on the Stanford–Binet and on the Wechsler scales between 55 and 69, mild. Forty to 54, moderate. Twenty-five to 39, severe. And Zero to 24, profound.

THE COURT: So on that type of classification he would, in any event, fall within the mild?

THE WITNESS: That's correct. As does he on the composite.

THE COURT: And although you've given me a definition of retardation, can you—has anyone broken out these in terms of definition: What is mild? What is moderate? What is severe? What is profound? In other words, can you characterize them verbally?

THE WITNESS: Yes, oh, yes.

THE COURT: All right. For instance, mild. What is the definition that you would use for mild?

THE WITNESS: Well, it's not a definition. In my book, for example, I have developed—and these are also provided in the diagnostic classification system—what level of adaptation is expected of an individual with mild, moderate, severe or profound retardation as a function of chronological age. So that if we talk about someone like Mr. Fairchild who is an adult and you want—would you like me to distinguish between those four levels?

THE COURT: Yes, I would.

THE WITNESS: Okay. The person, as I said, who is mildly retarded as an adult is an individual again who has an IQ score between 55 and 69, who has the potential—we are now talking post school age—to work. That is, to be employed in regular employment. To function adaptively in his community, to have friends, same sex and opposite sex, and marry, to become a parent, to vote, to drive a car if in some cases they can take a driver's test orally. And to essentially function in a way not very different from yours and mine.

In fact, in one of the more recent famous books the author refers to the—what he calls the cloak of competence. That is to say, that in spite of these intellectual limitations which are particularly pejorative during the person's school experience, as an adult they are functioning relatively effectively in the community. They are likely to have problems in the management of money. They are often—they are likely to be functioning at unskilled kinds of jobs and then are subject to greater unemployment.

They are less capable of dealing with stress and a mentally retarded parent increasingly becomes a poor parent as the number of children that she has to take care of increase. They are often—they have a less likelihood of marriage and they are more likely to be socially isolated. Loneliness is not an uncommon problem. And they are also likely to develop what are called benefactor relationships in which they seek out some normal individual who can be there to assist them during periods of stress.

Now, once we move beyond the level of mild mental retardation, we are dealing with a group of individuals who will not be generally able to function independently in society. That is, once they leave—once they become adults. They will always need some degree of assistance.

And petitioner's witnesses do not contend that mildly retarded persons cannot understand *Miranda* warnings or that they cannot knowingly and intelligently waive the rights embraced in such warnings. In fact, Dr. Baroff examined Mr. Fairchild specifically in this regard and concluded that he "certainly demonstrated adequate understanding of those rights." Note his testimony:

THE WITNESS: Washington University, I think so, yes. Grisso in 1981—I got this book from our law school library—published this book on the *Miranda* and juveniles. And what he did was to develop a little multiple choice. Well, he developed schemes for evaluating understanding of the four warnings by asking the person what the warning means and then rating the person's response on a scale of zero, one to two; two being apparently adequate understanding by the criteria that he provides.

And Barry, when we evaluated him at the prison, certainly demonstrated adequate understanding of these rights.

THE COURT: He did?

THE WITNESS: He did.

And although Dr. Baroff found certain deficits in his understanding of such terms as "waive" and "interrogation," he concluded:

> So he has at this point—there are still aspects which he does not understand and which, of course, I didn't attempt to teach him, but he certainly does have adequate understanding by Grisso's criteria of the four rights that, as I understand it, make up the heart of *Miranda.*

But petitioner contends that he did not understand those rights back on March 5, 1983, when the rights were read to him and he signed the waiver, i.e., shortly before he confessed to the crimes against Ms. Mason. It is argued that he knows and understands his rights now only because he has been taught those rights by his fellow death row inmates and, more particularly, by Mr. Parker.

Ms. Ruth Luckasson of Albuquerque, New Mexico, can fairly be described as Mr. Fairchild's key witness in the March 1989 hearing. She, along with Mr. Dennis Keyes, performed the tests that became the basis for the filing of the Successor Petition.

Ms. Luckasson has a national reputation in the field of mental retardation. She serves as an Associate Professor of Special Education at the University of New Mexico. She earned her law degree from the University of New Mexico in 1980. She teaches courses on the Characteristics of Mental Retardation and the Legal Rights of the Handicapped. Although she does not have her Ph.D., she does have a Masters Degree in Special Education.

In response to a call from Mr. Fairchild's lawyer, Ms. Luckasson agreed to put together a team to evaluate petitioner. The team consisted of herself, Mr. Dennis Keyes, a Certified School Psychologist, and Dr. Jack Stark, a consultant from Nebraska. She and Mr. Keyes came to Arkansas on February 22, 1989, and saw Mr. Fairchild on February 23, 1989. They administered a series of tests in the period from 9:15 a.m. until 1:45 p.m. on that date.

It is interesting to note that Ms. Luckasson testified that she had no impression that Mr. Fairchild was mentally retarded during the course of testing. She said, "That came later."

After she scored the tests she concluded that Mr. Fairchild was mentally retarded. On the WAIS–R test she found a composite IQ of 63 with a 69 on the Verbal part and a 61 on the Performance part. She felt that Mr. Fairchild's functioning during the tests was corroborative of her opinion. She observed that when Mr. Fairchild was allowed "to be just interacting he functioned in an adequate way." But when he was "required to do things on testing" his mental retardation seemed clear to her.

It is Ms. Luckasson's opinion that Mr. Fairchild has substantial cognitive difficulties. He cannot read "to any useful degree" and cannot spell. She found his "school skills" immature.

Ms. Luckasson then reviewed Mr. Fairchild's school records which confirmed that his academic skills were poor and that the problems existed from an early age. She places Mr. Fairchild in the mildly retarded range.

Ms. Luckasson then dealt with the *Miranda* issue: whether Mr. Fairchild made a knowing and intelligent waiver of his constitutional rights on the morning of March 5, 1983. She pointed out that the whole concept of such rights is complex and, at best, presents difficult ideas to comprehend. But she had to acknowledge that Mr. Fairchild performed very well on the Grisso CMR tests, the tests specifically designed to measure comprehension of one's *Miranda* rights.

It was apparent to the Court that, at some point, Ms. Luckasson began to lose her scientific objectivity and skepticism. The problem appeared to be that she started out with absolute confidence in the validity and accuracy of the WAIS–R score results. Then, assuming this conclusion represented unassailable sacred ground, everything else had to be bent and forced to fit. For instance, she quickly found that "significant deficits in adaptive behavior

were observed in his performance on the remainder of the tests." Surely such boot-strapping cannot substitute for a careful and critical evaluation of Mr. Fairchild's adaptive behavior based upon the most reliable evidence available. But here again the WAIS–R numbers—the sacred ground—appear to be driving the methods used to assay other critical areas of inquiry.

And her defensive posture with respect to the WAIS–R score explains her reluctance to fully accept the results of the CMR tests dealing directly with *Miranda* comprehension. Nevertheless she was forced to deal with the fact that Mr. Fairchild scored extremely high on that test. Her response basically was to restate the question. She asked, in effect, "Assuming that Mr. Fairchild now has an adequate understanding of *Miranda* rights how could he have achieved that level of understanding?" Again, being convinced that Mr. Fairchild is mentally retarded, she logically concludes that Mr. Fairchild could not have developed this knowledge on his own. This brought Ms. Luckasson to the conclusion that only an "extraordinary intervention" involving intensive, long sustained training—consistent with good special education techniques—could have produced this level of comprehension in Mr. Fairchild. She states that Mr. Fairchild simply *could not* have arrived at his present state of knowledge without such an intervention. So having brought herself to this conclusion, she quickly and, the Court believes, uncritically, embraced the petitioner's proffered explanation: his fellow inmates taught him. In the vernacular she "bought Mr. Parker," finding him entirely persuasive and believable. As explained elsewhere, the Court is not so charitable toward Mr. Parker or toward the "extraordinary intervention" theory.

It is clear that Ms. Luckasson is an extremely intelligent, able, conscientious and highly motivated person. She is a sincere and, the Court expects, very effective advocate for the mentally retarded. But advocacy can interfere with objectivity. The hope and the wish can be the parents of the belief. The singularly most revealing evidence of this phenomenon arose out of the Court's questioning of Ms. Luckasson about another confession that Mr. Fairchild had made involving a robbery in December of 1982. There was a transcript of his confession concerning this crime. Mr. Fairchild had acknowledged its accuracy and the police officers involved corroborated its details, but Ms. Luckasson was reluctant to accept it as true:

THE COURT: Now, then, if you walk into the kitchen after the murder and find the pantyhose in the cabinet, what is his—I mean, what is it? Are you saying that—does a mentally retarded person of the mental retardation that you say he is, does he not remember if he drove down and did something? Are you saying his recollection of those events is not to be trusted? He just started to tell you—he came back and he started telling you "where I've been," would he not tell you what had happened or could he not?

THE WITNESS: I think that the important thing is to remember that a person who has mental retardation has very serious—the results of the mental retardation will affect almost every dimension of his life and almost every dimension of his functioning, and mental retardation is a serious disability. And that whenever we are interacting with a person who has mental retardation in any way that we have to remember that his perception of the world and his communication of the world is colored by his mental retardation.

Now, this is not to say that people who have mental retardation can't ever remember things or that they can't do things. This is not to make those generalizations.

THE COURT: Were you in court this morning when I read the questions and answers, the statement that he gave in connection with another criminal event?

THE WITNESS: Yes.

THE COURT: And described getting in the car, driving and getting out and running and the man shooting, and so forth. Is there anything in your—I mean, is there any reason why he can't tell what

happened if he went on that episode with that man?

THE WITNESS: Well, according to the testing that we did and in what I believe is an accurate picture of his functioning, he has very impaired abilities in putting things in logical order. So if he's trying to put something in order or describe a sequence of events, it seems to me highly suspect that what he is describing accurately reflects reality. Now, he may believe it does.

Note the premise of her inability to deal with what, to the Court, was clear, admitted, and corroborated reality: Our tests show him to have very impaired abilities in putting things in logical order. Ergo, if he does clearly and coherently relate events, "it seems to me highly suspect that what he is describing accurately reflects reality." Ms. Luckasson appears incapable of abandoning or even questioning the "sacred ground" of her IQ numbers and mental retardation diagnosis. She does not say, "Hey, he is obviously accurately and clearly relating what happened in a manner inconsistent with our diagnosis. Therefore, we should look back at that diagnosis and consider whether we might be mistaken." Note the continuing colloquy:

THE COURT: Even in connection with this thing this morning about getting in the car, driving down to College Station, all that—is that just something that he's making up as he answers questions?

THE WITNESS: It could be in response to suggestions from the people around him and they don't have to be malevolent suggestions. I mean, they don't have to be evil people who are putting these ideas in his head. They can do this with perfectly good motivation. Suggest ideas to him.

THE COURT: You understand that he's admitted that this was true and that doesn't bother you to think he—do you think really it's not true? This is the incident involving this other officer and robbing this man and driving off and—

THE WITNESS: Well, the question—I think it's likely that he believes that it's true and I think it's likely that he believes that it's accurate. For me the

question is: Can a description that involves conceptual skills in which he is very impaired accurately reflect reality?

THE COURT: Well, are you doubtful of it in this case? This particular one that you heard us read in which he described —"Now, let's go back to December 23, 1982, somewhere in the early morning hours. Do you recall being with somebody driving about that time in a car?"

"Yeah, I was with Harold Green."

"You were with Harold Green. And what had you—all just done?"

"We took some money from an old guy."

"Okay. Where did you take the money from an old guy? Do you remember the location or anything?"

"In front of some old cafe."

"What part of town?"

"On Roosevelt."

Is he, in your view, just making all this up answer by answer as he goes along?

THE WITNESS: Well, he's responding answer by answer.

THE COURT: The next question is: "Could it be around the Circle–B Restaurant?"

"Yeah."

"What were you driving at that time?" He said, "What kind of car?"

"A blue Malibu maybe?"

"Yeah."

"What route did you take after you pulled this robbery?"

"We went like going down to College Station."

"Okay. You were on Roosevelt then?"

"Well, we had turned off Roosevelt. We turned off like going to College Station."

"Let's back up a minute to the robbery. Were you-all armed?"

"Yeah, he was."

"With what?"

"A gun."

"Do you remember what kind of a gun?"

"A .38 or a .32, something like that."

"How did you-all come up to the old man? What was he doing?"

"He was getting a paper out of a box and Harold walked up there, put the gun on him and took his money."

Now, is this all fiction? He says it's true. Are you saying it's not true?

THE WITNESS: I'm saying that it's possible that he believes it's true but that his—but that it may not reflect reality. He may believe it's true but it may not reflect reality.

THE COURT: Now, then, let's say, you know, in testing the reality of it, that a car came up—a police car and the lights came on and they slowed down and then they sped off and the officers say that's exactly what happened, and that somebody shot at them, you know. And he says, "Yes," they shot. Now, is there any—why would you not—there's nobody that says it's not true. He says it's true, the officer says it's true. What is it about that that makes you suspect this is not a true statement of what happened? It's not this crime we're talking about now; this is another one.

I gather you do suspect that it's not true; is that correct?

THE WITNESS: I suspect that it is not entirely accurate.

Ms. Luckasson starts, and stays with, the assumption that Mr. Fairchild is mentally retarded. Then with that talisman in hand, she rejects anything and everything that is inconsistent with that assumption.

So while the Court admires Ms. Luckasson for her sincerity and for her willingness to fight for what she believes in, it finds her critical opinions in this case flawed and unsubstantiated by the evidence.

The Court had an opportunity to hear Mr. Dennis Keyes explain the WAIS–R test that he administered to Mr. Fairchild. In the Court's view, those details further explain how Mr. Fairchild scored so low on the test. Mr. Keyes acknowledged some variability in the results—such as was discovered by Dr. Johnson re the Stanford–Binet test. And it was clear to the Court

that Mr. Fairchild feigned ignorance on certain responses.

Since Mr. Keye's testimony was taken by telephone, he being in New Mexico, the record does not include the raw WAIS–R data. Nevertheless, Mr. Keyes gave an adequate explanation and description of that data. Dr. Johnson did not have an opportunity to study the WAIS–R data. She was therefore not in a position to comment specifically thereon while she was on the stand.

On the basis of all the evidence in the case, the Court is convinced that the WAIS–R numbers—just like the Stanford–Binet numbers—are unreliable. The only testing milieu that the Court believes to be reasonably reliable is that at the federal prison in Springfield in 1986. The motivation of Mr. Fairchild at the State Hospital in 1983 and in connection with the 1989 tests is suspect. But at Springfield, the petitioner's objective was to be found competent so that he could waive his federal habeas corpus rights and be executed. The Revised Beta test was administered by experienced experts. Although this test, being more of a screening device, is not as precise as either the WAIS–R or the Stanford–Binet, it is probably the most reliable rough indication of Mr. Fairchild's intellectual and cognitive ability that we have.

The last of petitioner's witnesses which the Court needs to assess is Mr. William Frank Parker, also a deathrow inmate. Mr. Parker's contribution became important once it was demonstrated in tests given by Dr. Johnson and also by Dr. Baroff and Ms. Luckasson that Mr. Fairchild *presently* understands the *Miranda* rights. Even petitioner's experts conceded that some mildly retarded persons—as they believe Mr. Fairchild to be—can understand and intelligently waive their *Miranda* rights. So the next question was: did Mr. Fairchild have this knowledge and awareness back on March 5, 1983, when he "waived" his rights before confessing? If so, petitioner loses on this issue. If not, how do we explain his present knowledge? As discussed above, Ms. Luckasson, being convinced that Mr. Fairchild is mentally

retarded, is of the opinion that Mr. Fairchild could not have developed his present understanding of his rights absent some "extraordinary" educational intervention. So if he did not understand his rights in 1983, he must have experienced such a massive intervention sometime *since* 1983. Enter Mr. Parker who Mr. Fairchild identifies as his key teacher in this scenario.

Mr. Parker, who admits his own guilt of capital murder, was the most blatantly cynical of all the witnesses. To him most legal rights are viewed as screens behind which the guilty criminal can successfully hide. At one point, he was asked whether he would ever advise an arrested person to make a statement. His answer, "Always keep quiet." Then he was asked, "Regardless of fault?" and his answer was, "Regardless of fault. Especially if you're guilty." He further explained, "I wouldn't want to help a police officer do his job."

Since coming to death row in November 1985, Mr. Parker has taken a two-year correspondence course as a paralegal. He states that he has taken courses in criminal law, trial procedure, research and trial practice.

Mr. Parker first met Mr. Fairchild when they were at Cummins, around the first of 1986. They would walk and talk in the yard. Someone told Mr. Parker that he should study the cases of his fellow death row inmates "because they're tried for the same thing you are." So he did. He testified that he was "only interested in cases that affect my case, which is capital felony murder, kidnapping, attempted murder."

When he read about Mr. Fairchild's case, Mr. Parker said to himself, "Hold it here. There's something wrong." He told Mr. Fairchild, "Man, if you hadn't confessed, they wouldn't have had nothing on you." He told Mr. Fairchild "that I felt that he wasn't guilty." He stated that Mr. Fairchild "felt the same way, that he didn't want to confess."

After they moved to Tucker, Mr. Parker testified that he really got into law courses and became fascinated with Mr. Fairchild's case. So he and Mr. Fairchild did a lot of talking. At some point he asked Mr. Fair-

child why he confessed and he replied, "They told me to." Mr. Parker asked Mr. Fairchild if he did not understand that he had a right to remain silent and he replied, "yes," but, Mr. Parker states, "He didn't understand that right." Mr. Parker explained that since he himself was at that time making his plans to go back for another trial and was going to represent himself he just "tested him on his *Miranda* rights." He further explained:

> The real reason I was drilling him on his *Miranda* rights was for disciplinaries. We're always getting disciplinaries on deathrow.

Mr. Parker was then asked how an understanding of *Miranda* rights would help one in connection with a prison disciplinary proceeding. His response:

A. You're actually in a trial. You're actually in a trial. And I was explaining to him about how to plead. You go in there and there's a judge and then there's witnesses or whatever and they take pictures of the evidence if you have contraband or statements—witness statements and the majority of the guys, they don't understand that, you know.

Q. Well, what's the *Miranda* rights got to do with it?

A. Because he has the right not to talk to that judge.

Q. Do they read the rights to you when you're charged with a disciplinary?

A. They—usually, Your Honor, that guy sits down there and he's got a tape recorder going and he's going so fast you don't know really what he's saying.

Q. Well, has anyone ever read you your rights in connection with a prison disciplinary?

A. When there's violence involved like assault on an officer or something like that, there is, sir.

Q. When they might prosecute you; not—

A. Where there's—

Q. —in the prison discipline system but in the courts?

A. Well, usually, the way I understand it is, if you've done something wrong like assault on an officer or something like that or—which is—I mean is Barry Fairchild or myself either spitting on an officer or throwing something on an officer, they have a right to charge you with assault. And I think it's procedure—I wouldn't swear to it—that they read you your *Miranda* rights.

Q. Do you recall that you've had your—

A. I've had my *Miranda* rights read to me.

Q. By a prison officer?

A. Yeah. It concerned an Officer Denton.

Q. How many disciplinaries have you been involved in?

A. I think in the years that I've been there about six—five or six.

Q. And were your rights read to you on each occasion?

A. I think just once.

Q. Go ahead.

Q. [BY MR. BURR] Do you know whether Barry has been involved in any disciplinary charges where *Miranda* rights might have been read to him?

A. I don't know.
I know that once Barry had a fight with Charles Singleton. An assault on another officer—I mean, another inmate is a felony, I guess. But they usually don't do it. It depends. But you've got to see, guys on deathrow, anything you do wrong they want to use against you later on so that they can blow it out of proportion or make it, you know, where they charge you with a felony or—

Q. So explain again, if you could, what the need was for Mr. Fairchild to be able to assert—or understand and make an intelligent decision about whether to assert his *Miranda* rights on death row.

A. A lot of times officers will come to your door. They're looking for contraband or something or just trying to stir up trouble. And, myself, I don't talk to them. I just stand in my door and just don't talk to them. A lot of guys that don't know any different will just talk to them, would answer their questions or—there's a bunch of situations where you would have to just not talk. If you got in a fight, they'd say, "Who threw the first fight?" [Sic] They're just fishing. You just say—don't talk. And it took me a long time to make Barry Fairchild understand: Don't answer their questions, no matter what they are or how harmless they sound.

The explanation Mr. Parker gives of the reasons he instructed Mr. Fairchild in his *Miranda* rights is full of holes and unworthy of belief. Apparently, Mr. Parker reasoned that if he wanted the Court to believe he actually systematically trained Mr. Fairchild in understanding his rights, he obviously had to come up with an answer to the question, why? Why train a person on deathrow about his *Miranda* rights? Of what early benefit would that knowledge have for someone under a sentence of death? Later, Mr. Parker appeared to realize his explanation was not credible. He frankly acknowledged that "teaching Barry Fairchild his *Miranda* rights, to me was like feeding a dead horse, you know, I figured, you know, it was already over with." So then he switched by explaining his teaching motivation as "a game." He states, "I would play with Barry."

The idea that Mr. Fairchild now has the *Miranda* rights well in mind is inconsistent with another observation of Mr. Parker: "You could sit him down and teach him something and he'll know it and come back two days later and ask him the same question and he won't remember it." Mr. Parker testified that he had explained the *Miranda* rights to Mr. Fairchild "at least a hundred times." He was asked if he knows if Mr. Fairchild understands them today. His answer:

I don't think he does. He understands the rights; he doesn't understand the concept.

But the CMR tests show that he does.

The Court simply does not credit Mr. Parker's testimony. The Court has observed his demeanor on the witness stand.

It has assessed the reasonableness or unreasonableness of his testimony. Although petitioner's counsel attempted to show that Mr. Parker was unaware of the need or effect of his testimony and, therefore, would not have any motive for fabricating same, there is evidence to the contrary:

Q. Mr. Parker, do you know that one of the issues that's now being litigated before Judge Eisele is Barry's understanding of his *Miranda* rights and his understanding of what it means to waive those rights?

A. Yes, sir, I do.

Q. When did you first become aware that this was an issue in his case?

A. A few months back.

Q. Do you recall how you became aware of it?

A. Well, read the paper every day and I read about it and—

THE COURT: You get the newspapers every day?

THE WITNESS: Yes, sir.

THE COURT: Can you watch television every day?

THE WITNESS: Yes, sir.

Q. [BY MR. BURR] Do you recall exactly what you read in the newspaper or heard on TV that made you aware of this issue?

A. All along I've known that Barry Fairchild is not playing with a full deck. We have others on deathrow that are retarded. And when I seen that Barry Fairchild had to understand his *Miranda* rights and I taught him that *and then I seen in the paper where they was using that against him* and I didn't—I didn't feel too good about that.

Q. Why is that?

A. I felt it was my fault.

Q. Explain that a little bit more.

A. I felt they was going to kill Barry Fairchild because I taught him something.

(Emphasis Supplied)

The CMR tests were not conducted by Dr. Johnson until March 5, 1989. The test results were reported in the newspaper along with petitioner's counsel's statement that such tests, even if valid, did not prove that Mr. Fairchild understood his rights back in 1983. As soon as Mr. Fairchild found out that he had passed the CMR, and the media so reported, Mr. Parker became privy to that information. See colloquy above. The rest follows.

The Court wishes to make it clear that it is not suggesting that petitioner's lawyers had anything to do with this. To the contrary, it has all the hallmarks of something worked out between Mr. Fairchild and Mr. Parker and served up to petitioner's lawyers and experts as the answer to their problem.

As stated elsewhere, the Court is convinced on the basis of the totality of the circumstances that Mr. Fairchild not only understands his *Miranda* rights now, but that he also understood them on March 5, 1983. His knowledge and understanding is *not* the consequence of the alleged extraordinary educational intervention since 1983 by Mr. Fairchild's fellow deathrow inmates and, more particularly, by Mr. Parker.

REVIEW OF IMPORTANT PARTS OF RESPONDENT'S CASE.

Under the Section "Immediate Occasion for Hearing," *supra* the Court went over Dr. Johnson's report of March 3, 1989, and noted her skepticism as to the accuracy of the IQ test she had administered to Mr. Fairchild and the bases for her concern about its reliability. Dr. Johnson's later studies confirmed that the original IQ score of 60 was unreliable.

On March 6, 1989, Dr. Johnson filed a second report. She had found and administered to Mr. Fairchild a test called the "Comprehension of *Miranda* Rights" (CMR). Mr. Fairchild obtained the following scores:

| Test | Mr. Fairchild's Score | Maximum Score |
| --- | --- | --- |
| CMR | 8 | 8 |
| CMR-TF | 12 | 12 |
| CMRV | 11 | 12 |

So, Mr. Fairchild came within one point of making a perfect score on the CMR.

When Dr. Johnson testified again at the full hearing, she concluded that Mr. Fairchild was not retarded. She roughly esti-

mated his IQ at between 72 and 78. The bases for her revised opinion will be stated in some detail.

After her first court appearance on March 3, 1989, Dr. Johnson checked to determine if there were some more specific tests that had been devised to measure the competence of a person to waive his or her *Miranda* rights. Through a colleague, she found such a test. It is called the "Comprehension of Miranda Rights, Vocabulary" (CMRV) Test. It apparently was developed by Dr. Thomas Grisso. She thereupon obtained a copy of the test and the instructions for its proper use and administered same to Mr. Fairchild with the results indicated above. See her report dated March 6, 1989, Respondent's Exhibit B. As stated in that report, "These findings indicate that Mr. Fairchild understands the meaning of the *Miranda* warnings as assessed by all three of these measures." Plaintiff's experts have also, since March 3, 1989, tested Mr. Fairchild with the use of the CMRV and have come to the same conclusion. See Dr. Baroff's testimony.

Although Dr. Grisso's book is entitled "Juveniles' Waiver of Rights," he has included a section on adults. Dr. Johnson reviewed the research conducted to determine if the number of prior felony arrests was significantly related to CMR scores. That research indicated that, for adults, the number of arrests does relate significantly to an understanding of the *Miranda* rights and therefore to the CMR scores. In this connection, it should be noted that Mr. Fairchild has a lengthy arrest record. See p. 8 of the Appendices to petitioner's "Successor Petition for Writ of Habeas Corpus." However, the evidence makes it clear that Mr. Fairchild's actual arrest record is much more extensive than that revealed on his official "rap" sheet. In this connection, it will be recalled that Mr. Womack, a black officer and a friend of the Fairchild family, testified that he had arrested Mr. Fairchild at least three times before 1970 and, on each occasion, read him his rights.

It is important to read the entire report made by Dr. Johnson on March 6, 1989 and the three appendices attached thereto because that report and those appendices not only reveal Mr. Fairchild's comprehension, but also show vocabulary usage and sophistication that would not be expected of one who had a 60 IQ on the Stanford–Binet or a 63 IQ on the WAIS–R test. Dr. Johnson herself expressed surprise at Mr. Fairchild's performance—especially in vocabulary performance.

In addition to administering the CMRV test, Dr. Johnson, after March 3, 1989, did the following things:

a. She had extensive conversations with Mr. Fairchild to learn how he thinks about things and to learn how he put sentences together and to determine if he understood her questions and responded appropriately. The results:

Q. And what did you learn from your conversation with him, or what did he tell you?

A. Well, he had no trouble at all understanding any of the questions, and he was very responsive and, I think, would have talked for hours if we hadn't had an ice storm going on. Was just very self-disclosing and revealing and anything I asked he tried to answer.

Q. And the answers were appropriate to your questions?

A. Yes.

Q. And was there any evidence of unusual thought process or anything abnormal about his conversation with you?

A. No.

b. She reviewed the contents of petitioner's "Successor Petition for Writ of Habeas Corpus." The petition is 32 pages in length and the appendices add an additional 109 pages.

c. She read the transcript of the 1986–87 federal court hearings.

d. She observed both of the videotaped "confessions" twice and listened to both of those tapes once.

e. She reviewed the literature on the "Revised Beta IQ Examination" and on the Henman–Nelson IQ tests.

f.  She reviewed the tests administered at the federal medical facility in Springfield, Missouri in 1986. She obtained the results of the MMPI test administered at Springfield and rescored it.

g.  She read Dr. Pritchard's deposition.

h.  She reviewed the Vineland Adaptive Behavior Questionnaire and "went to the test materials on the Vineland to look at the standardization and the norms on that."

It will be recalled that the school records indicate that the Henman–Nelson test was administered to Mr. Fairchild in the 1965–66 school year, i.e., when he was either 11 or 12 years of age. The school records indicate a score of 65. It was naturally important to attempt to determine the significance of that score. Dr. Johnson investigated and determined that the Henman–Nelson is a "pencil and paper group-administered abilities test." The school records indicate that Mr. Fairchild was in the fourth grade at the time. At that level, the Henman–Nelson would require reading and writing.

Dr. Johnson stated that the test that Mr. Fairchild took in 1965–66 was probably the 1957 version of the Henman–Nelson test. She conceded that most of the information which she had about that test related to the 1973 revision thereof. It was just assumed that the basic nature of the test, however, was not changed. Note Dr. Johnson's comments:

Q.  Is there any other information about the test that you were able to review that would be helpful in terms or that may be appropriate to relate to the Court, then?

A.  Yes. It said that this test has a number of important limitations when used as a sole screening instrument for selecting gifted or identifying learning disabilities in minority, culturally diverse and economically disadvantaged children.

It is noted that the Henman–Nelson does not consider multiple intelligences. What that means is like on the Stanford–Binet or the WAIS you have a number of scores and those are put together and come up with one score.

On the Henman–Nelson you simply get one score.

The other thing that is noted is that the manual specifically calls for caution when using the Henman–Nelson for individuals who are known to be from an educationally disadvantaged subculture. It also advises caution when extreme scores—and that is, below 80 or above 130—are obtained. Consistent with these cautions, research suggests that the Henman–Nelson tends to underestimate Wechsler full-scale IQ scores by about 10 to 15 points for certain populations.

Q.  Well, I guess was it not also true with respect even to Stanford–Binet and Wechsler back—has it only been in the last, say, 10 years that they have been redone to try to get out of them some of these biases, racial and cultural biases?

A.  There wasn't that much change in the Wechsler or the Stanford–Binet.

Q.  Before I leave that, do you now feel that the current tests, the Stanford–Binet or the Wechsler, are neutral in terms of cultural—either culturally deprived or racial biases?

A.  Essentially, yes.

Q.  And so you're saying this one apparently underestimates by 10 to 15 points, I gather those, who were in the disadvantaged area; is that correct?

A.  Correct. And that would be because it's basically a verbal test requiring reading and writing and it doesn't have visual/spacial components where you use that hands or show that kind of creative intelligence. It's more of an ability test like an achievement test rather than an intelligence test.

Q.  But it does suggest some things if it were given and scored. If he got 65 back then and it did involve pencil and paper and he's in the fourth grade, he would have to be responding to visual stimuli?

A.  Correct.

Q.  Maybe they repeat it. I don't know. You'll have to tell me. But I'm assuming when you say pencil and paper—

when you're administering to a group, they all of their little tests in front of them—

A. That's correct.

Q. —and they indicate their answers.

A. That's right.

Q. If he scored 65 and it's biased by 10 or 15 points against him, it would suggest that he would be making a higher grade if it were an unbiased test.

A. Right.

Q. We need to find out a little bit about the pre–1973 version of the test, so we'll get back to that later.

If, indeed, the 1957 version of the test was similarly biased, as one would suspect, then Mr. Fairchild's actual score would apparently be 75 or 80, rather than 65.[2]

Dr. Johnson then examined the State Hospital's records prepared in 1983. It will be recalled that one of petitioner's contentions is that the state failed to provide him with a professionally adequate evaluation of his mental condition. Petitioner faults the state for not adequately testing him in 1983, suggesting that if they had done so,

the test would have revealed petitioner to have a low IQ and to be mentally retarded. It is therefore important to note what the State Hospital's mandate was and how they performed their work. Dr. Johnson reviewed that work, as evidenced by the actual medical records, and also by reviewing the deposition of Dr. Pritchard. As a result, she came to understand why Dr. Pritchard arrived at the conclusion that "there was no point in giving him any other tests because he was not going to get valid results."

Dr. Johnson noted that Dr. Pritchard administered the Wechsler memory test to Mr. Fairchild. One of the "striking" things was that Mr. Fairchild did not get his birthday correct and that he did not know the month or the day and therefore obtained a zero score for his response. This stood out to Dr. Johnson because in all other reports, Mr. Fairchild was "oriented times four," i.e., oriented as to time, place, person and situation. Dr. Johnson observed that people who are severely demented do significantly better on this type of test than did Mr. Fairchild. She testified, "and so, based

---

**2.** Post trial the parties have submitted further data on the Henmon–Nelson test going back to 1953. The Court notes the following comment from the *Fourth Mental Measurements Yearbook* published that year:

> The *Henmon–Nelson Tests of Mental Ability* belong to the class of group intelligence tests which yield a single global score, an overall estimate of general intelligence; having no part tests, they are not diagnostic and they provide no measure of specifics. In the manual, the authors say "a wide variety of types of questions is used, thus furnishing a test of many kinds of ability." But the 90 items of Form A of the test for elementary grades include at least 52 items which are strictly verbal—vocabulary, word classification, verbal analogy, anagrams, and sentence completion. The items may be different in form, but the function being measured would appear to be almost entirely verbal comprehension. At all three levels, these tests are patently measures of that highly verbal component sometimes called "general intelligence" but perhaps more aptly labelled "scholastic aptitude."

> \* \* \* \* \* \*

> For those who prefer a single score measure of intelligence, the *Henmon–Nelson Tests of Mental Ability* have some definite advantages: their administration is simple, they can be scored quickly, and, most important, as far as one can judge from the available evidence,

they *do* measure scholastic aptitude, particularly at the lower levels where verbal comprehension is perhaps a more important constituent of school success than is either originality or initiative.

> \* \* \* \* \* \*

> Although the tests provide only overall estimates of intelligence, they can still be recommended to those who want a quickly and fairly cheaply obtained rough measure of that highly verbalized factor sometimes called scholastic aptitude. They are inappropriate for use in clinical situations in which diagnosis is desired, and they will probably give but poor assessments of the mental ability of children with language or reading difficulty or of children who are not verbally inclined. The tests appear to have most usefulness in the elementary school where they are particularly valuable in predicting school success.

The *Fifth Mental Measurements Yearbook,* published in 1959, states that the content of the then newly revised edition of the test "is substantially the same as that of the original tests." There is also the observation that, "The heavy emphasis on verbal content may produce results somewhat unfair to the non-academic student." These observations further buttress Dr. Johnson's views. The score of 65 by Mr. Fairchild on this highly verbal test when he had only the most rudimentary reading and writing skills is significant.

upon the results of this test, I understood why Dr. Pritchard then gave him what's called the 'memory malingering test.' It is so called because there is no memory involved in it." Then, when Mr. Fairchild did not name any of the shapes on this test, Dr. Johnson understood why Dr. Pritchard decided there was no point in giving Mr. Fairchild any other tests since the results already obtained had indicated that Mr. Fairchild was malingering.

Nevertheless, Dr. Pritchard did give Mr. Fairchild a Rorschach test. The Rorschach consists of a set of ten plates with different types of "ink blots" on each of them. Of the ten cards, Mr. Fairchild gave a response to only one which was card #5 which he said "looked like a bat." That is known as a "popular" response and he gave it within six seconds which is in contrast with the waiting periods on the others, some of which were quite long. This was further evidence that Mr. Fairchild was malingering.

So, Dr. Johnson's testimony supports the professional reasonableness of Dr. Pritchard's decision on testing Mr. Fairchild.

Dr. David A. Pritchard testified in this proceeding by deposition. He is presently the Senior Psychologist with the Central State Hospital in Georgia. He received his Ph.D. in Clinical Psychology from Indiana University in 1972 and has served as an Assistant Professor of Psychology at North Texas State University and at the University of Mississippi. He was later granted tenure at the University of Mississippi and served as Director of the Clinical Training Program, the Doctoral Program in Clinical Psychology. He came to Little Rock in December 1982 as the Supervising Forensic Psychologist at Rogers Hall in the Arkansas State Hospital. He remained in that position for approximately three years. He is licensed to practice both Clinical and Forensic Psychology in Mississippi, Tennessee, Arkansas and Georgia and is board certified in Forensic Psychology which is the specialty which provides evaluations and professional opinions to state and federal courts and administrative tribunals on psychological questions that have an impact on legal questions such as competency to stand trial, criminal responsibility, etc. There are only about 200 board certified forensic psychologists in the United States.

Dr. Pritchard testified that it would be normal not to give an IQ test under the circumstances revealed in the Fairchild file, i.e., when it was determined that the patient was malingering and uncooperative. He was asked if he had any information to lead him to believe that it either was or was not necessary to perform an IQ test on Mr. Fairchild. His response was:

> There's nothing in my report which would indicate that—that a test should be given; that is, there was nothing— there was nothing clinically or behaviorally which would suggest that he was severely enough retarded that an intellectual assessment was critical. However, it is a part of the routine at the State Hospital to give a test of intellectual functioning to every Defendant so that we can rule in or rule out the possibility of mental retardation.

Dr. Pritchard described the Wechsler memory test and the results thereon by Mr. Fairchild:

> In Mr. Fairchild's case, his performance on the Wechsler Memory Scale was so far below average that one would conclude, if you considered only the test results, that he was totally demented. He was just—he had absolutely no memory of anything. That is such a—an extreme score that I decided to give him the Memory Malingering Test to see whether or not he may be exaggerating any memory problems which might have been present.

> The Memory Malingering Test consists of the brief presentation of very simply graphic stimuli. For example, a box—a picture of a box, a picture of a circle, a picture of a triangle. These are presented for three to five seconds, they're immediately taken away and the subject is to tell you what it was that was on that card.

> Now, even a person with a very, very severe legitimate memory disorder will be able to report to you what was on

each one of those cards. It simply is not a task which involves a lot of memory skills.

In Mr. Fairchild's case, he clearly—his performance clearly indicated that he was manufacturing this memory problem. So his score on the Wechsler Memory Scale could not be taken at face value, but had to be interpreted as an indication of malingering. And that—and the impressions I generated during my interview are the basis for my diagnosis of malingering.

Dr. Pritchard was asked if he had an opinion as to whether or not Mr. Fairchild was, in 1983, mentally retarded. He responded that there was no information developed by himself, the social worker or the psychologist which would suggest mental retardation. He was then asked if he had an opinion whether a mildly retarded person would be able to understand the *Miranda* warnings. His response was:

In my experience, an individual who is mildly retarded—let me rephrase that. Mild mental retardation by itself is not predictive of whether or not an individual would understand the standard Miranda warnings. What would be more critical would be the individual's prior experience with the criminal justice system.

If this were the Defendant's first experience with being arrested and charged with a crime, then given that he is mentally retarded, you may have some doubts about whether he understood all the implications of waiving the *Miranda* rights. On the other hand, if you have a mildly retarded individual who has been through the criminal justice system a number of times, then it is possible for that individual to be much brighter—that is to have much greater "street knowledge"—about what the *Miranda* warnings mean than the individual who has had no prior experience with the criminal justice system.

Finally, Dr. Pritchard was asked if his diagnosis of malingering could be a mistake "in the sense that maybe this gentleman was mentally retarded." His response was:

A. No, I feel very confident that he was malingering.

Q. All right. So his inability to respond you don't attribute to mental retardation, per se?

A. No. Now, I must say that his—his efforts at presenting himself as having some type of severe mental problem were not very sophisticated. Okay, that is, they were pretty readily transparent to myself and to any other mental health professional, and they were borne out by the results of the Memory Malingering Test. But that's not to say—I mean, his unsophisticated effort or attempt to appear psychiatrically disturbed is not the same thing as being mentally retarded.

Getting back to Dr. Johnson, the Court notes that her testimony was interrupted to take Dr. Blau's testimony by telephone. Dr. Johnson heard Dr. Blau's testimony. When she resumed her own testimony, she first reviewed Dr. Blau's criticism of Dr. Pritchard's work. Her rebuttal appears entirely reasonable and plausible and is accepted by the Court. Her testimony also undermines many of Dr. Blau's opinions and assertions about the various tests (including the Revised Beta), the manner in which they are given, to whom, and the results.

The Court finds and concludes that Dr. Pritchard did a professionally competent job of evaluating Mr. Fairchild under all of the facts and circumstances. His decisions were reasonable and professionally sound.

Dr. Johnson then looked at the evaluation made of Mr. Fairchild in 1986 at the federal prison facility at Springfield, Missouri. She read the entire Springfield report, but she focused on the psychological evaluation. She was curious why they used the Revised Beta because she does not use it in her own practice. She therefore studied about the test and checked it out. She reviewed the affidavit of Richard Joseph D'Andrea, Ph.D., who administered the Revised Beta.

Dr. D'Andrea has a Ph.D. in Clinical Psychology. He is a member and fellow of the

American College of Forensic Psychology. He is at present the Chief Psychologist of the Allenwood Federal Prison Camp. From 1975 to 1987 he was a Clinical Psychologist at the U.S. Medical Center for Federal Prisoners at Springfield, Missouri. In this role, he trained Ph.D. level and M.S. level interns and, inter alia, provided independent psychological evaluations for the federal courts.

In his affidavit, Dr. D'Andrea gave the rationale for the use of the Revised Beta Examination as follows:

> The Revised Beta Examination is a performance test that is used in assessing intellectual functioning in illiterate individuals due to its non-reliance on reading skills and academic achievement. In this regard, it is minimally, culturally, and academically biased in comparison to other standardized tests such as the WAIS-R. Individuals with low intellectual functioning tend to receive higher I.Q. scores on the Revised Beta Examination as compared to other standardized intelligence tests; however, the difference in scores would not be so great as to inappropriately diagnose an individual as having an I.Q. score of 87 which is in the upper limits of the dull normal range (90 is at the normal range) when he is in fact mentally retarded (I.Q. of 70 or below). It should also be noted that the Beta I.Q. test was administered as a matter of routine to assess the general intellectual functioning as part of a battery of tests. There was never any indications during the clinical interview or any other time during his evaluation at Springfield, Missouri, that would have raised the issue of mental retardation, much less indicate that there was an intellectual deficit in regard to assessing his legal predicament. This was supported by the lack of any mention of low intellectual functioning in past records and the observations of his Counsel for Defense, Mr. O'Bryan, and Mr. Miller, Assistant Attorney General, who both felt that Mr. Fairchild was competent.
>
> In summary, the Revised Beta I.Q. test would not be an appropriate test if one suspected mental retardation or a learning disability and was attempting to arrive at a precise appraisal of intellectual functioning. However, for the purpose of arriving at a general assessment of intellectual functioning in regard to the issue of competency in an individual who was illiterate and shows no signs of mental retardation or has a history of mental retardation, the Revised Beta I.Q. test is entirely appropriate. Individuals who are so intellectually deficient that they are incompetent to understand simple legal issues are usually so self-evident, especially to a trained observer, that an intelligence test would be used more as an attempt to verify the condition after the fact, than for the initial observation that the individual is mentally retarded. In this regard, the choice of an appropriate intelligence test is a moot issue.

Dr. Johnson was asked what she had learned about the Revised Beta. Her answer:

> Well, essentially what I suspected at the time I was reading this was that it had in fact been used as a screening instrument, and I also thought, based on the whole writeup, that at the time he was there there was never any indication that he was retarded or psychotic or did not know what was going on. So there was no clinical evidence to suggest that he needed an individually-administered IQ test. And that was when I got this back from Dr. D'Andrea that's what I expected that it would show.
>
> But the Revised Beta itself is—contrary to what Dr. Blau was saying, it is a test that's designed for adults with below average abilities. He was saying it was designed for adults who were either average or better, and at least this is the Revised Beta 2. He may have been referring to the original one back in the thirties. I'm not sure.
>
> But it is a non-verbal, group-administered test. It takes about 15 minutes to give. It is recommended for adults who are suspected of having literacy problems. This is from the Mental Measurements Yearbook. It indicates that in the past this examination has been used

quite extensively for the testing of prison populations and unskilled workers. Although the test may be useful with the general adult population, the fact that the manual emphasizes the "exceptionally low test floor," suggests it is designed for adults with below average abilities.

So, I thought that probably that's what they used as a screening test. That's what they have used for years. Within institutions, within practices people use their tests, they come up with their own norms. Someone outside that system might not understand it, but if you are in that system and if you looked at hundreds or thousands of these things, it has more meaning to you. So I just thought that it was probably used as a screening test to get a rough estimate because there was no need to do an individually-administered IQ test.

A further observation of Dr. Johnson is important:

THE WITNESS: There is little research on this test. One of the things they mention here is that in terms of construct validity and comparing it with other IQ's the Revised Beta came out with a lower score than the people made on a WAIS. So, in other words, their WAIS IQ was higher than the IQ they obtained on the Revised Beta.

THE COURT: So, one would have expected if Revised Beta test was properly administered and the results were valid and he got 87, you would expect him to get an IQ—on which one? Either Stanford–Binet or Wechsler?

THE WITNESS: They just refer to the Wechsler here.

THE COURT: Above 87.

THE WITNESS: That's correct.

Dr. Johnson was referring to the old WAIS, not the WAIS–R (Revised) administered by Dr. Luckasson to Mr. Fairchild. She was asked to compare the old WAIS with the WAIS–R. Her answer:

The WAIS—typically you get a higher IQ on the WAIS than you do the WAIS–R by about 8 points.

They go on to point out that on this test, this study, this research, that the people were of approximately average in ability while the test is designed for below average, illiterate examinees.

So from this testimony, we learn that tests results using the old WAIS yielded IQ's that were higher than those derived from the Revised Beta. We are not told how much higher. Here, Mr. Fairchild got a score of 87 on the Revised Beta. Let us assume that, if tested using the old WAIS, he was only one point higher, i.e., 88. Then we are told that the old WAIS typically gave a higher IQ "by about 8 points." Under this exercise we could conclude that Mr. Fairchild should get a WAIS–R IQ score of around 80. In the light of all of the other evidence in the case, such a score would not, in the Court's opinion, be far off Mr. Fairchild's true IQ.

Then Dr. Johnson was asked whether in her opinion the Revised Beta was an appropriate test to use under the circumstances. She replied:

Well, anytime you're doing a psychological evaluation, you have to focus on what is the question to be answered; otherwise, you could do 10 hours of testing. Like Dr. Blau this morning was reviewing everything that should be in a psychological evaluation. That could easily be 10 or 12 hours of testing. In my practice, I have to do the least amount of testing to answer the question at hand. For example, I do social security evaluations, I do worker's comp evaluations. I do a lot of testing—about a third of my practice is testing—and I have to focus in and answer the question that's being asked. Just like you all asked me to give him an IQ test. I could have said, "Well, I can't give the IQ test unless I give all these others." But I think that's what they did at Springfield: they were using the minimal amount of test to answer the question at hand.

Dr. Johnson notes that Dr. D'Andrea also performed an MMPI test. He had provided only a summary of his interpretations so she decided to rescore the whole thing. To do this, she obtained the raw data—some 566 true/false questions and answers.

Before looking at the results of Dr. Johnson's analysis, let us recall Dr. D'Andrea's own summary conclusions:

The MMPI indicated a significant need to appear in a favorable light and to give socially approved answers regarding self-control and moral values. Lack of flexibility in adapting and a poor tolerance for stress and pressure is suggested. Similar individuals are seen as evasive, defensive about admitting to problems, and handling anxiety and conflicts by refusing to recognize their presence. They are described as hostile, irritable, demanding, argumentative, resentful, suspicious, immature, narcissistic, egocentric, and self-indulgent. Rationalization and projection are noted defense mechanisms. These individuals are often seen as impulsive and manipulative and are often in conflicts with authority figures. Poor sexual and marital adjustments are often noted. They—it's supposed to be there. There was no evidence of the distress signs of anxiety or depression, nor was there any evidence of bizarre mental content which would be suggestive of any psychosis.

Dr. Johnson agreed with Dr. D'Andrea's opinion that Mr. Fairchild was attempting at Springfield in 1986 to present himself in a favorable light. Her scoring of the MMPI confirmed Dr. D'Andrea's interpretation about Mr. Fairchild being narcissistic and went on:

... rationalizing his behavior, ignoring social standards; not profiting from experience, even if that experience includes punishment or psychotherapy; a disregard for social standards; often in trouble and referred for evaluation and treatment by various social agencies; little insight into his own behavior; and not taking responsibility for his problems or behavior; not cooperative in terms of keeping appointments; financial responsibility, and so forth; self-centered; immature; impulsive; emotionally superficial. A good first impression is often made by this individual as he is socially outgoing, energetic, and daring, but the presence of moodiness, unreliability, resentment and irresponsibility undermines

intimate, enduring interpersonal relationships. Under stress, there is difficulty modulating the expression of hostility which often results in temper outbursts. Anxiety and depression, which when reported do not appear genuine, are limited to superficial thoughts and feelings. Such expressions are usually transitory and a result of an environmental crisis such as getting caught. Genuine complaints of emptiness, boredom and self-dissatisfaction are common. People with this profile often see others as objects to be manipulated and used. They cannot see themselves as others see them, and are therefore apt to show poor social judgment and planning aptitude. Successful parenting is unlikely. There is often a history of chemical abuse and legal problems. If there is no history of abuse, be alert to that potential. They often experience marital, vocational, educational and interpersonal problems. Personality disorder diagnosis such as anti-social or passive-aggressive are typical. Mild paranoid features are likely. Along with a rather suspicious nature, the person is overly sensitive, quickly hurt in interpersonal and work situations. Potential for brooding and resentment, yet projecting blame and hostility onto others.

The MMPI results as stated by Dr. D'Andrea and Dr. Johnson reveal a personality strikingly different from the one suggested by petitioner's experts. Those experts describe Mr. Fairchild as being highly suggestible, compliant and easily led by authoritative figures. But note Dr. D'Andrea's observation that people like Mr. Fairchild are likely to be "hostile, irritable, demanding, argumentative, resentful, suspicious" and are often seen "as impulsive and manipulative and are often in conflict with authority figures." Add to this Dr. Johnson's statement that persons like Mr. Fairchild rationalize their behavior, ignore social standards, do not profit from experience, and are self-centered. She goes on to state, "People with this profile often see others as objects to be manipulated and used." The Court observes that these ob-

servations do accurately describe Mr. Fairchild as the Court has carefully studied and observed his behavior.

Then, Dr. Johnson noted the results Dr. D'Andrea had obtained on the Visual Motor Bender Gestalt Test. Those results were "perfect" which justified Dr. D'Andrea's conclusions that, "there was no evidence of any motor-perceptual difficulties indicative of any organic brain impairments...." Then Dr. Johnson pointed out that Dr. Luckasson had also given Mr. Fairchild a developmental test of visual motor integration (VMI) in February of 1989 and had found a VMI score of 6 years, 10 months on the Beery test. Dr. Johnson's comment:

> THE WITNESS: My comment is that the Bender test—those designs that you have on that sheet of paper—are essentially the very same items as in the Beery test. Some of the designs are exactly the same.

> THE COURT: Let me see if I can understand the significance of that comment. If you look at this and say that the Bender—that this is perfect. In other words, that he is making—he's looking at something and exactly drawing it. What would be his score?

> THE WITNESS: You really don't give those a score when it's—it's within normal limits. It's not impaired. It's average.

> THE COURT: When you look on page 103 to perceptual-motor and you see visual and auditory. Essentially they are using the same type of test. They look at something and ask him to draw it. What are these scores that we see here indicate?

> THE WITNESS: Well, it indicates—to me it indicates that he did a whole lot better at this type of task when he was at Springfield than he did when he was tested February 23rd, '89.

> THE COURT: Well, the summary of test results here on this February 23, '89 suggests that his perceptual-motor responses are essentially consistent with a lower IQ.

> THE WITNESS: Right.

> THE COURT: Whereas his performance in Springfield take him all the way out of any abnormal rating as far as Bender is concerned.

> THE WITNESS: That's correct.

> THE COURT: And this is a test where if they say, "Look at that and draw it," then assuming you can draw it the way it is, you can also not draw it the way it is. So, you can make a choice.

> THE WITNESS: Right.

To the Court, this is additional evidence of the difference in motivation in the two different testing situations. At Springfield in 1986, Mr. Fairchild was hoping that he would be found competent so that the Court would permit him to waive his federal habeas rights. But in February 1989, his motivation was to create a predicate for asserting that his waiver of his *Miranda* rights on March 5, 1983, was not knowingly and intelligently made because of low IQ and mental retardation. It was his hope that, if he could win on this claim, he would get a new trial, exclude his confessions, and walk away a free man. And the immense difference in results on these two tests reflect this "secondary gain" phenomena very clearly. It is further justification for Dr. Johnson's conclusions that the 1989 IQ tests are unreliable. The Court agrees and concludes that it would not be reasonable or safe to rely upon them.

The Court then went over the Revised Beta test results in great detail with Dr. Johnson and afterwards inquired:

> THE COURT: Well, you've done a lot of testing, and independently of your use of this particular test, having looked at it, can you draw any judgment? Would you expect—let me put it this way: Would you expect a person who made 87 on this test, having examined it, to make a—before you gave him the Stanford–Binet test—to make the scores you developed on the Stanford–Binet test?

> THE WITNESS: No. After I had finished the Stanford–Binet, my feeling was that his scores were higher than they were. I came home that night and scored it, and then I rescored it

because I had thought his scores were higher. That was when I, you know, looked at the pattern of his responses and saw that there was a lot of that variability that I talked about.

The Court then reviewed the results Dr. Johnson got on the Stanford–Binet test. After she identified various areas of concern, the Court asked:

THE COURT: So, is it fair or not fair for me to interpret what you're saying as indicating that you have some doubts on the validity of the Stanford–Binet numbers—the results that you got?

THE WITNESS: Yes, sir. After I reviewed all of this other material, then it confirmed my clinical judgment from his behavior and my impressions after the tests were administered that he had done better than the numbers indicated that he had done.

She also made the following comments about the MMPI:

The MMPI—the validity of it. Mr. Fairchild told me he took this test by tape; it was not read to him. Dr. Blau had mentioned that someone reading it to him with his level of intelligence would have to explain the meanings and explain the double negatives and that kind of thing. It was important to me that he took it by tape and understood it and produced a valid profile because that shows a good level of comprehension.

It was apparent to the Court that there was very little scientific rigor employed by petitioner's experts in their effort to measure Mr. Fairchild's adaptive behavior. And it is necessary to evaluate adaptive behavior because a conclusion of mental retardation necessitates a finding that the putative low intellectual functioning results in, or is associated with, deficits or impairments in adaptive behavior. Dr. Luckasson attempted to obtain answers to the Vineland Adaptive Behavior Scales directly from Mr. Fairchild but gave up on that effort because she states he was unable to understand a sufficient number of the questions to provide scorable answers. Her own conclusions about his adaptive behavior were then drawn mostly from her experience with Mr. Fairchild during the testing period of some six hours. She stated in her report: "Given the extent and nature of his disability as determined by other tests, and his consistent willingness to cooperate ... we concluded that his inability to understand the Vineland questions was caused by his mental retardation and accompanying receptive language impairments. Significant deficits in adaptive behavior were observed in his performance on the remainder of the tests." The Court was thoroughly unimpressed. This is bootstrapping carried to an extreme. It occurred to the Court that there was much more reliable information about Mr. Fairchild's adaptive behavior to be found in the state court and federal court records, in Mr. Fairchild's appearances in court, and as a witness, than that relied upon by Ms. Luckasson.

Dr. Baroff completed the Vineland Scale through the means of interviewing Mr. Fairchild's mother, sisters and a minister friend of the Fairchild family. None of these sources was brought forth as a witness during the hearing. They were all interviewed in March 1989 when the objective of the "Successor Petition" for habeas corpus relief was known to all. The actual Vineland was produced and put into the record at the request of the Court. See Petitioner's Exhibit K.

Dr. Johnson and the Court discussed the problem:

THE COURT: ... Would you rely solely upon family members, for instance, or close friends as a substitute for getting information from Mr. Fairchild, for instance; and if you couldn't get it from Mr. Fairchild, would you then turn to that kind of source, or would you have a broader source of information about his adaptive behavior over the period of his life?

THE WITNESS: I would attempt to look at it from other directions rather than using the Vineland. So many of the questions on there are simply inappropriate.

But if you look through that, so many of those questions have to do

with, "Does he prepare his own meals? Does he buy his own groceries?" And he's going to obtain a zero on those simply because of his setting if we're talking about where he is now.

THE COURT: Can you tell me—apparently both Dr. Baroff and Ms. Luckasson concluded that Mr. Fairchild was not the appropriate source of information that you might include in a Vineland. Now, ordinarily when you are doing a Vineland Adaptive Test where do you get the information, the answers to all the questions?

THE WITNESS: Ordinarily you are interviewing the parent because you are using this test with a small child, or you are interviewing someone who has custody over somebody because you use it with severely retarded individuals.

THE COURT: This test arose out of the Vineland School; is that correct?

THE WITNESS: Yes.

THE COURT: For retarded children?

THE WITNESS: Yes.

Dr. Johnson was then asked if there are other types of adaptive behavior tests that are geared to adults. Her response was, "Not for relatively normal functioning adults." She states that for most people mental retardation is "either apparent or it's not apparent." The Court observes that it was never "apparent" to anyone before February of 1989 that Mr. Fairchild was retarded—not to his family, not to his lawyers, not to the experts at the State Hospital who observed him in 1974 and for some two weeks in 1983, nor to the experts who observed him for over one month at Springfield, Missouri in 1986, nor indeed to the Court.

The Court discussed the Vineland (Petitioner's Exh. K) in great detail with Dr. Johnson. That discussion clearly reveals the unreliability of the Vineland as used with Mr. Fairchild as a basis for determining his adaptive behavior. In sum, petitioner has failed to show that any subaverage general intellectual functioning on the part of Mr. Fairchild resulted in or was associated with deficits or impairments in his adaptive behavior.

Dr. Johnson was asked if she did any adaptive behavior analysis on Mr. Fairchild:

THE WITNESS: Well, I reviewed the records as looking for when he wasn't incarcerated or having trouble with the law, was he working, was he holding part-time jobs or something, and the records indicated that he was. The records indicated that he had a relationship with a lady and that she had four children, and he has a good relationship with them—the children, as well as with her.

The records indicated that he does drive; that he functions independently. There's never been any suggestion that he needed to be institutionalized because he was retarded or psychotic or brain damaged or couldn't take care of his daily needs. He looks well nurtured, so he is eating on a regular basis. And what I tried to do was going by the outline of how the Vineland defined adaptive abilities, use the records to try to answer those questions.

THE COURT: Explain that to me.

THE WITNESS: Well, the subtests that we've just gone through about does he understand what's said to him, can you understand what he says to you, can he read and write—

THE COURT: Where are you looking now?

THE WITNESS: This is from the manual of the Vineland. You don't have this.

THE COURT: From the Vineland manual. All right.

THE WITNESS: How does he eat, dress, practice personal hygiene, what household tasks does he perform? And somewhere in the records the mother was talking about how he checks on her, he does things around the house, he still continues to come over almost on a daily basis.

How does he use time, money, telephone, job skills; how does he interact with others; how does he use play and

leisure time; how does he demonstrate responsibility and sensitivity to others. And those are the factors that the questions on the Vineland are set up to answer. So that's what I tried to look at in the records.

Finally, Dr. Johnson was asked if she had an opinion on the appropriateness of the Vineland test under Mr. Fairchild's circumstances. She replied:

A. I don't think it's appropriate to use it alone without supplementing it with other information that's available in the records and from just observation and interview.

Q. Let me ask you this, too. I believe I asked the same question of Dr. Baroff. If the information you get from the answers of the people that are being interviewed is not correct information, then your conclusions based on that may be erroneous conclusions. Do you agree with that? Is that a fair statement?

A. I agree with that.

Q. Is there really any way to determine whether or not the answers are appropriate answers?

A. No, you can't really determine that. That's the reason it's important to get as much information as you can so you can compare your sources.

Dr. Johnson was not able to review the raw test data Dr. Luckasson developed when testing Mr. Fairchild on the WAIS–R, that is the Revised Wechsler. Nevertheless, she noted the summary of the test results. Just as she noted a peculiar variaility in the scores she obtained on the Stanford–Binet, Dr. Johnson also noted the variability in the WAIS–R scale scores. She was asked what conclusions she would draw:

A. Well, like in so much of his testing, you know, including the Stanford–Binet, there are just areas where he does well and other areas where he doesn't do as well. That cognitive inefficiency that I mentioned earlier.

Q. Would it be suggesting of malingering? Is that a conclusion that could be reached?

A. Certainly not putting out his maximum effort. Malingering or having emotional reactions to some of the items because of school problems.

Q. Could it have anything to do with, as you have indicated in your testimony, that some questions he reacts negatively to because he perceives them to be like a school-type question? Could that account for it?

A. I think that could account for part of it; but I think that since there's so much of it, it just suggests he just wasn't putting out his best effort.

Q. You have no doubt noted she has indicated in a report that in her opinion he appeared to be making his best effort. What would that suggest to you?

A. Well, a person can be cooperative and they can, you know, work with you and all and still not put out their best effort. They can hold back. That's the reason you analyze the within test variability and you look at the pattern across tests, and you look at records.

These conclusions are consistent with other evidence reflecting the effect of motivation and secondary gain on test results. The Court is satisfied that the WAIS–R administered by Ms. Luckasson did not accurately measure Mr. Fairchild's intellectual functioning. The result is unreliable and cannot safely be relied upon.

Dr. Luckasson observed the videotaped confessions of Mr. Fairchild and made observations thereon which she contended suggested retardation. A secondary objective apparently was to suggest that those confessions were the product of suggestion and were unreliable. Dr. Johnson also viewed both of those tapes twice and, in addition, listened to both an additional time. When she started to testify about her observations thereon, petitioner's attorney objected on the ground that Dr. Johnson might not be familiar with the signs of mental retardation. She was asked to give some of her background in this regard.

Well, first of all, any clinical psychologist studies the core elements of intelligence, which is all ends of intelligence—from gifted to retarded and in between. As a neuropsychologist my specialty is testing. It's evaluations. And I have tested thousands of people. I have tested people who had had 60 IQs because they had dementia; 60 IQs because they were retarded; 60 IQs because they were brain damaged. Early in my training I worked at the Diagnostic Center for juvenile delinquents at Alexander where we evaluated all the kids that came through and had to determine if, in fact, they were emotionally disturbed or retarded or needed some kind of special services.

The Court overruled the objection and permitted Dr. Johnson to express opinions on the videos just as Ms. Luckasson had. Dr. Johnson was asked if she observed the kind of things Ms. Luckasson had described:

A. As I recall, what she was saying was that they asked a number of inappropriate questions, and she defined this by saying they encouraged bias in the responding. She was saying that they asked yes and no questions, and that this encouraged bias in the responding because retarded people have a bias towards saying yes.

In my viewing of the tape, I did not see that. He appeared to me to be spontaneous, relaxed. She indicated that he was acquiescent. I didn't see that. There were times when he, in fact, would correct the officer about what he had said. The incident that comes to mind was where they were talking about the location of the farmhouse and the officer said, "hard to find," or "difficult to find," and they agreed yes. And he said, "isolated," and Mr. Fairchild said, "isolated but not difficult to find." He corrected him. That was just one of a number of instances.

One thing that I found especially striking was that they gave him a cigarette and he started smoking; and after awhile, he just reached across the officer to get an ashtray. I found that striking because if someone was frightened and uncomfortable and scared, I wouldn't think they would be very calm and relaxed and reaching across someone to get the ashtray.

I didn't see any—at times he didn't seem to understand a word like "encounter." He didn't understand encounter and they picked that up and defined it for him immediately. There was another word like that as well.

To me, there was such a congruence between what he was saying and his body language. They just fit together perfectly. He very much uses his hands—as much as I do—and that all fit together. When he was talking about her jacket, he would do this. (Indicating.) When he was talking about her hat, he would do this. (Indicating.) Where the barn was, where the sheds were, where the trees was—were. They jumped out of the car and he indicated ran across the tracks and by an elementary school. To me, I just did not see that kind of suggestions going on and that kind of acquiescence.

Q. Now, one additional thing that you have indicated that you had an opportunity to review was the transcript of the hearing before this Court in 1987. Do you have any comments about your review of the transcript that would be pertinent to the matter before the Court now?

A. Again, what stood out was his vocabulary. One of the things I recall was when he was talking about where the officers had struck him, rather than saying, you know, in my gut or my belly or whatever, he kept saying, "In my midsection." That stood out to me. There were a couple of other occasions like that where his vocabulary exceeded or his use of language exceeded what I would have predicted based on a 60 IQ.

Dr. Baroff and Ms. Luckasson had commented that Mr. Fairchild's not beginning to talk until age 2 (as reported by his

mother) was indicative of mental retardation. She was asked if she agreed:

A. No, I don't agree with that.

Q. Why not?

A. Well, because the tables of development that are used by developmental psychologists and child clinical psychologists and pediatricians shows that that is not unusual. I brought this along just for reference. It has age 12 months what's expected, age 24 months what's expected in terms of language development. And it has a range here, but the range of combining two different words extends from—

MR. BURR: I'm sorry. Doing what?

THE WITNESS: Combining two words. Ranges from 14 months to about 26 months. Pointing and naming one body part ranges from age 15 months to about age 23 months. Naming a picture ranges from—

THE COURT: Pointing and naming—

THE WITNESS: Arm. Body part.

THE COURT: What was the range?

THE WITNESS: About 14, 15 months to about 23 months. Naming a picture— in other words, pointing at a picture and saying what's in it like dog— ranges from 16 months to about two and-a-half years, 26 months.

So for a child to start talking at age one is very unusual. It's exceptional, a child that does that.

Q. And it wouldn't be abnormal if they didn't start speaking until age two, then.

A. It would be abnormal if they didn't make any sounds, but for a child to babble and talk and say Mama or Dada or something like that before age two. It's the upper limit, but it's not out of the range of normal.

Finally, Dr. Johnson was asked based upon all the information that had been developed and reviewed by her if she had an opinion as to whether Mr. Fairchild is mentally retarded. Her response:

In my opinion, based on everything that I have read and looked at and the independent research that I have done and the testing, in my opinion he's not mentally retarded.

\* \* \* \* \* \*

I think that he has sufficient adaptive abilities to where he would not meet the three items necessary for a diagnosis of mental retardation. His development milestones—walking, talking, that kind of thing—as reported by his mother do not indicate retardation at that very early age level. No doubt he had a lot of problems in school. The attendance shows that it was very poor. I expect that it was even worse than what the record looks like because his mother, in the records, talked about how he would go to school but would come home to be with her. I'll bet a lot of times that didn't get counted. So, I have no doubt that his education was just nil to nothing.

The test that was administered, the Henman–Nelson—I would have to look at it, but from what I gather on it at the age it was given to him, even though part of it might be matching where he didn't have to actually read anything, by the fourth grade he probably did have to read some, plus we don't know how it was administered. He may very well have been just said, "Do this," because his school records look like he wasn't getting a lot of individual attention. So, I have doubts about before age 18.

Then in regard to an IQ, all those IQ tests that he's been given measure something. His emotional state and his reason for being tested has to be taken into account when you're evaluating the scores because any test, whether it's an achievement test, IQ test, aptitude test is a standardized interview. It's a standardized way of observing the behavior. And a person's initiative, their motivation, their attitude toward their performance on that test is going to vary, depending on why the test is given. They may be cooperating and trying to do their best, but conscious and well as unconscious factors can definitely interfere.

So, I have no doubt that he has a very low IQ. I think that the Stanford–Binet, from what I have analyzed of it in the

context of everything else, is a low estimate of his functioning. I don't think he's an 87 as reflected by the Revised Beta. But I think his IQ is probably somewhere 75, 78. Somewhere along in there.

Dr. Rosendale became the staff psychiatrist for the Arkansas State Hospital in 1970 and continued in that position until 1984 when he retired. Dr. Rosendale was the "attending physical" in connection with Mr. Fairchild's evaluation at the State Hospital in 1983. He would see him as he made daily rounds and would ask Mr. Fairchild if he wanted to talk but Mr. Fairchild declined. He ordered medical and psychological testing, the latter by Dr. Pritchard. Basically, he recalled Mr. Fairchild's refusing to cooperate and his diagnosis of "malingering."

Mr. Fairchild was at the hospital from April 14, 1983, until May 2, 1983. Because of his refusal to cooperate, Mr. Fairchild was not kept there for the usual 30 days.

Dr. Rosendale testified that he had good contact with Mr. Fairchild during the initial interview but had no cooperation thereafter. Mr. Fairchild understood the capital murder charge and the possible penalties of death or life without parole. Mr. Fairchild told Dr. Rosendale that he had been arrested 10 to 12 times. He claimed to be hallucinating and to be hearing voices from inside his head.

As indicated in his report of April 29, 1983, under "Stream of Talk & Activity," Dr. Rosendale testified that there was no evidence of mental retardation. This is important because it reveals that the issue of mental retardation was taken up, considered, and ruled out.

Dr. Rosendale also noted that he checked and determined that Mr. Fairchild had never been a patient at the State Hospital facilities in Benton but had been there on a work-release program from the prison.

Dr. Rosendale noted in his report that Mr. Fairchild claimed he had not been given his *Miranda* warnings, "but when asked to recite these rights, he rapidly goes through the four steps." And this was less than two months after the *Miranda* rights were given to Mr. Fairchild on March 5, 1983.

As stated in his report, Dr. Rosendale was of the opinion "that at the time of the commission of the alleged crime, he [Mr. Fairchild] was responsible, and further, that he is competent to stand trial. He will have no difficulty in assisting his attorney in a court of law."

[Note: Dr. Luckasson in 1989 also gave Mr. Fairchild the CAST–MR test (Competence Assessment for Standing Trial for Defendants with Mental Retardation). Her conclusion: "Mr. Fairchild appears to be competent to stand trial, that is, he appears able to understand the proceedings of a trial and assist his lawyer with his defense." These two assessments on this one competency issue were made almost six years apart.]

Dr. Rosendale testified that a CAT-SCAN and an EEG were administered to Mr. Fairchild with negative results.

Dr. Rosendale did not believe Mr. Fairchild's statements that he was hallucinating because his reactions were inconsistent with that possibility. He testified that people who are hallucinating are very concerned and very disturbed as a consequence. Mr. Fairchild was not. He simply did not show the appropriate responses. And, as noted above, Dr. Pritchard independently developed evidence of Mr. Fairchild's malingering.

Although he acknowledged that he is not an expert on mental retardation, Dr. Rosendale testified, based on his clinical judgment and long experience, that he does not believe Mr. Fairchild to be mentally retarded.

Dr. Donald Butts, the staff psychiatrist who examined Mr. Fairchild at Springfield, Missouri in 1986, also testified. He saw Mr. Fairchild briefly every day for over a month. These daily meetings would last 10 to 15 minutes. Twice a week he would interview Mr. Fairchild for 30 minutes to an hour. He pointed out that Mr. Fairchild was under observation by some staff member 24 hours per day.

It was Dr. Butts' opinion that Mr. Fairchild's cognitive abilities would place him in the low average to average. As stated in his report of September 29, 1986, "The patient's IQ was estimated to be in the low average to average range on mental status evaluation."

Noting that Mr. Fairchild had been arrested a number of times, Dr. Butts stated his opinion that petitioner could understand the *Miranda* warnings. He felt that to be within Mr. Fairchild's capability. He cited Mr. Fairchild's behavior while at Springfield. He pointed out that Mr. Fairchild had learned the rules of the prison and there had been no complaint that he did not understand those rules.

Dr. Butts testified that he would be very skeptical of any finding that Mr. Fairchild was retarded. And the Court observes that this has been the reaction of all persons, lay and expert, who studied Mr. Fairchild, or had close association with him, before 1989. Dr. Butts testified that he was surprised to learn that Mr. Fairchild's IQ had been put in question. To him, as a trained observer, the situation was obvious. He observed that it is hard to hide mental retardation on a day-to-day basis. He did not see the WAIS–R test result of 63 or the Stanford–Binet test result of 60 on the one hand, and Mr. Fairchild's actual functioning, on the other hand, to coincide. He was clearly skeptical of these two 1989 scores. The Court, as explained in more detail elsewhere herein, has come to share that skepticism. Indeed, it has gone beyond skepticism to the conviction that both of those scores are unreliable.

*OTHER EVIDENCE BEARING UPON MR. FAIRCHILD'S MENTAL STATUS, FUNCTIONAL INTELLIGENCE, AND ADAPTIVE BEHAVIOR.*

A.  The 1974 Armed Robbery and Related State Hospital Report.

The earliest Arkansas State Hospital report that we have on Mr. Fairchild is dated October 21, 1974, and is signed by H.G. Hearnsberger, M.D. See last page of Petitioner's Exhibit J. It is in reference to an armed robbery charge against Mr. Fairchild. Respondent's Exhibit G consists of the Advice of Rights signed by Mr. Fairchild on August 17, 1974, in connection with said charge and also a hand printed confession signed by Mr. Barry Lee Fairchild together with a "Plea Statement" also signed by him. The confession, hand printed by Mr. Fairchild, states:

Me m—Frank K. Martin robbed old man. He pulled the gun dan I took the wallet we ran

As the Court understands it, it was Ms. Ruth Luckasson's opinion that a person with the degree of mental retardation that she found in Mr. Fairchild could not possibly have written that confession. But it is quite clear that he did.

Of further interest is the manner in which Mr. Fairchild proceeded in that case. He went to the State Hospital where he was seen by Dr. Hearnsberger. The Doctor's brief notes are as follows:

Been in jail 1½ months—armed robbery. Supposed to have gotten some money. Wanted to plead insanity because he had been to Beton [sic]. He was picked up at 7:30 and he was supposed to have been at home at the time robbery occurred some 20 minutes before. A friend, Frank Martin, was with him and he is in jail now. Man robbed is about 40, blonde and heavy st. Never seen him before he came to jail. He decided himself to plead insane. He thinks some insane people shake and others act normal. He doesn't think he is insane. He thought the hospital would be the best place for him to come. He has bad nerves—shakes a lot—when he gets excited, mad in fights. Worked in landscaping for T.A. Willis. Worked 4–5 months. Stays mad most of the time. Never had any good times in his life. Says memory is bad. Knows date, month, year and day of week. Only vision is light flash across. No auditory hallucinations and no obsessions. Doesn't drink much. Few dreams. No serious illnesses. Has been shot in left arm by sister in 1967. Dislikes loud sounds. No paranoia. Not afraid they will pin robbery on him. Mother intends to get him a good lawyer. No bizarre thoughts or mannerisms.

Provisional Diagnosis: No mental disorder. 318.10

Treatment and Disposition: Admit to 7–B and Discharge. Return to County Jail. Called attorney. Check on record from Building 8–9 in Benton.

Mr. Fairchild was 20 years of age at the time. He pled guilty pursuant to the "Plea Statement" which was also signed by his attorney, Mr. Michael Castleman, on December 12, 1974. According to his Police Record, he was sentenced to seven years on December 13, 1974. The Court believes that this record not only bears upon Mr. Fairchild's competency, but that it foreshadows some of his behavior at the Arkansas State Hospital in 1983 after he was arrested for the rape and murder of Ms. Mason.

B. Prison Institutional Record.

The Assistant Director of the Arkansas Department of Correction, Mr. Larry Norris, testified concerning Mr. Fairchild's institutional record. Mr. Fairchild served one month on a grand larceny charge in 1971. He came back in 1974 on a seven-year sentence for robbery. After serving 26 months on that sentence, he was paroled on November 10, 1976. On August 9, 1979, he was returned as a parole violator. He remained on a newcharge and was then discharged on October 28, 1980, after serving 14 months. Finally, he was returned on his current death sentence on August 2, 1983.

Mr. Fairchild has a relatively good disciplinary record. Apparently he has received only three or four disciplinaries in total and only two while on death row.

Before he was placed on death row he served as a trustee with the beef herd with minimal supervision. He had a good attitude and good work performance, reflecting good adjustment. He was moved to the cattle operation at Booneville, Arkansas, in 1975, before going to pre-release at Benton in 1976.

Mr. Norris served on the Classification Committee and has talked with Mr. Fairchild several times. He never doubted that Mr. Fairchild understood their conversations. And he observed that Mr. Fairchild followed instructions. He testified that they have always had a good relation and that Mr. Fairchild had no problem adjusting to prison.

Mr. Fairchild's parole records indicate that he reported quite regularly as required while under parole supervision.

Mr. Norris noted that Mr. Fairchild's last disciplinary was on July 7, 1988. It was for the unauthorized possession of an FM radio. Mr. Fairchild gave a statement admitting he had a radio.

Mr. Norris stated *Miranda* warnings are not given in connection with prison administrative disciplinaries. This is important in connection with the testimony of Mr. Parker, another death row inmate, who stated that he "schooled" Mr. Fairchild on his *Miranda* rights so that he could use that information in connection with prison disciplinaries.

C. Mr. Fairchild's Behavior in Police Undercover Work and His Prior Contacts with Criminal Justice System.

Mr. Fairchild, as stated elsewhere herein, had numerous run-ins with the law starting when he was around eleven years of age. It has already been noted that Mr. Womack arrested him at least three times before 1969, and his formal arrest record does not begin until 1971. But Mr. Fairchild also had knowledge of law enforcement activities and procedures from working with the police. At the trial in state court before the jury, he testified:

Q. [MR. O'BRYAN] Who is Wayne Chaney?

A. He is a detective for North Little Rock.

Q. Do you know what part of the North Little Rock Police he works for?

A. From the way I understand, he works with North Little Rock.

Q. Have you ever had any dealings with him working in narcotics?

A. Yes, sir.

Q. What kind of dealings?

A. I use to help them bust different type guys.

Q. You got paid for that, didn't you?

A. Yeah.

Q. You did it because you needed the money?

A. Yeah. Just really, I liked to—

Q. You liked Chaney?

A. Yeah. At the time, I liked him.

Q. You and him got along pretty good?

A. Yes.

Q. Did he ever come over to your mom's house when you were there?

A. Yes, sir.

Q. Very many times or just a few?

A. Very many times.

Q. Many times?

A. Yes, sir.

Q. What would he do when he would come over to your house?

A. We sat around and talked. If he had anything he needed to do, I would go over and try to get it taken care of for him.

Q. If he wasn't wanting you to do anything, would he still come by the house and talk?

A. A few times.

Q. What kind of things did you do for him?

A. Just like he would have a drug bust that he needed to get busted. He would tell me the guys name or whoever he is. I would go over and call the guy that he wanted to bust. I would go call him and have it set up.

Q. What do you mean, "set up"? How do you do that?

A. Just like when I called the guy, I would tell him to meet me at a certain place with whatever he got.

Q. Would you ask for something in particular?

A. Yeah. Just like marijuana, or cocaine, or something like that. I would tell him to meet me at a certain place with a certain amount. He would always meet me there.

Q. What would happen when you would meet him?

A. They would be parked somewhere watching. When we meet, I would always act like I'm going to buy it. They would rush in there and bust them.

Q. Did they arrest the other guy?

A. Yeah, he arrested both of us.

Q. Then what would happen? Did they put you in jail?

A. No. They wouldn't put me in jail. They would take me in the interrogation room in North Little Rock. They would take him in one and me in the other.

Q. Then you would bond out, I guess.

A. Yeah.

Q. You didn't have to get a bondsman, did you?

A. No, sir.

Q. Would you have a court date come up when you were suppose to go to court after an arrest like that?

A. No, I wouldn't really have no court date. The way they would handle it, it would seem like I would.

Q. Do you know what was suppose to happen at court, or why they were doing it that way?

A. That is the way they would have it set up. Like me and the guy was suppose to go to court the same date. He would go, and I wouldn't show. So the judge would call my name. I wasn't there. He would just put a warrant out and say he was going to put a warrant out for me.

Q. For not showing up in court?

A. Right.

Q. They didn't ever pick you up for not showing up in court?

A. Right.

Q. Did that happen one time or more than one time?

A. That was more than one time.

Q. How many times do you think?

A. About ten or fifteen.

Q. You mean actually where they would go through and mock arrest with you?

A. Right.

Officer Chaney confirmed the use of Mr. Fairchild as an informer:

Q. [BY MS. KESL] How long have you known Barry?

A. Three or four years.

Q. During that time, have you had, for lack of a better term, a relationship with Barry Lee where he has assisted you in some drug arrests?

A. Yes, ma'am. Two months and last year, '82, about two months he helped me.

Q. Exactly how did that work?

A. He was coming to us with information about drugs. We would pay him after an arrest was made and we would seize drugs, we would pay him a fee for helping us.

Q. He would tell you somebody that he was going to buy drugs from, supposedly buy drugs from, and tell you where it was going to be?

A. Yes, ma'am. The particular incident he helped us on, he made arrangements with another individual to deliver a few pounds of marijuana. At which time, when he did, we arrested the suspect. And after the arrest and we seized the marijuana, we paid him a fee for helping us.

Q. About how much was he paid?

A. I really couldn't recall. It wasn't very much. It was twenty or thirty dollars at the most. That's determined by the lieutenant how much we pay out.

Q. During at least one of the incidents where this was set up, was it made to appear that he was arrested?

A. Yes, ma'am.

Q. Did you actually go through reading him the rights form?

A. No, ma'am. We didn't read him his rights. We placed him under arrest.

Q. You went through the motions as if you were placing him under arrest?

A. Only in front of the other suspect, so that we could keep his identity safe, that he was working with us.

Q. Was he told to appear in court?

A. We told him that the judge—On the day of court, that the other suspect was suppose to come to court, the judge would call his name out, as he would if he was really arrested, to be there.

It takes a certain amount of intelligence and guile to operate effectively as a police informer. And police do not ordinarily deal with persons in such roles who are unreliable, unpredictable, or who cannot follow instructions carefully. Mr. Fairchild's description reveals a clear understanding of the procedures involved and the ruse being carried off. He not only did it for the money, he "liked to."

D. Willingness To Lie and To Manipulate Legal System.

Since the credibility of psychological evaluations of Mr. Fairchild in 1983, 1986 and 1989, is at issue in this proceeding, it is important to note that Mr. Fairchild is willing to lie even under oath. For instance, he has lied about the abuse he contends he suffered at the hands of the law enforcement authorities. One does not have to rely solely upon this Court's previous findings (see September 11, 1987, Findings of Fact and Conclusions of Law entered after a two-day hearing) to establish that fact. No, petitioner has admitted it on at least one important occasion. The issue related to the bandage on his head which is clearly seen in the videotapes of his confession. In the 1986 hearings before this Court, Mr. Fairchild was on the stand when the following occurred:

THE COURT: Let me ask. The bandage on your head there in the picture that we saw, was that put on your head in Russellville at the hospital?

THE WITNESS: Russellville.

THE COURT: At the hospital?

THE WITNESS: Yes, sir.

THE COURT: Is that the only time a bandage was put on your head?

THE WITNESS: Yes, sir.

THE COURT: Have you made any statement to the contrary? Have you ever made any statement that you were hit on

the head down here and that your head was bandaged down here in Little Rock?

THE WITNESS: I can't recall.

THE COURT: Anyway, that bandage was put on up there at Russellville?

THE WITNESS: In Russellville.

After the attorneys completed the questioning of Mr. Fairchild, the Court again took up the subject:

THE COURT: Let me just ask you. Back at the hearing in front of the trial court about this whole thing—do you remember?

THE WITNESS: Yes, sir.

THE COURT: You testified and mentioned that Mr. Robinson was there and Major Dill and several other people were sitting around. Let me just read. It says, "So you were telling them you didn't know anything about it?"

"Yes, sir."

"Then what happened?"

"Tommy Robinson walked up there with a shotgun. I didn't know if he had anything in it or not. He was pointing it at me. I put my hand up trying to block him."

"Were you sitting down or standing up?"

"I was sitting down."

"What did he do with the shotgun?"

"He hit me."

"What was he doing with it?"

"He was pointing it at me. He was telling me that he was going to blow my head off and stuff like that."

"Can you remember exactly what he said?"

"He said, 'If you don't tell me what I want to know, I'm going to blow your head off.'"

"Were there other police officers there?"

"Yes."

"Which ones?"

"I don't know their names. I know them when I see them. That captain that has the Afro type, he was there."

"Has he been here today?"

"Yes, sir."

"Then you say Sheriff Robinson was holding a rifle on you—a shotgun. And then you did what?"

"I put my hand up. He had it right up close to my face and it was so he wouldn't hit me in the face with it. He hit me across the arm."

"Anywhere else?"

"When I went over just like that, that's when he hit me on the head."

"What did he hit you in the arm with?"

"With the barrel of the shotgun. He did like that."

"Then you bent over."

You say, "My hand was hurt and I went over and put it down between my legs. That's when he hit me in the top of my head."

"Did you have a bandage on your head at that time?"

"No. After he knocked me in the head with it, it was kind of bleeding and they took me downstairs."

"He hit you in the same place the dog bit you?"

"No. He didn't hit me in the same place. It was right up above it."

"You couldn't really say what it looked like back there?"

"No, I couldn't really."

"So, then, after that, when did they put the bandage on it? Right after he hit you with the gun or after a little while?"

"About a little while."

After reading the quoted language from the state trial court record, this Court asked:

THE COURT: Now, did that happen?

THE WITNESS: What's that?

THE COURT: At the Pulaski County Jail. Did they hit you over the head and take you down and bandage up your head?

THE WITNESS: No, sir.

THE COURT: That didn't happen?

THE WITNESS: No, sir.

THE COURT: Why did you say so here?

THE WITNESS: Because he whupped me up pretty bad with that shotgun. That's the reason I said that. *But he didn't hit me in the head. I already had that bandage on.* (Emphasis supplied)

The point here is not simply that Mr. Fairchild will lie under oath but to emphasize the mental acuity required in adopting an untrue scenario and then staying with it quite consistently—at least until the rug is pulled out.

Earlier in that state court *Denno* suppression hearing the state had called Sheriff Robinson. The sheriff testified as follows:

Q. Okay. What was his condition, as you observed it, his physical condition, regarding alertness and that type thing?

A. He had a large bandage on his head, but he was very alert and did not appear to be under any stress or under the influence of any type of drugs. He was mentally alert.

\* \* \* \* \* \*

Q. Now, Sheriff Robinson, prior to the videotaped statement being taken, did you see any promises or threats made to the Defendant to get him to give that statement?

A. No. I did not.

Q. Did you, at anytime during the taking of that videotaped statement, prior to it, while it was going on, did you or any other officer or any other person whatsoever threaten or coerce the Defendant in any manner or make any promises to get him to give you that videotaped statement?

A. No. He was very cooperative and it was a very amiable type situation.

Q. You never saw any beatings at all?

A. No.

Q. Did you ever hit him with a shotgun, rifle butt, any type of long gun butt?

A. No. I did not.

\* \* \* \* \* \*

Q. I believe you have earlier testified that you didn't see any physical force, threats of violence, or anything like that by anyone directed toward the Defendant to get him to make that statement, is that correct?

A. No. He was very cooperative.

\* \* \* \* \* \*

Q. Did you see any suggestive suggestions to him, as to how to answer the questions?

A. I did not.

\* \* \* \* \* \*

Q. Was he expressing any complaints about anything, pain or anything else, the second statement, that you recall?

A. Some point in time he said he had a headache. I think someone gave him two aspirins. I don't know what point in time. He was a very unusual prisoner and/or arrested person. He was very cooperative. It was not a combative type scenario in dealing with him at all.

Of course, Mr. Fairchild was present and heard that testimony. He also heard the following re-direct examination of the sheriff:

Q. Sheriff, I asked you, did you ever touch him or hit him with any type of a long rifle or shotgun butt prior to the first statement. Did you ever do that during your entire contact with the Defendant?

A. I have not.

And he also heard Dr. Sandra Young testify at the suppression hearing. She is the doctor who took care of the dog bite on Mr. Fairchild's head at St. Mary's Hospital in Russellville on the night that petitioner was captured. After she was questioned concerning her treatment of Mr. Fairchild, petitioner's counsel, Mr. O'Bryan, asked the court for permission to have Dr. Young view a portion of the videotape in order to observe Mr. Fairchild. The court granted permission. Before the first part of the videotaped confession was shown to Dr. Young, the following cross-examination occurred:

Q. (BY MS. KESL) Ms. Young, what type of bandages did you apply to this wound?

A. None.

Q. None whatsoever?

A. No.

Q. When he left the Russellville Hospital, did he have bandages?

A. No. We routinely do not to head wounds, unless you need a pressure dressing. Because nothing will stick, because of the surrounding hair. Usually patients are more uncomfortable from the bandage than they are from the wound.

MS KESL: That's all the questions.

The videotape was shown so that Dr. Young could observe Mr. Fairchild's appearance. Then, further cross-examination of Dr. Young occurred:

Q. (BY MS. KESL) Dr. Young, you just watched the portion of the videotape?

A. Yes.

Q. Did you recognize Mr. Fairchild in the tape?

A. No. His face was dark. All I could—

Q. The person that you saw on the tape, did you observe any bandages on that person?

A. Yes.

Q. Would you describe those bandages, for the record?

A. Appeared to be wrapped around the back of the head, across the forehead.

Q. Did you put those bandages on Mr. Fairchild?

A. No. I did not. May I make a comment. If the nurse did at the hospital, it wasn't documented and he wasn't charged for it.

Q. The hospital records do not indicate that?

A. The hospital records do not indicate such bandages.

Q. You didn't order such a bandage?

A. It's certainly not written on the chart. I don't recall. I don't routinely put bandages on—

Then the prosecutor inquired of Dr. Young as follows:

Q. (BY MR. RAFF) Okay. At the Russellville Hospital, is it possible that a nurse or other medical personnel saw Barry Lee Fairchild after you finished your treatment?

[Objection made and overruled.]

A. No. The nurse would have gone in to give the tetanus shot after I had left the room, while I was out writing on the chart.

Q. So, it is a fact then, that a nurse did go in and see him after your treatment, is that correct?

A. Yes.

Q. Is it possible that that nurse wrapped his head in a bandage?

A. That's possible, If she did, she didn't charge for it.

Q. Okay. We're not worried about money here today.

A. I know. But that's one way to follow-up.

It is the judgment of this Court that a retarded person could not monitor the testimony of other witnesses, identify opportunities arising therefrom to support his physical abuse contentions, and then tailor his own testimony to be consistent therewith. At the suppression hearing, Mr. Fairchild testified:

Q. Do you remember her giving you the tetanus shot?

A. Yes. She gave me a shot.

Q. Do you remember her putting a bandage around your head?

A. She didn't put no bandage.

Q. Did anybody there in the hospital at Russellville put a bandage around your head?

A. No, sir.

And then on cross-examination:

Q. She did put stitches in your head like she testified to?

A. Yes, sir.

Q. You said she didn't put a bandage on your head?

A. No, sir.

Q. And nobody there at Russellville put a bandage on your head?

A. No, sir.

Q. When Bowman was driving you back from the Pope County Sheriff's Office, back to Little Rock, Pulaski

County, there wasn't any bandage on your head?

A. No, sir.

\* \* \* \* \* \*

Q. When Tommy Robinson hit you in the head, did you bleed?

A. I guess not right then. Because, like I said, they waited for a while before they took me to the doctor. And then I felt something going down the back of my neck, right back there.

Q. They had to take you to the doctor again?

A. Yes. They had to take me downstairs. They have got a nurse office down there. They took me down there. They saw it was bleeding. That's when they put that bandage around my head.

Q. Was it a nurse, female nurse?

A. Female nurse.

Q. Who treated you down there?

A. Yes.

Q. What did she do to you, do you remember?

A. She just cleaned it with something, and put something on it, and put that thing around it, that bandage.

Q. Right after he hit you, did they take you down to the nurse then?

A. No, sir. They waited a while.

Q. They waited a while?

A. Yes.

Q. Did Tommy go down there with you to the nurse?

A. No, sir. He didn't go down there.

Q. Is that woman nurse, that was downstairs, is she the one that put that big old bandage, kind of like a turban around your head?

A. Yes.

Q. She put that on?

A. Yes.

Mr. Fairchild also testified at the trial before the jury about this matter. It must be remembered that the suppression hearing described above was conducted on June 9, 1983, before the judge and out of the presence of the jury. But at the trial before the jury, held in late July 1983, the same issue came up. By this time, Mr. Fairchild knew that the state could readily establish that the bandage seen on the videotape had been placed on his head at the hospital in Russellville. At the trial his testimony was:

Q. After you got bit by the dog, I guess they put you in the patrol car then?

A. Yes, sir. They put me in the patrol car.

Q. Where did they take you to?

A. The hospital.

Q. Do you remember what happened over there?

A. No, not really.

Q. Do you remember seeing the doctor, Dr. Young that was here this morning?

A. Yes, sir. Well, I remember seeing a woman, after they took me and put me on the bed. I remember seeing a woman. She was going something to the back of my head. That's about all I know.

Q. What about a nurse. Did a nurse work on your head?

A. Yeah. Well, a woman. She was a nurse. She doctored me in the head.

Q. Did you feel okay then about the dog bite?

A. Well, I really don't know how I—I just was there, you know.

Q. Did they put a bandage on your head over there?

A. If they did, I didn't remember.

Q. Could you see up? Do you ever remember looking in a mirror?

A. I didn't get to look at no mirror or nothing.

Q. Did you see a nurse in the Pulaski County Sheriff's Office?

A. Yes.

Q. Later on that same night?

A. Later on that same night.

Q. What did she do?

A. She cleaned some blood up and stuff where I got hit in the head.

Q. Okay. Do you know of anything else. Did she put any more bandages on your head or anything?

A. I don't know. She might have. She took something off and put something on. I don't know if it was a bandage or not. It was laid on at the Sheriff's Office.

On cross examination during the trial before the jury, Mr. Fairchild testified as follows:

Q. [BY MR. RAFF] Let's talk about that head bandage. Do you remember that?

A. Yes.

Q. You talked about it before, hadn't you?

A. Right.

Q. When did you get the head bandage, Mr. Fairchild?

A. From the way they did me down at Pulaski County. I guess the nurse there was changing it or she was checking it. But I understood my lawyer said that they put on one in Russellville. I didn't know, you know.

Q. I want to ask you again. When did they put that head bandage on?

A. When did they put it on?

Q. Yeah.

A. I don't know. They said they put on one in Russellville, but I don't know.

Q. You didn't even know you had it on? Is that what you're going to tell this jury is the truth. You didn't even know you had it on?

A. I couldn't see up on my head. That dog had bit the back of my head. It was hurting real bad.

Q. Come on Mr. Fairchild. Are you going to tell this jury that because you couldn't see it, you didn't know it was on your head?

A. My head was hurting real bad. I didn't know if nothing was on my head or not.

Q. Did you ever take your hands and do like that?

A. I had handcuffs on.

Q. The whole time?

A. The whole time.

Q. You never knew that a nurse put a bandage on your head, and you couldn't feel anything all the way around your forehead down to your eyebrows? You are telling that jury that is the truth under oath, that you didn't know you had the head bandage?

A. Just like she was shaving the back of my head, and when she got through, I was just about asleep.

Q. You are telling this jury under oath for them to believe is the truth, that you didn't even know when they put the head bandage on?

A. I don't remember when they put the head bandage on my head at Russellville. I thought they did it in Little Rock.

Q. Did you ever, in fact, testify under oath that it was put on somewhere else, and you remember it being put on somewhere else?

A. Like I said, at the Pulaski County Jail, when they took me downstairs, the nurse was cleaning the back of my head or something, and she was putting something on it. So I thought maybe she was putting another head bandage on.

Q. Another head bandage on?

A. Another head bandage.

Q. But you already had one on from Russellville, is that right?

A. Yes, my lawyer told me.

Q. I know what your lawyer's told you now. I'm talking about what you were telling me before.

A. Yeah.

Q. You told me you didn't have a head bandage on until you went downstairs in Pulaski County, is that right?

A. I didn't know I had it on there. I had on one. Just like I said, when I went down there, she must have changed it, or she was checking it.

Q. So, now you're telling us that you think you did have one on in Russellville. You told me before you didn't, isn't that right?

So we see an obvious effort to accommodate to the failed earlier attempt and to engage in damage control. Now he is saying that, "If they did [bandage his head at the hospital in Russellville], I didn't remember," and to suggest a possible reason for his confusion, i.e., that a nurse at the Sheriff's Office in Little Rock "might have" put on more bandages. All of this has to be viewed in the light of his admission at the hearing before this Court in 1986 that he had lied, and that "the only time a bandage was put on" his head was at the hospital in Russellville and that "he [the Sheriff] didn't hit me on the head. I already had that bandage on."

And the record shows other instances of Mr. Fairchild's attempted manipulations of the judicial system in ways quite inconsistent with the 1989 IQ test results and the resulting inference of mental retardation. These instances do not reveal him as passive or as being easily subject to suggestion. See Dr. Hearnsberger's report of October 21, 1974, and a petitioner's conduct (e.g., feigning hallucinations) in 1983 at the State Hospital that resulted in the finding of malingering. There is much of the "conman" in Mr. Fairchild and this could have been noted by those testing him if they had carefully reviewed the entire record that is available.

PERSPECTIVE: ISSUES AND NON-ISSUES.

Few issues stir us like the death penalty. But courts cannot, and must not, let public opinion or the personal opinion of the individual judge (whether that be for or against the death penalty as a matter of state legislative policy), or the arguments over the wisdom or efficacy of that penalty, affect them in discharging their judicial function. The role of the courts is quite limited. They must attempt to see to it that the law is followed and that the constitutional rights of the defendant are protected. There can, of course, be some tension in this area if defendants are given the right to waive compliance with the law or the Constitution. See discussion below. But ordinarily, the path of judicial duty is clear.

The Supreme Court has ruled that the states may enact laws permitting the imposition of the death sentence as the penalty for certain crimes and under certain conditions. The State of Arkansas and some 36 other states, through legislative action, have opted to permit the death penalty in certain cases. Unless and until the Supreme Court changes its position, the central battleground of ideas on this issue—the place where the pros and cons must be argued out—will be in the state legislatures.

The constitutionality of the Arkansas death penalty statute has so far been upheld for the crime of capital murder even in circumstances such as we have here, that is, even where the defendant may not have been the person who actually killed the innocent victim and, indeed, may not even have had any reason to believe that his accomplice would kill the victim.

Death penalty cases are different from all other cases. Courts have an obligation in such cases not only to follow the law but to attempt to carefully explain their rulings. Their opinions can help serve the didactic function of informing the public of the real issues and the non-issues in particular cases. The court can attempt to delineate what is reasonably subject to debate and controversy and what is not. It is for that reason that the court has gone to such lengths to identify the issues and to explain the evidence and the bases for its factual findings and legal conclusions in both the present and the prior habeas proceeding.

Upon the basis of all the evidence, the Court is convinced that there can be no reasonable doubt concerning Mr. Fairchild's actual involvement in the crimes against Ms. Mason as confessed by him on March 5, 1983; that there can be no reasonable doubt that his confession was free and voluntary and not the product of suggestion or coaching; and that there can be no reasonable doubt that Mr. Fairchild knowingly and intelligently waived his "Miranda

Rights" (which he accurately understood) before confessing on March 5, 1983.

The Court, having considered all of the evidence, the opinions and the arguments, what is its present assessment of Mr. Fairchild's intelligence and cognitive abilities? The answer is that it is about the same as the less focused assessment that it had *before* the 1989 IQ tests were performed, to wit: Mr. Fairchild is considerably below average in his intelligence and cognitive abilities but he is clearly not "mentally retarded" as that term has been explained by the experts and is understood by the Court.

Should people of Mr. Fairchild's background and mental level or status be subject to the death penalty? As stated by Judge Richard Arnold in *Smith v. Armontrout*, 865 F.2d 1502, 1506 (1988):

> The whole presupposition of the criminal law is that most people, most of the time, have free will within broad limits. They are capable of conforming their actions to the requirements of the law, and of appreciating the consequences of failing to do so. Without this fundamental moral and legal assumption, punishment, one of the principal purposes of the criminal law, would be an irrational exercise. The watchword of the law is individual responsibility.

The Constitution attempts to draw lines to fit this principle of individual responsibility. Children may not be executed, but the precise age has yet to be finally set by the Supreme Court. Insane people ordinarily may not be executed, or even tried, but the proper definition of insanity continues to be argued. And certainly there is some level of mental retardation that would constitute a complete bar.

It is important to note here that Mr. Fairchild has heretofore been found:

1. To be competent to stand trial, i.e., that he was aware of the nature of the charges against him and was capable of cooperating effectively with his attorneys in the preparation of his defense;
2. To have the capacity, at the time of the commission of the alleged offense (capital murder of Ms. Mason), to appreciate the criminality of his conduct (i.e., basically to know right from wrong) and to have the capacity to conform his conduct to the requirements of the law.
3. To have the capacity to appreciate his position and to make a rational choice with respect to continuing or abandoning the pursuit of his federal habeas corpus rights and that he was not suffering from any mental disease, disorder or defect which would substantially affect that capacity.

In sum, Mr. Fairchild is a sane adult who understands the difference between right and wrong and has the capacity to conform his conduct to what is right. He has not been shown to suffer from any mental disease or defect or to be subject to any compulsion which would prevent, or interfere with, his exercise of free choice to either obey or to disobey the law.

Despite the Supreme Court's efforts to remove the capriciousness attendant all too often to the imposition of the death penalty in the past, there remains—and possibly always will—a certain happenstantial quality: what are the guiding principles which inform prosecutorial discretion in the decision to seek or not to seek the death penalty in individual cases? What are the circumstances that convince juries to assess the death penalty in some cases and not in others? For instance here, was the jury angered by Mr. Fairchild's decision to lie by completely denying his guilt and by falsely accusing the law enforcement officers of using actual force and threats to obtain his confession? Stated otherwise, was Mr. Fairchild's flawed defense strategy in part responsible for the death penalty decision? So some of the happenstantial circumstances incident to the imposition of "the extreme and ultimate" penalty remain, albeit apparently within constitutional tolerance.

Finally, as a matter of legal principle, the Court is not comfortable with the full implication of *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976). The idea that the criminal who has been convicted and sentenced to death may pick and choose—as Mr. Fairchild has here—which

issues he wants to pursue and which he does not clearly leaves open the possibility that the law and the Constitution may not be followed because the convicted criminal may choose not to raise the issue. There is something unseemly in turning over such important decisions to criminals. Does the state itself not have an interest in vindicating its own law, that is in making certain that the law has been followed? Does the state not have an interest in death penalty cases which transcends the "right" of the convicted criminal to waive judicial review of at least certain fundamental constitutional issues? Perhaps the U.S. Supreme Court's decision, if certiorari is granted, in *Simmons v. State*, 298 Ark. 193, 766 S.W.2d 422 (1989) (third party seeking review), will give us some indication whether there will be any limitation placed upon the *Gilmore* waiver doctrine in the habeas area. But at this point, this Court is convinced it must follow *Gilmore* as, indeed, it has in this case and also in *Franz v. Lockhart*, 700 F.Supp. 1005 (E.D.Ark.1988).

Petitioner's Successor Petition for Writ of Habeas Corpus will be dismissed and the stay of execution entered herein on the third day of March, 1989, will be set aside and held for naught.

## APPENDIX A

### REVIEW OF ACTUAL FINDINGS UNDERLYING PREVIOUS RULINGS

[NOTE: Ironically, the evidence and testimony brought forward by the petitioner at the hearings on March 16–21, 1989, would, if accepted, tend to support and reinforce the earlier findings of this Court that Mr. Fairchild was cooperative and forthcoming from the time he arrived at Little Rock until he gave his first videotaped statement. His situation of being in custody was not strange or unfamiliar to him. Mr. Fairchild is portrayed by his witnesses as mildly mentally retarded—suggestible, passive, deferential to and cooperative with authority figures. Even Mr. Parker, one of petitioner's fellow death-row inmates, testified, in effect, that you would not want to be involved in a crime with Mr. Fairchild because, if apprehended, Mr. Fairchild would immediately talk—not because he wanted to but because he could not refrain from talking. And Mr. Thomas Womack, the black ex law enforcement officer who arrested Mr. Fairchild about three times before 1970, testified that each time he would read the *Miranda* rights to Mr. Fairchild and then ask if he wished to talk, invariably Mr. Fairchild would "go on and talk." Mr. Womack testified that when he arrested petitioner, Mr. Fairchild was not resentful. "He always talked." This testimony would, of course, tend to negate any idea that the law enforcement officers had to beat a confession out of Mr. Fairchild after they arrested him in March 1983.

Petitioner's evidence at the March 16–21, 1989, hearing also, if accepted, would tend to negate the other theory of petitioner: that the police officers told him what to say in the videotaped statements and rehearsed him on the story many times and that only then did he give the statements we see on those tapes. But Mr. Parker testified that in order to get Mr. Fairchild to understand his rights, he had to intensively drill him thereon over a period of many months. Mr. Fairchild testified that this training program went on for "a year or two." And Ms. Luckasson testified that, absent a massive, "extraordinary intervention" of this type using good special education methods, Mr. Fairchild could not have achieved the level of understanding he now has of his *Miranda* rights (as evidenced by his near perfect score on the CMR test). So, again, to credit this testimony is to seriously weaken and undermine the theory that the law enforcement officers corruptly made up a detailed false story about Mr. Fairchild's involvement in the Mason tragedy, forced or coerced him into agreeing to state it on videotape, rehearsed him on it in the one hour that he was in custody in Little Rock before the first tape was made—all with the results we now see on the videotapes. It

is suggested on the one hand that it would take a massive educational effort over a protracted period of time to enable Mr. Fairchild to come to his present understanding of his rights and, on the other, that, in a period of one hour or less, Mr. Fairchild could be programmed to perform as we see him on the videotape.

Although the Court does *not* accept petitioner's contention that he is mentally retarded, having an IQ in the low 60s, see discussion above, still it is important to note preliminarily how that evidence, if it were accepted, would bear upon the Court's earlier findings and conclusions. The Court at the earlier hearing evaluated Mr. Fairchild as having below normal intelligence. And that circumstance was considered in arriving at the factual findings made. The Court's general assessment of Mr. Fairchild's mental status has not changed as a result of the evidence presented at the March 1989 hearing.]

The Court again states that none of the evidence presented in this most recent hearing has cast any doubts upon its factual findings of September 11, 1987. On the contrary, the Court remains completely confident of those findings. It is true that the Court's findings do not rest simply upon the testimony of some one witness or one exhibit. The overall factual conclusions result from, and are built on, a mosaic of subsidiary findings. Much of the testimony of the police officers and other witnesses was contradictory and inconsistent. Some of this may have resulted from deficiencies in recollection or lack of candor or even deliberate falsehood. Some officers may have wanted it to appear that the first statements by Mr. Fairchild concerning his involvement in the crimes were made *after* the video camera was first turned on. Some officers who were not as involved in the interview with Mr. Fairchild before the taping may have believed the taped statement was the first statement of the facts made by Mr. Fairchild. But it was clear from the evidence, and indeed it is obvious and beyond question that those who sug-gested making the arrangements for the video recordings knew what Mr. Fairchild's story was before the decision to tape was ever made.

Mr. Fairchild testified about the officers' writing out his statement in five or six lines and then reviewing it with him over and over. The Court did not credit Mr. Fairchild's version, but it does believe that some notes were made by the interviewing officer or officers while Mr. Fairchild was first confessing his involvement shortly after his arrival in Little Rock and after being first advised of his rights.

The task of the fact-finder is to find the truth by moving beyond the imperfections in the evidence: imperfections in perception and recollection; imperfections resulting from bias, prejudice and self-interest; imperfections based on an excessiveness of zeal derived from bad or good motives; imperfections based upon deficient moral or philosophic principles such as that the end justifies the means. The strengths and frailties of human beings are the daily grist of the judicial mill. Sometimes the truth is not to be found in the testimony of one witness or one group of witnesses but, as stated, from a composite or mosaic of facts found, and inferences drawn therefrom, after sifting it all through the processes of reason and commonsense derived from experience. Often facts are best found *seriatim:* as each factual issue is resolved the remaining factual issues become more manageable.

Here, after listening to the petitioner and all of the other witnesses, it became clear to the Court that the law enforcement officers did not physically abuse or threaten petitioner as claimed. The Court noted that Mr. Fairchild was not isolated in a room with only one or two officers after he was returned to Little Rock on March 5, 1983. He was in an area where many officers were present. And they were constantly coming and going. And the officers present were not under only one command. They were from a variety of police jurisdictions. Not only would they all have had to lie, but they would have had to continue to "stonewall" until today. But it

was not the logical implausibility that convinced the Court. It was the testimony of all of the witnesses, including that of Mr. Fairchild, and the circumstantial evidence.

It was next found that the law enforcement officers did not fabricate a story of petitioner's involvement and then train him to regurgitate that story on the videotape. Not only did the Court find that the alleged widespread and grossly evil corruption of officers from the Pulaski County Sheriff's Office, the Little Rock Police Department, the North Little Rock Police Department, the Lonoke County Sheriff's Office and the Prosecuting Attorney's Office for the Seventeenth District (a necessary conclusion from the allegations made and testimony given by Mr. Fairchild)[1] simply did not occur, but the Court also found that petitioner would have been incapable of carrying off such deception on the videotapes. And, indeed, if the objective of this suggested massive, corrupt, conspiracy was to railroad ("lynch" would not be too strong) Mr. Fairchild, why risk it all on the very chancey videotape procedure? Why not lay it all out in a written statement with all of the details clearly and orderly inserted and then have Mr. Fairchild sign and initial it? But, if that is not the true scenario; if, indeed, Mr. Fairchild has confessed his involvement, there really is no problem with using the video, especially since that vehicle would enhance the effectiveness of the statement—assuming again Mr. Fairchild was telling the truth—and would also make it less vulnerable to attack if there were a later recantation.

It has been the Court's experience that law enforcement officers—even federal law enforcement officers—rarely use either auditory or video recordings of defendants' statements and confessions even though it is clear that to do so removes many questions and, indeed, creates a more effective and reliable statement. The Court has never understood this reluctance to use the fairer and more effective vehicle. Although audio and video recordings can be attacked—as the two such recordings made in this case were—they are easier to defend if honestly made because they are not as subject to the suspicion of manipulation or contrivance as are statements simply written out by law enforcement officers and signed by the defendant. Here, for instance, the officers were lead by Mr. Fairchild to believe that he had finished the eleventh grade and could read and write. If they had followed the usual practice of writing out the statement in the handwriting of one of the officers and then having the defendant sign it, its efficacy and reliability could have been attacked later upon a showing that Mr. Fairchild could not read or write.

Although petitioner's attorney suggested to the Court that viewing the videotapes would support the contention that the statement was programmed into Mr. Fairchild and that he was following cues from those in the audience, the Court's initial reaction, as stated above, was that the statements had the ring of truth. The Court has viewed those tapes many times— early on in the 1986 hearings, later after hearing all of the witnesses, and many times since—only to have its original impression reinforced. And it is interesting to note Dr. Johnson's reactions to viewing and listening to the videotapes in 1989 are precisely those that this Court, as the trier of fact, had when it first viewed those tapes in 1986. The Court is convinced that any objective, open-minded person will experience the same reaction.

In the fact-finding process, the Court singled out all of the testimony concerning the watch, all of the testimony concerning the gloves, all of the testimony concerning the "tour" on which Mr. Fairchild took the officers between the two videotaping sessions and, by isolating same, found indicia of reliability. For instance, with respect to the gloves, if one reviews the testimony of all of those who discussed the tour—and

---

1. For instance, Mr. Fairchild testified that before his second video confession he told the deputy prosecutor that in the first video he had told it "the way Tommy Robinson had it wrote out," to which the prosecutor is alleged to have replied, "Well, I just want you to say it the same way."

there were people in two automobiles on that tour—one thing is quite clear: the cars stopped on the way back at a certain point and several of the officers spent a considerable period of time—almost an hour—searching for the gloves. If the whole tour were a hoax, what purpose was served in going through such an exercise? And if we are involved in a fraudulent and corrupt deception, why not at least "find" gloves and use them as additional evidence?

The Court noted that the officers went with Mr. Fairchild on the "tour" *after* he had already given his video confession. In that video, Mr. Fairchild described the route he and his accomplice had taken and described the buildings and settings. He claims he was "rehearsed" to say these things. But if the officers knew he was not really involved but nevertheless wanted him to accurately "confess" to such matters, they obviously would have taken him on the "tour" *before* taping the confession so that he would get the "facts" right.

Little things: Sheriff Robinson stating that he slept through most of the trip, corroborated by Mr. Fairchild and the testimony of other officers; his waking up when Officer Dill stopped the car at the direction of Mr. Fairchild and backed up because Mr. Dill had driven past the proper turning point on the way to the abandoned farm house; Mr. Fairchild's concern about what would happen to his sister if he revealed that it was she who had Ms. Mason's watch until he was reassured by Officer Dill; and so forth.

Ms. Mason's watch deserves particular comment.

It will be recalled that in the first video-taped confession, Mr. Fairchild stated that he had taken "About $70.00" from Ms. Mason. And then he was asked:

LT. WAGGONER: Okay. How about any jewelry?
MR. FAIRCHILD: A watch.
LT. WAGGONER: Who got the watch?
MR. FAIRCHILD: Uh—

LT. WAGGONER: Did you take the watch off or did—
MR. FAIRCHILD: He took it off.
LT. WAGGONER: What did he do with it?
MR. FAIRCHILD: Gave it to me.
LT. WAGGONER: Okay. Do you know what jewelry he kept?
MR. FAIRCHILD: No.
OFFICER CHANEY: What did you do with the watch?
MR. FAIRCHILD: Irene has it.
OFFICER CHANEY: Irene who?
MR. FAIRCHILD: Sister.
OFFICER CHANEY: Your sister, Irene? How much money did you keep?
MR. FAIRCHILD: About $40.00.
OFFICER CHANEY: Ya'll split the money even?
MR. FAIRCHILD: Um-hum.
LT. WAGGONER: She had about $70.00?
MR. FAIRCHILD: Um-hum.
OFFICER CHANEY: Do you know if the woman had anymore jewelry?
MR. FAIRCHILD: No. I don't know if she had anymore jewelry.
OFFICER CHANEY: You didn't see Harold take anymore jewelry?
MR. FAIRCHILD: I didn't see him take anymore jewelry. I never noticed the watch until he brought it up.
DEPUTY SWINT: When did he bring it up?
MR. FAIRCHILD: After we was on our way back.
DEPUTY SWINT: In the car?
MR. FAIRCHILD: Yeah.

It is clear to the Court that Mr. Fairchild had confessed his involvement in the crime before the first videotape was made. And the question of locating the watch came up at that time. Officer Dill testified at the state suppression hearing:

Q. Did you, or any other officer, or any other person whatsoever, threaten or coerce the Defendant Fairchild in any manner, or did you make any promises to him to get him to give that first videotaped statement?

A. He was never threatened in anyway, Mr. Raff. I did tell him, when he asked me if it was necessary to—If he told us where the watch was at, would I charge the person. I told him that if they did not know that it came from the victim, that I would not charge them. Now, that's the only promise that I made.

Q. When was that? Was that on the tour?

A. Right. That was right before we began the tape, and after he had been advised of his rights. (T. 323–34)

With this assurance, Mr. Fairchild disclosed that his sister had the watch. And he so stated on the first video, See, *supra.*

After the first videotaped confession, Mr. Fairchild told the officers that he could direct them to the area of the crime. He also advised that he could locate some property that belonged to the victim. T. 1677. He directed the officers to his sister's home.

Q. [BY MR. RAFF]. After the Defendant showed you where the trooper got after him, and where he threw the gloves out that you did not find, what was your final place to go?

A. [BY MAJOR DILL]. The Defendant stated that he knew where there was a watch that belonged to the victim. He wanted to know, before he directed me to that area where the watch was, if we would charge the people that had the watch. I asked him, in turn, if the people knew where the watch came from. He stated, "No. They did not." I told him that if they did not know where the watch came from—

Q. In other words, from Marjorie Mason?

A. Yes, from Marjorie Mason. If they did not know where the watch came from, we would not charge them. He directed us to his sister's home.

Q. Do you recall her name?

A. Not offhand.

Q. But it was his sister?

A. Yes.

Q. He identified her to you as his sister?

A. That's correct.

Q. Did he tell you how to get there?

A. Yes. He directed us to the house. I went in and got his sister and brought her out to the car. The Defendant told her to give us that watch that he had stolen.

Q. Did she give you the watch?

A. She did.

Q. His sister actually gave you a watch, is that correct?

A. That's correct.

Q. In front of the Defendant.

A. Yes.

Q. In front of some other officers?

A. Yes.

Q. Major Dill, I want to hand you State's Exhibit 49, and ask you if you recognize it?

A. This is the watch. (T. 1682–83)

So, there is clear evidence that the watch was taken from the victim and that that is the watch that was received in evidence at the trial. But it has been stated that there is no *absolute independent* evidence that this was, in fact, Ms. Mason's watch. Although such evidence was not necessary, the proof offered by the State in that connection was very strong, indeed, overwhelming. Dr. John Mason, the father of the victim, Ms. Marjorie Mason, testified as follows:

Q. Dr. Mason, when was the last time you saw her, do you recall?

A. It's been Christmas.

Q. Dr. Mason, did you have occasion to buy her a watch?

A. Yes.

Q. Would you tell the jury the circumstances surrounding that, where you bought it, and what type of watch it was?

A. I ordered three watches for my three oldest children. They were all scuba divers.

Q. All three of them?

A. Yes. I ordered them from, I guess it was, On The Run Company, a mail order firm. They were three Cassio diver's watches. I gave her hers for her twenty-second birthday in December.

Q. Were the three watches identical?

A. No, they weren't. Two of them were men's watches and the other was a smaller lady's watch.

Q. Is she your only daughter?

A. No. She's my oldest daughter, oldest child.

Q. Did you personally give her that watch you bought?

A. Yes.

Q. You said it was a diver's watch?

A. Yes.

Q. Would you describe that watch?

A. It was a Cassio Watersport.

Q. Dr. Mason, I want to show you what's been marked for identification as State's Exhibit 49. And ask you if that watch is similar, and if it is, how similar to the watch that you bought for and gave your daughter, Marjorie Mason?

A. It looks just like it.

Q. Could it be the same watch?

A. Yes.

Q. It has no serial number which with to tell?

A. I don't know. I didn't—it's unusual. These watches came all packaged together in these little styrofoam pellets. They didn't have any guarantees or anything with them. Ordinarily, I write down the numbers and send them in, but these didn't have any.

Q. It does appear to be identical to the watch that you actually gave her?

A. Yes. It's proof tested at one hundred meters.

Q. Did she like the watch and did she actually wear and use it?

A. She put it on. The last time I saw her, she was wearing it.

Ms. Mason's mother, Ms. Sandra Breckur, testified about the watch as follows:

Q. [BY MR. RAFF]. Ms. Breckur, I want to hand you what's been marked and admitted into evidence as State's Exhibit 42, a photograph. I ask you if you can tell the jury what that picture reflects, and who it reflects?

A. It is Greta with her car, Toyota Tercel.

Q. Do you recognize that automobile with the vent windows.

A. Yes, I do. It's her car.

Q. Was that her car?

A. Yes, it was.

Q. Ms. Breckur, do you recall the watch that your daughter use to wear?

A. Yes, sir. It was the week before her death. She spontaneously came to visit us, because she had that Monday off.

Q. I want to show you what has been admitted into evidence as State's Exhibit 49, and ask you if you can tell this jury if you recognize it?

A. Yes, I do.

Q. What is it?

A. It's Greta's watch.

Q. Are you pretty sure that it is?

A. Yes, sir. It is. I noticed—She arrived, I guess, about 10:00 o'clock Friday night. We were in the kitchen. She was standing beside me and I looked at it. I remarked to her, I said, "That's a very attractive watch." It reminded me of her diver's watch that she had once. Also, *I thought it was kind of unique, because of the kind of strap on it. It wasn't solid.* She said, "Yeah. I needed a little more professional watch. All I had was my Snoopy watch, and I had to get another one." (Emphasis supplied)

Q. Ms. Breckur, the last time you saw your daughter alive, was she wearing that watch that you are now holding in your hand?

A. Yes, sir. She left Monday afternoon and returned and came back to Little Rock. She was wearing that, at that time.

MR. RAFF: Thank you.

THE COURT: Cross examine.

### CROSS EXAMINATION BY MR. O'BRYAN

Q. Have you looked at the watch since the time that Greta came in to see you back in—

A. Yes, I did.

Q. When was that?

A. I guess it was about three days ago. I also have in my possession the—I guess you would call it the guarantee that came with it.

Q. Instructions?

A. Yes, sir. That came with her personal effects.

Q. When you were thinking about the watch, when you saw it before and Greta was wearing it, do you recall the red area being on the face of the watch, specifically?

A. No, sir. Not specifically. I remember the digital. She kind of chuckled about it, and she said, "Yeah, it's easier to see a digital than trying to watch the second hand on a regular watch."

Q. It certainly is. But the red area on there is not something that you remember specifically about?

A. Not specifically, no, sir.

Q. In fact, looking—You do remember the black being on there?

A. Most definitely, yes.

MR. BRYAN: No further questions.

THE COURT: Redirect.

### REDIRECT EXAMINATION BY MR. RAFF:

Q. Ms. Breckur, does that look just like the watch your daughter had on the last time you saw her?

A. Yes, sir.

Q. Are you sure of that?

Q. Yes, sir.

The watch, State's Exhibit 49, is part of the trial record. It is exactly as described by Dr. Mason and shows that it was "water resistant" to "100 meters." And the strap has holes in it as Ms. Breckur stated. So, although Dr. Mason said that he had kept no record of its serial number, the identification evidence is overwhelming.

When Mr. Fairchild recanted his confession, he had to come up with an explanation about the watch. That explanation is found in the trial transcript of Mr. Fairchild's testimony as follows:

Q. Did you ever give your sister a watch?

A. Yes, sir.

Q. How long ago was that?

A. Back in the last part of December.

Q. Where did that watch come from?

A. I got the watch from a guy at McAlmont.

Q. Do you know his name?

A. I didn't know his name. They called him Ham.

Q. Is that just the name he goes by?

A. Nickname, I imagine.

Q. Had you ever seen him before that?

A. I seen him around, but I didn't know him. Just a guy you see around.

Q. What were the circumstances? Why were you at the same place where Ham was?

A. Right there where we was was an old gambling house where they shoot dice and shoot pool and stuff like that at.

Q. What else do they do there at this place?

A. Shoot dice, shoot pool and that's about it.

Q. Anything else. Do they drink beer?

A. Yeah, they drink beer and stuff like that.

Q. Is this a place of business or just kind of a place?

A. Just kind of a place.

Q. It's not a business?

A. I wouldn't say that.

Q. Are they suppose to be selling beer?

A. Don't nobody know that.

Q. Are they selling it or do people just bring it?

A. They're selling it.

Q. Is it like a store front or a house or what is it?

A. Just like an old house.

Q. Where is the place?

A. In McAlmont.

Q. Do you know what street it's on?

A. No.

Q. Tell me about Ham? You say you and Ham were talking. How did the watch come up?

A. I was standing there around the table where they were gambling at.

Q. Were you gambling?

A. No, I wasn't gambling. I was standing there around the table where they were gambling at. He walked up to me and asked me, did I want to buy a watch. I said, "No." I told him I didn't have no use for any watch. I just turned and walked out the door and was fixing to get in my car. When I got to getting in my car, he walked up to me and showed me the watch. I looked at it. He said, "I will take fifteen or twenty dollars for it." I said, "Well, it looks a pretty good old watch." I gave him fifteen dollars for it.

Q. What did you do with it?

A. I just put it in my pocket.

Q. Then what did you do with it?

A. I went over to my mother's house, and was around over there for about an hour. I showed it to my sister. She said that she liked it, so I gave it to her.

Q. You gave it to her?

A. Yeah, I gave it to her. She gave me twenty dollars for it when she got her check.

Q. What kind of check?

A. Welfare.

Q. Has she got some kids?

A. Yeah.

Q. About how long was that now before you went off to Russellville on the bus?

A. How long was that?

Q. From the time you got the watch before that trip you made to Russellville?

A. It was around the 26th or 27th of December.

Q. You mean right after Christmas?

A. Right after Christmas, right.

On cross-examination, he testified:

Q. What else was written out on all those lines, Mr. Fairchild? How about the watch? How about you stealing her watch and taking it to your sister's and selling it for twenty dollars. Did they write that out for you?

A. Just like I said, I didn't steal no watch.

Q. Did Larry Dill handwrite that out on this white sheet of notebook paper for you to memorize?

A. No.

Q. He did not write anything out about the watch?

A. He told me that.

Q. He just told that to you?

A. Yeah.

Q. You remembered it?

A. Yeah.

Q. Did he tell you twenty dollars?

A. He asked me what could I sell a watch—How much would a watch be worth?

Q. Larry Dill asked you that?

A. Yes. He asked me how much is a good watch worth. Chaney said, "about twenty dollars."

Q. They told you to come up with that figure?

A. Yeah.

Q. Mr. Fairchild, a minute ago you told this jury that you, in fact, said that some guy told you it's worth twenty dollars, is that right?

A. Yeah. That's what I'm saying. That's what they was writing out.

Q. You are saying Larry Dill just happened to come up with the same figure that this fellow that you claim

you got this watch from sold it to you for?

A. Yeah.

Q. Just coincidence?

A. Right.

Q. Have you ever seen that watch before?

A. The same one or one like it?

Q. Are you going to tell that jury where you got it, Mr. Fairchild?

A. Yeah.

Q. Are you going to tell them the truth?

A. Yeah. That looks like the same one I got out at McAlmont.

Q. You got from some guy named Ham, is that right?

A. Yeah.

This review of the evidence concerning the watch should, in itself, make clear the involvement of Mr. Fairchild in the crimes against Ms. Mason far beyond any reasonable doubt. It should be remembered that Mr. Fairchild contends that he is innocent and knew nothing of the facts and circumstances surrounding those crimes. It is his contention that all of the factual information contained in the videotaped confessions was fed into him and that he was "rehearsed" to repeat that information on the videotapes. Part of that information dealt with the watch. In the first video, Mr. Fairchild states that a watch was taken off of Ms. Mason by his accomplice and was given to him on their way back from the scene of the crimes. When he was asked what he did with it, he responded, "Irene has it." And then he identified Irene as his sister. Immediately after the first videotape, he took the officers on the "tour" and, near the end of that tour, he directed them to the residence of his sister. Then Mr. Fairchild directed his sister to turn the watch he had given her over to the officers. She thereupon gave the officers the watch which later became State Exhibit 49, the Casio scuba diver's watch which appears in the record.

Although the record is silent on the point, it is possible that the officers, through their prior investigations, had learned that Ms. Mason was wearing a watch when she was abducted. If so, it can be argued that it is possible that they could have programmed Mr. Fairchild to state that the watch had been taken from Ms. Mason, but how would one account for the statement that he had given the watch to his sister, Irene? It is not possible that the officers could have known that, except out of the mouth of Mr. Fairchild on the morning of March 5, 1983. Everyone acknowledges that the watch was then picked up on the "tour" before dawn from Mr. Fairchild's sister, and that watch turns out to be the scuba diver's watch, tested to a depth of a 100 meters (almost 300 feet), precisely as described by Dr. Mason.

Or, assume a different sinister scenario: if the police knew that a watch had been taken from Ms. Mason, they could ask Mr. Fairchild if his sister had a watch. If he said yes, then they could command him to tell the story that we see on the videotape and expect to corroborate it later by obtaining a watch from Mr. Fairchild's sister. However, to make this turn out right, the watch they would find in Mr. Fairchild's sister's possession would have to be the same type as that described by Dr. Mason, to wit: a scuba diver's Casio depth tested for 100 meters. Also, Mr. Fairchild's sister would have to state that her watch had been given to her by Mr. Fairchild. Again, preposterous!

Additional police work could have added to the certainty, but such was in no way necessary. For instance, the watch at issue does have a serial number on it. And we have Dr. Mason's testimony that he ordered this watch (and two others) from a mail order firm known as "On The Run." And we know that he gave Ms. Mason the watch for her 22nd birthday in December of 1982. Inquiries could have been made of the manufacturer and the mail order house concerning the watch to show that it had in fact been shipped to Dr. Mason in Florida and that the serial number was the same as the serial number on the watch picked up from Mr. Fairchild's sister on

March 5, 1983. And this information could then have been compared with Mr. Fairchild's story as to how he got possession of the watch on December 26 or 27, 1982, from the man called "Ham," at McAlmont, while other evidence discloses that Ms. Mason did not even move to Arkansas until early to mid February 1983. The police authorities probably considered this as completely unnecessary "overkill" since they had Mr. Fairchild's confession which had been confirmed by the retrieval of the watch and by its clear identification by Ms. Mason's father and mother. And it is probably too late to run such a redundant check now, business record retention practices being what they are.

The Court has reviewed some of its fact-finding processes because petitioner has obliquely attacked those findings in this most recent proceeding and because death penalty cases simply are not like any others. They should receive and do receive extraordinary judicial scrutiny. The trial court during the suppression hearing and the jury during the trial have reviewed the evidence and petitioner's contentions about the confessions. The trial court found that Mr. Fairchild's statements were made voluntarily after petitioner had been properly advised of his rights. The jury listened to the evidence, including Mr. Fairchild's testimony, and found his guilt beyond a reasonable doubt. The trial court record was reviewed by the Arkansas Supreme Court which affirmed the verdict and the sentence. This Court heard the habeas challenges made by petitioner and found them without merit. The Court of Appeals for the Eighth Circuit affirmed.

Mr. Fairchild's successor petition for habeas relief has not only caused the Court to deal with the new evidence presented, but to also review again the entire record. Of course, that record is extremely important to an understanding of petitioner's mental status and condition in March 1983. But a by-product of that review in a death case is the reexamination of past decisions in order to determine if there were any material flaws or errors therein. The Court concludes there were none. So, as stated in the Opinion herein, there really is no reasonable basis for doubting Mr. Fairchild's involvement in the rape and murder of Ms. Mason on February 26, 1983.

One can question whether the jury would have sentenced Mr. Fairchild to death had that jury, at the sentencing hearing in 1983, heard all of the evidence presented to this Court during the March 1989 proceedings. Of course, one must first speculate as to how much of that "evidence" concerning his IQ and possible mental retardation might have been generated by testing back in 1983. But assume that only the evidence which this Court has credited in these proceedings had been presented to the state jury that is: Evidence that Mr. Fairchild has a dull, below normal, level of intellectual functioning; that he had a disastrous school experience, failing his way through the ninth grade; that he is a functional illiterate; and that he may have been susceptible to manipulation or suggestion by others. Would that evidence have made any difference to the jury?

It will be remembered that the *direct* knowledge that the jury had about the crime came from Mr. Fairchild's confessions. He admitted that he raped Ms. Mason but stated that his accomplice actually shot her in his absence and to his surprise. Indeed his description shows that he was upset when he saw what had happened. Under these circumstances, might such evidence about his mental status have tilted the jury's verdict in favor of a sentence of life without parole?

Of course it is tempting but not fruitful to speculate. The jury may have been angered by its awareness that Mr. Fairchild was lying in denying his guilt and in making unfounded charges of brutality against the police. His defense strategies may have prejudiced the jury against him.[2]

---

2. If he had taken the stand and admitted his involvement to the extent reflected in the video, i.e., denying his direct participation in the murder, then perhaps the sentence would have been life without parole. One wonders if his trial strategy was motivated by the same reasoning that was responsible for his decision to waive all habeas challenges that did not have the po-

And the jury's actual impression of Mr. Fairchild's mental status back in 1983 might well have been accurate; that is, the jury may have seen him exactly as the evidence today reveals him. If so, one could assume the verdict would be the same.

Even if one could contend that Mr. Fairchild's counsel at his 1983 jury trial was ineffective for not developing evidence at the sentencing phase concerning petitioner's mental status—and the record clearly indicates to the contrary—we are faced with an insurmountable roadblock of Mr. Fairchild's own choosing: He has specifically and emphatically waived any and all habeas challenges which, if successful, would result only in the possibility of changing his death sentence to one of life without parole. And this Court, following *Gilmore v. Utah*, 429 U.S. 1012 (1976), has already held that a competent adult can waive his federal habeas claims if he does so knowingly and intelligently. [And Mr. Fairchild's competency has been established to the satisfaction of the Court.] Indeed, the Court has decided that such a person can waive certain claims while going forward with other challenges, i.e., he or she can pick and choose. And at the beginning of this most recent proceeding, Mr. Fairchild reconfirmed his desire to make no challenge or attack which did not hold forth the ultimate possibility of freeing him entirely from this charge and from prison custody.

tential of requiring his release from prison, to wit: "I will do what I can to beat the rap but if I fail I would prefer to die than to spend the rest of my life in prison."